**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 21-mj-71 (ZMF)** |
| | **:** | |
| **ERIC MUNCHEL,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| _____ | **:** | |

**APPEAL OF RELEASE ORDER AND**
**EMERGENCY MOTION FOR STAY PENDING APPEAL**

The United States appeals a Middle District of Tennessee Magistrate Judge's release order, which takes effect Monday, January 25, at 11:00 a.m. EST, and moves for an emergency stay until the appeal is resolved.

## INTRODUCTION

Armed with a taser and clad for battle in fatigues, a tactical vest, combat boots, gloves, and a gaiter that revealed only his eyes, the defendant, Eric Munchel, stormed the United States Capitol on January 6, 2021. Upon penetrating the building through a door breached by insurgents, the defendant grabbed a handful of Capitol Police flexicuffs and exclaimed: "Zip ties. I need to get me some of them mother----s!" Then, with his co-conspirator, Lisa Eisenhart—who also wore a tactical vest and took flexicuffs—the defendant joined a group of insurgents searching for Members of Congress. Surrounded by insurgents exhorting veiled threats such as "Treason!", "Anybody home?", "They're cowards!", and "Are you afraid?", the defendant infiltrated the Senate chamber—only minutes after the Senate body, including the Vice President of the United States, had been evacuated. The invasion halted the proceedings of a Joint Session of Congress, which had convened to certify the Electoral College vote as required by the Twelfth Amendment.

Government Appeal Exhibit No. 1



Four days after the Capitol insurrection, on January 10, 2021, the FBI executed a search warrant at the defendant's Nashville home, where they found the tactical gear he wore on January 6, five pairs of plastic flexicuffs, a black taser holster, and an arsenal of firearms—including assault rifles, a sniper rifle with a tripod, other rifles, a double barrel shotgun, other shotguns, pistols, a drum style magazine, and hundreds of rounds of ammunition. The defendant was later taken into custody in the Middle District of Tennessee under a criminal complaint issued by a Magistrate Judge of this Court. He is charged with civil disorder by impeding law enforcement and federally protected functions, entering restricted grounds, felony violent entry, and conspiring with Eisenhart to commit those offenses. The investigation continues.

The government moved for pretrial detention. On January 22, 2021, a Magistrate Judge in the Middle District of Tennessee ordered the defendant's release to home confinement, but stayed the order's execution until 11:00 a.m. on Monday, January 25, to afford the government the chance to appeal. The government appeals and requests an emergency stay until the appeal is resolved.

## BACKGROUND

### I.     Procedural History

On January 10, 2021, the defendant was arrested in Tennessee under a complaint/warrant issued by Magistrate Judge G. Michael Harvey.  The complaint charged the defendant with entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a) (a misdemeanor), and violent entry on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2) (a felony).  The defendant made his initial appearance in the Middle District of Tennessee on January 11, and the government moved for detention.  Based on subsequently obtained evidence, the government applied for, and Magistrate Judge Zia M. Faruqui approved, a new criminal complaint jointly charging the defendant and Eisenhart with the same offenses, along with civil disorder (a felony), in violation of 18 U.S.C. § 231(a)(3), and conspiracy to commit that and the two offenses in the original complaint, in violation of 18 U.S.C. § 371.  On January 22, Magistrate Judge Jeffrey S. Frensley of the Middle District of Tennessee conducted a preliminary and detention hearing. Magistrate Judge Frensley found probable cause, denied the government's detention motion, and ordered the defendant released to home confinement.  At the government's request, Magistrate Judge Frensley stayed the release order until Monday, January 25 at 11:00 a.m. EST.[1]

### II.     The Government's Allegations

The government's investigation—to date—establishes the following:

### A.     The Capitol Incursion

On January 6, 2021, at approximately 1:00 p.m., a Joint Session of the House of Representatives and the Senate convened to certify the Electoral College vote in the 2020

---

[1] The government ordered a copy of the transcript of the hearing on an expedited basis and will deliver it to the Court upon receipt.  The only government exhibit marked at the hearing was the affidavit in support of the criminal complaint.  ECF No. 1.

Presidential Election.  Vice President Michael R. Pence, in his constitutional duty as President of the Senate, presided over the Joint Session.  The Capitol's exterior plaza was closed to the public, but a large crowd began to gather outside as the Joint Session got underway.

As the House and Senate proceedings ensued, crowd members forced their way through, up, and over Capitol Police barricades and advanced to the building's exterior façade.  Capitol Police officers attempted to maintain order and stop the crowd from entering the Capitol building, to which the doors and windows were locked or otherwise secured.  Nonetheless, shortly after 2:00 p.m., crowd members forced entry into the Capitol building, including by breaking windows and assaulting Capitol Police officers, while others in the crowd encouraged and assisted those acts. The crowd was not lawfully authorized to enter or remain inside the Capitol, and no crowd member submitted to security screenings or weapons checks by Capitol Police or other security officials.

Shortly thereafter, at approximately 2:20 p.m., House and Senate Members (including Vice President Pence)—who had withdrawn to separate chambers to resolve an objection—were evacuated from their respective chambers.  Less than 30 minutes after the evacuation, some of the crowd that had breached the Capitol, including the defendant, stormed into the Senate chamber. The Joint Session and all proceedings of the Congress remained suspended while Capitol Police and other law enforcement agencies worked to restore order and clear the Capitol of the unlawful occupants.  Later that night, law enforcement regained control of the Capitol.  At approximately 8:00 p.m., the Joint Session reconvened, presided over by Vice President Pence, who had remained hidden within the Capitol building throughout the insurrection.

In the course of the insurrection, approximately 81 Capitol Police and 58 MPD officers were assaulted, including one Capitol Police officer who died.  Additionally, four citizens died; many media members were assaulted and had cameras and other news gathering equipment

destroyed; and the Capitol suffered substantial damage—including broken windows and doors, graffiti, and residue of various pepper sprays, tear gas, and fire extinguishers deployed both by insurgents who stormed the Capitol and by Capitol Police officers trying to restore order.

**B.**    **The Defendant's Conduct at the Capitol**

**1.**    ***The Criminal Complaint***

As set forth in the affidavit in support of the complaint, ECF No. 1, on January 4, 2021, the defendant and his mother, Eisenhart, traveled from Nashville to Washington to participate in the January 6 "March for Trump."  Shortly after 2:00 p.m. that day, the defendant and Eisenhart, dressed in combat attire, stormed the Capitol.  They eventually breached the Senate chamber alongside other insurgents searching for Members of Congress.  The below photographs depict the defendant and Eisenhart in their tactical gear, inside and outside of the Capitol.  Government Appeal Exhibit No. 1 shows the defendant in the Senate chamber, equipped with plastic zip ties, or "flexicuffs" (which are used by law enforcement as hand restraints), a cell phone strapped to his chest (which the FBI would later confirm was videotaping the incursion), and a holster on his right hip; Government Appeal Exhibit No. 2 also depicts the defendant in the Senate chamber; Government Appeal Exhibit No. 3 shows the defendant and Eisenhart together outside the Capitol before the building was breached; and Government Appeal Exhibit No. 4 shows both the defendant and Eisenhart approaching the Senate chamber, equipped with flexicuffs.

Government Appeal Exhibit No. 1



Government Appeal Exhibit No. 2



Government Appeal Exhibit No. 3



Government Appeal Exhibit No. 4



Later that night, January 6, 2021, MPD officers encountered the defendant in the area of the Grand Hyatt Hotel, where he and Eisenhart stayed from January 4 to 7.  One of the officers observed a black holster on the defendant's right hip, along with the black grip of what appeared to the officer at that time to be a firearm.  Officers spoke with the defendant, who allowed them to remove the item from the holster.  The item turned out to be a black and yellow "Taser Pulse," a weapon designed to administer an electrical shot.  Officers confiscated the weapon.  The taser is shown in Government Appeal Exhibit No. 5, below.  The defendant told the officers that he possessed the taser for his own protection while he participated in "First Amendment assemblies" earlier that day.  The defendant was identified at that time by his Tennessee concealed weapons permit.  *See* ECF No. 1, ¶ 21.



Government Appeal Exhibit No. 5



The day after the insurrection, January 7, 2021, the defendant told a reporter for *The Times* (of London) that he had traveled to Washington "to show that we're willing to rise up, band together and fight if necessary.  Same as our forefathers, who established this country in 1776."  *See*  https://www.thetimes.co.uk/article/trumps-militias-say-they-are-armed-and-ready-to-defend-their-freedoms-8ht5m0j70 (last viewed January 23, 2021).  He elaborated that the insurgence upon

the Capitol was "a kind of flexing of muscles," and specified that"[t]he point of getting inside the building [was] to show them that we can, and we will." *Id.* He told the reporter that he was a gun owner, but asserted that he had left his guns in Tennessee due to the District's strict gun laws. *Id.* For her part, Eisenhart claimed to *The Times* reporter that she and the defendant entered the Capitol as "observers"—a claim belied by their combat attire, the flexicuffs they carried to the Senate chamber, the defendant's taser, and further video evidence described below. *See* ECF No. 1, ¶ 27.

### 2.    *Subsequently Obtained Video/Audio from the Defendant's Cell Phone*

In the course of its investigation, the FBI obtained the defendant's cell phone, which he had mounted to his chest during the insurrection. *See* Government Appeal Exhibit No. 1. The cell phone contained video and audio from the Capitol insurrection, which was not available at the time the current complaint was obtained. The video, which will be made available to the Court, shows Eisenhart in a large crowd outside the Capitol and depicts her and the defendant walking towards the front side. At one point, the video shows an encounter with apparent members of the "Oath Keepers."[2]   The defendant, upon recognizing the group can be heard to state: "Oath

---

[2] In *United States v. Jessica Marie Watkin*s, et al, 21-mj-119 (ZMF), the government alleged that at least three Oath Keepers conspired to obstruct the Joint Session in an effort to stop the certification of the Electoral College vote. According to the affidavit supporting the operative criminal complaint (ECF No. 1 at ¶ 12) in that case:

> Law enforcement and news media organizations observed that members of a paramilitary organization known as the Oath Keepers were among the individuals and groups who forcibly entered the U.S. Capitol on January 6, 2021. The Oath Keepers are a large but loosely organized collection of militia who believe that the federal government has been coopted by a shadowy conspiracy that is trying to strip American citizens of their rights. Though the Oath Keepers will accept anyone as members, what differentiates them from other anti-government groups is their explicit focus on recruiting current and former military, law enforcement and first responder personnel. The organization's name alludes to the oath sworn by members of the military and police to defend the Constitution "from all enemies, foreign and domestic."

Keepers," and bumps fists with one of them.  One apparent Oath Keeper can be heard asserting that, "There's 65 more of us coming."

Around that point in the video, it is evident that crowd members are breaching or attempting to breach the Capitol.  Eisenhart can be heard stating, "We're going straight to federal prison if we go in there with weapons."  The defendant can be heard replying with words to the effect of, "Yeah, that's why I'm not going in there," and Eisenhart can be heard stating, "Let's go put it—we can put 'em in the backpacks."  The video then depicts the defendant and Eisenhart walking towards a low stone wall, where the defendant sets up plastic chairs and helps others climb over the wall towards the Capitol while offering words of encouragement.  Eisenhart likewise can be seen encouraging crowd members to climb the wall and enter the Capitol: "Yeah, go up in there. You can go up in there now."  Moments later, the defendant can be heard stating the words, "take my weapons off before I go in there."  The defendant and Eisenhart then appear to retreat through the crowd to a location where a tactical bag and other items appear to have been stashed.  Once at that location, the defendant and Eisenhart appear to remove items from their clothing and place them in or near the bag.  Eisenhart can then be heard to say: "We're going in"; "the [tear] gas isn't bad"; and "Let's go in, let's go in."

The video then depicts the defendant and Eisenhart pushing through a crowd to draw closer to a Capitol egress.  An unidentified woman can be heard making a reference to "treason," to which the defendant can be heard to reply: "Hell yeah it is!"  Eisenhart can be heard telling a man—who stated that he had been "maced" and claimed to have "punched two of them in the face"—"Good . . . . While everyone else is on their couch, you guys are training, and getting ready for it."  Soon thereafter, the defendant can be heard saying, "We ain't playing fucking nice no god damn more," to which Eisenhart can be heard to reply: "That's right."  Moments later, the video depicts a person

in the crowd telling the defendant and Eisenhart, "You guys look like y'all ready to go."  The defendant can be heard to reply: "F---ing ready to f--k s--t up."  At another moment, a man can be heard shouting, "Congress is shut down! Tear gas packages thrown in the Congress!" Eisenhart can then be heard to exclaim: "They got tear-gassed, mother---ers!  Oh my God.  That is [unintelligible] my best day, to know that they got tear-gassed."  Other people in the crowd can be hear screaming, "F--k that, this is our house!"

The video further shows the defendant and Eisenhart crawl through a broken metal guardrail outside the Capitol, as the defendant exclaims, "Hell yeah, baby!"  Once they reach the front of the Capitol, Eisenhart can be heard exclaiming, "The story of how we got in is going to be great—who got us in the house," and the defendant replying, "Probably the last time I'll be able to enter the building with armor and . . . f---ing weapons."  With the sounds of shattering glass and breaking windows in the background, the defendant can be heard shouting, "I guess they thought we were playing!"  The defendant and Eisenhart can then be seen breaching the Capitol entrance amidst a throng of insurgents.  Eisenhart and others can be heard shouting, "Treason!"  Around this point on the video, the defendant can be heard to state: "Don't break s--t,"; "No vandalizing s--t,"; and "We ain't no god damn Antifa, mother---ers."

Finally, the video shows the defendant spot plastic zip ties—flexicuffs—on a cabinet inside a hallway in the Capitol and exclaim: "Zip ties! I need to get me some of them mother---ers."  The defendant can then be seen grabbing several plastic flexicuffs and Eisenhart can be seen carrying flexicuffs as well.  Later, the defendant and Eisenhart are depicted entering the Senate gallery, while other crowd members seeking Members of Congress can be heard yelling— "Anybody home?"; "They went into the tunnels"; "Where'd you go?"; "They're cowards!"; "Are you afraid?"; and "Treason!"  The video also shows the defendant and Eisenhart leaving the Senate

gallery, and Eisenhart stating, "Don't carry the zip ties, just get 'em out of their hand, out of [unintelligible] get 'em out of our hands."

### C.     Reported Assault by Defendant

On the evening of January 6, 2021, after the insurrection, an individual posted a video of the Grand Hyatt hotel lobby on Twitter.  The person then posted a message that read: "After I took this video, several Trump supporters harassed me and tried to follow me to my room.  One accused me of being 'antifa.'[3]  Hotel security intervened and moved me to new room.  What a weird day." *See*  https://twitter.com/WilliamTurton/status/1346980284252745729 (Last accessed on January 23, 2021).  The person added: "The Trump supporters demanded that I delete the video.  One woman flashed her taser at me, and threatened to mace me." *See* https://twitter.com/WilliamTurton/status/1347024856416714752 (last viewed January 23, 2021). Two days later, on January 8, based on another video from the Grand Hyatt posted to social media, the person identified the defendant as "one of the people in the hotel lobby who demanded I delete the video, put his hands on me, and screamed at me . . . ." *See* https://twitter.com/WilliamTurton/status/1347699125408641024 (last viewed January 23, 2021); https://twitter.com/WilliamTurton/status/1347699345345417217 (last viewed January 23, 2021). Evidence of this encounter was not presented at the preliminary and detention hearing in the Middle District of Tennessee.

---

[3] According to the Anti-Defamation league, antifa is a loosely organized anti-fascist protest movement that, in some instances, has engaged in violent confrontations.  *See* https://www.adl.org/antifa (last accessed January 24 2021).

D.      **Search Warrant Execution and Additional Investigation**

The government obtained a search warrant for the defendant's Nashville residence, which the FBI executed on January 20, 2021. Inside, the FBI found the tactical gear the defendant wore when he stormed the Capitol and five pairs of plastic flexicuffs:


Government Appeal Exhibit No. 6



The FBI also discovered a safe in the defendant's bedroom, which contained approximately 15 firearms, including assault rifles, a sniper rifle with a tripod, a double barrel shotgun, other rifles, shotguns, pistols, and hundreds of rounds of ammunition. The FBI also found inside the bedroom a .22-caliber pistol, dozens of rounds of ammunition, a drum style magazine, and multiple empty and full magazines. The defendant's arsenal is depicted below.

Government Appeal Exhibit No. 7



Additionally, around the same time that the FBI executed the search warrant and it was clear that the defendant was a criminal suspect, it appears that he took steps to evade detection, including: avoiding his residence and workplace, deactivating his Facebook account, and giving his cell phone—which contained highly inculpatory footage of the Capitol siege—to an associate.

# ARGUMENT

## A.    Legal Standard

Because this Court has original jurisdiction over the defendant's prosecution, it has sole authority to review the Magistrate Judge's release order and may stay that order pending review. *See* 18 U.S.C. § 3145(a)(1) ("If a person is ordered released by a magistrate, . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release."); *see also, e.g.*, *United States v. El-Edwy*, 272 F.3d 149, 152-54 (2d Cir. 2001) ("With respect to the decision whether to detain or conditionally release the defendant, . . . section 3145(a) makes clear that the ultimate authority lies with the district that has the primary interest in the question—the district in which the prosecution is pending.").  The review of a magistrate's release order is *de novo*.  *See, e.g., United States v. Tortora*, 922 F.2d 880, 883-84 (1st Cir. 1990); *United States v. Hudspeth*, 143 F.Supp.2d 32, 35-36 (D.D.C. 2001) (Kennedy, J.).

The government may move for pretrial detention in any case, among others, charging "any felony . . . that involves the possession or use of . . . any [ ] dangerous weapon," 18 U.S.C. 3142(f)(1)(D), or involving "a serious risk that such person will flee," *id.* § 3142(f)(2)(A).  The defendant is subject to a pretrial detention request by the government in this case, because (1) he is charged with felony offenses arising from his participation in the Capitol insurrection while armed with a taser, and (2) he poses a risk of flight.  If the Court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, [the Court] shall order the detention of the person before trial."  18 U.S.C. § 3142(e)(1).  A finding of either risk of flight or danger is sufficient for detention.  *See e.g., United States v. Ferranti*, 66 F.3d 540, 543-44 (2d Cir. 1995).  The former

must be established by a preponderance of the evidence, *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996), and the latter by clear and convincing evidence.  18 U.S.C. § 3142(f)(2)(B).  The government may proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).  The Court should consider: (1) the nature and circumstances of the offense, (2) the weight of the evidence, (3) the defendant's history and characteristics, and (4) the nature and seriousness of the danger the defendant poses to any person or the community.  18 U.S.C. § 3142(g).

**B.**   **Analysis**

Each of the four statutory factors favor detention.

First, the nature and circumstances of the offense involve fear, intimidation, and violence— directed at law enforcement, elected public officials, and the entire country.  The defendant can make no serious claim that he went to the Capitol on January 6 intending to engage in peaceful protest or civil disobedience.  Instead, the evidence supports the conclusion that he intended to contribute to chaos, obstruct the Electoral College certification, and sow fear.  This is illustrated by the defendant's preparation before reaching the Capitol and expressly stated intent: the defendant dressed in combat attire from head to toe; armed himself with a taser (and, appearing from his own cell phone video and audio recording, a more dangerous weapon); and told a reporter that his intent in going to the Capitol was "a kind of flexing of muscles" and that he was ready to "fight if necessary."  Once at the Capitol, the defendant's conduct was consistent with that expressly stated intent: the defendant helped and encouraged other insurgents to ascend a wall to access the Capitol; exclaimed that he was "F---ing ready to f--k s--t up"; affirmed cries of "Treason" by other insurgents; responded to the chaos by exclaiming, "I guess they thought we were playing!"; stormed into the Capitol through a breached door; grabbed Capitol Police plastic flexicuffs, comprehending that they are instruments of restraint and kidnapping; marched

throughout the Capitol searching for Members of Congress who he believed had committed "Treason"; and infiltrated the Senate chamber.  The nature and circumstances of the alleged offenses all indicate forethought and specific intent to obstruct a congressional proceeding through fear, intimidation, and, if necessary, violence.  These threads—planning, forethought, intent—are all indicative of a capacity and willingness to repeat the offense and pose a clear threat to community safety.  As the defendant himself told *The Times* reporter, "[t]he point of getting inside the building [was] to show them that we can, and we *will*" (emphasis added).

Second, the weight of the evidence against the defendant is immense: he has been photographed and caught on tape inside the Senate chamber in battle fatigues and equipped with flexicuffs; admitted to being armed with a taser; confessed to traveling to Washington to "fight if necessary" and to "show them that we can, and we will" take the Capitol; been recorded on his own cell phone inciting and encouraging other insurgents to breach the Capitol, seeking out Members of Congress once inside the Capitol, and making and endorsing veiled threats; etc.  The evidence amassed so far subjects the defendant to felonies beyond that with which he has been charged so far, including obstructing Congress, interstate travel in furtherance of rioting activity, sedition, and other offenses.  These offenses carry substantial penalties, which incentivizes flight and evading law enforcement—a thought that the defendant already appears to have contemplated by virtue of avoiding his residence and workplace, terminating his Facebook account, and leaving his cell phone with an associate.

Third, the defendant's history and characteristics animate the conclusions drawn from the facts above.  The defendant appears to have assaulted a person whom he, for no reason, associated with a rival extremist group.  He also keeps what can only be described as an arsenal of firearms and ammunition in his home.  Although Tennessee law permits the defendant to maintain such an

arsenal, it nonetheless indicates the continued capacity to carry out the sort or fear and intimidation campaign in which he partook on January 6.  Moreover, the defendant has had several prior contacts with law enforcement.  According to the Pretrial Services Report, he has been arrested on drug possession charges three times, convicted twice, and failed to appear once.

Finally, it is difficult to fathom a more serious danger to the community—to the District of Columbia, to the country, or to the fabric of American Democracy—than the one posed by armed insurrectionists, including the defendant, who joined in the occupation of the United States Capitol. Every person who was present without authority in the Capitol on January 6 contributed to the chaos of that day and the danger posed to law enforcement, the Vice President, Members of Congress, and the peaceful transfer of power.  The defendant's specific conduct aggravated the chaos and danger.  It was designed to intimidate Members of Congress and instigate fear across the country.  Make no mistake: the fear the defendant helped spread on January 6 persists—the imprint on this country's history of a militia clad insurrectionist standing over an occupied Senate chamber is indelible.  Only detention mitigates such grave danger.

## CONCLUSION

There is no release condition or combination of release conditions that will reasonably assure the community's safety or the defendant's return to court.  This Court should stay the Middle District of Tennessee Magistrate Judge's release order and, after a hearing, order the defendant detained pending a trial.  To effectuate the stay, it must be entered before 11:00 a.m. EST on Monday, January 25, 2021.  Proposed stay and transportation orders are attached.

Respectfully submitted,

MICHAEL R. SHERWIN
ACTING UNITED STATES ATTORNEY


_____
AHMED M. BASET
Assistant United States Attorney
IL Bar 630-4552
U.S. Attorney's Office for the District of Columbia
Public Corruption & Civil Rights Section
555 4th Street, N.W.
Washington, D.C. 20530
Email: ahmed.baset@usdoj.gov
Phone: 202-252-7097


_____
J.P. COONEY
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
Public Corruption & Civil Rights Section
555 4th Street, N.W.
Washington, D.C. 20530
D.C. Bar No. 465429
Email: joseph.cooney@usdoj.gov
Phone: 202-252-7281


_____
JUSTIN SHER
Trial Attorney
D.C. Bar No. 974235
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20004
Email: justin.sher@usdoj.gov
Office: 202-353-3909

## **CERTIFICATE OF SERVICE**

I certify that I will provide a copy of the foregoing Appeal of Release Order and Emergency Motion for Stay Pending Appeal to the Federal Public Defendant in the Middle District of Tennessee, which is currently representing the defendant in proceedings before that court.


J.P. COONEY
Assistant United States Attorney
Public Corruption & Civil Rights Section