```
 1                     UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
        * * * * * * * * * * * * * * *    )
 3      UNITED STATES OF AMERICA,        )    Criminal Action
                                         )        No. 21-118
 4                    Plaintiff,         )
                                         )
 5         vs.                           )
                                         )
 6      ERIC GAVELEK MUNCHEL and         )    Washington, DC
        LISA MARIE EISENHART,            )    February 17, 2021
 7                                       )    1:08 p.m.
                      Defendants.        )
 8      * * * * * * * * * * * * * * *    )

 9

10

            TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING
11                     CONDUCTED VIA ZOOM
            BEFORE THE HONORABLE ROYCE C. LAMBERTH,
12                  UNITED STATES DISTRICT JUDGE

13

14      APPEARANCES:

15      FOR THE GOVERNMENT:       AHMED M. BASET, ESQ.
                                  LESLIE GOEMAAT, ESQ.
16                                JUSTIN SHER, ESQ.
                                  UNITED STATES ATTORNEY'S OFFICE
17                                  FOR THE DISTRICT OF COLUMBIA
                                  555 Fourth Street, NW
18                                Eleventh Floor
                                  Washington, DC 20530
19

20      FOR THE DEFENDANT         SANDRA G. ROLAND, ESQ.
                 MUNCHEL:         OFFICE OF THE FEDERAL PUBLIC
21                                  DEFENDER
                                  625 Indiana Avenue, NW
22                                Suite 550
                                  Washington, DC 20004
23

24      FOR THE DEFENDANT         GREGORY S. SMITH, ESQ.
                 EISENHART:       LAW OFFICES OF GREGORY S. SMITH
25                                913 East Capitol Street, Southeast
                                  Washington, DC 20003
```

1     APPEARANCES, CONT'D:

2

        FOR PRETRIAL SERVICES:   CHRISTINE SCHUCK
3

4     REPORTED BY:               LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
5                                United States District Court for the
                                   District of Columbia
6                                333 Constitution Avenue, NW
                                 Room 6706
7                                Washington, DC 20001
                                 (202) 354-3269
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              THE COURT:  Good afternoon.
2              THE COURTROOM DEPUTY:  Good afternoon, your Honor.
3     We're on the record in Case 21-118, United States of America
4     versus Lisa Eisenhart and Eric Munchel.
5              Counsel, please identify yourselves for the
6     record.
7              MS. ROLAND:  Sandra Roland with the Federal Public
8     Defender for Mr. Munchel.
9              MR. SMITH:  Greg Smith for Lisa Eisenhart.
10             THE COURTROOM DEPUTY:  Counsel for the Government,
11    please identify yourself for the record.
12             MR. BASET:  Ahmed Baset on behalf of the United
13    States.
14             MS. GOEMAAT:  Leslie Goemaat for the United
15    States.
16             MR. SHER:  Justin Sher on behalf of the United
17    States.
18             MR. BASET:  I'm not sure if this is being heard,
19    but this is Ahmed Baset on behalf of the United States.
20             THE COURT:  All right.
21             MR. BASET:  I do apologize.  I am having some
22    technical difficulties on my end.
23             THE COURT:  And are the Defendants on the line?
24             MS. ROLAND:  Yes, your Honor.
25             MR. SMITH:  Yes, your Honor.
```

```
 1              MS. ROLAND:  Mr. Munchel is present from CTF by

 2     video.

 3              THE COURT:  I can't see --

 4              MR. SMITH:  As is Ms. Eisenhart -- I'm sorry.

 5     Ms. Eisenhart is also present by video from CTF.

 6              THE COURT:  Can both of the Defendants just raise

 7     your hand if you can see and hear me.  Okay.  I wanted to be

 8     sure you could see and hear me.  All right.

 9              Let me start with -- before we do the arraignment

10     of the Defendants, let me explain where I think we are in

11     the case, counsel.

12              I received yesterday morning the indictment.  It

13     apparently came down Friday night or Friday at some point.

14     I didn't receive it until yesterday.  I tried to set this

15     for a hearing yesterday, but could not get things

16     coordinated with the jail to do it yesterday, so I set it

17     for today.

18              My explanation of how things work, so that counsel

19     know how things work with me, is a district judge is

20     assigned the case upon indictment.  So pre-indictment, there

21     was the complaint that had been filed and the determination

22     by the magistrate on the bond position as stayed by the

23     Chief Judge, who supervises the magistrates and supervises

24     everything pre-indictment, and the appeal of the

25     magistrate's decision on bond to the Chief Judge, which had
```

1    not been determined.  She had ordered the Defendants

2    transported here, and they did not arrive here until Friday.

3           She could have had the hearing, but it was too

4    late Friday to have the hearing on the appeal with the

5    prison.  And at the time of the indictment, the Chief Judge

6    no longer had the power to act in the case.  The power

7    became mine once the case was indicted.  So the power to

8    determine the status of the defendant upon indictment is to

9    the judge assigned to the case, so it is my determination of

10   the status of the Defendants.

11          So normally, the next step is an arraignment,

12   which I plan to do in the next five minutes.  The clerk will

13   arraign the Defendants; and then normally the practice is

14   for the judge in the indicted case to determine the status

15   of the Defendants, a *de novo* determination.  So whatever

16   happened with the magistrate is something I would look at,

17   but I have to find *de novo* what will be the status of the

18   Defendants in any indicted case.

19          Traditionally, many judges of the Court defer to

20   the magistrate.  Here, traditionally, I do not.

21   Traditionally, I just set for myself a status of the

22   Defendants.  And so that is what I will do in this case.

23          I, of course, have the advantage, since I had a

24   day to get ready for this, of reviewing what occurred before

25   the magistrate in Tennessee; so I have reviewed the

1    transcripts, since I had them available, and the documents

2    that were filed in Tennessee and the documents that were

3    filed on appeal here.  So I have those documents and have

4    reviewed them.

5            Normally, the way we do detention hearings and

6    bond status is by proffer, in this Court in any event.  But

7    I'll take whatever proffers the Government wants to make and

8    the Defendants want to make after we do the arraignment, and

9    then I'll determine the status of the Defendants and then

10   we'll try to set a further schedule.  But I just wanted to

11   lay that out as to how we're doing things.

12           So first I'll ask the clerk to please arraign the

13   two Defendants on the indictments.

14           THE COURTROOM DEPUTY:  Your Honor, in Criminal

15   Case 21-118, Defendants Lisa Eisenhart and Eric Munchel have

16   been charged as to Count 1, 18 USC 1512(c)(2) as well as (k)

17   with obstruction of an official proceeding; as to Count 2,

18   18 USC Subsections 1752(a)(1)-(2), (b) and 2, restricted

19   building or grounds; as to Count 3, 40 USC 5104(e)(1), (2)

20   and 2, violent entry or disorderly conduct; and as to

21   Count 4, 18 USC Subsection 2, aiding and abetting.  This is

22   as to both Defendants.

23           I'd ask how both Defendants wish to plead, and do

24   you waive the formal reading of the indictment?

25           THE COURT:  Ms. Roland, why don't you speak for

1    Mr. Munchel first.

2              MS. ROLAND:  On behalf of Mr. Munchel, we do waive

3    a formal reading of the indictment on his behalf.  I'd like

4    to enter a plea of not guilty and assert his statutory and

5    constitutional rights, including the right to a speedy

6    trial.

7              THE COURT:  And Mr. Smith on behalf of the other

8    Defendant?

9              MR. SMITH:  Your Honor, on behalf of

10   Ms. Eisenhart, the same:  We will waive the formal reading,

11   enter not guilty pleas on all four counts, all counts of the

12   indictment, and reserve and request a speedy trial.

13             THE COURT:  You waive reading?

14             MR. SMITH:  Yes, your Honor.

15             THE COURT:  What is the Government requesting

16   regarding Defendants' status?

17             MR. BASET:  Your Honor, the Government is

18   requesting that Ms. Eisenhart and Mr. Munchel remain held

19   pending trial.

20             THE COURT:  Do you want to proceed with your

21   proffer as to why they should be detained without bond?

22             MR. BASET:  Yes, your Honor.

23             THE COURT:  I'll let each Defendant then respond.

24             MR. BASET:  Yes, your Honor.

25             In both --

```
 1                  [Mr. Baset drops off the Zoom call.]

 2             THE COURTROOM DEPUTY:  Mr. Baset, we lost you

 3    after your second word.

 4             MR. BASET:  Mr. Munchel is dressed in camouflage

 5    fatigues and a black vest and he's got a Taser hanging from

 6    his hip in a holster.  He's also got a face covering that

 7    covers not just his mouth and nose --

 8             THE COURT REPORTER:  (Indicating.)

 9             THE COURTROOM DEPUTY:  Excuse me, Mr. Baset.  I

10    apologize.  The court reporter did not hear anything you

11    said.  You dropped off after the first word when you started

12    speaking.

13             MR. BASET:  I do apologize.  I am suffering from

14    some technical difficulties.  I'll try this again.

15             There are no conditions or set of conditions that

16    can assure the community safety.  And the record is

17    supported by that in -- from below.

18             Are you all able to still hear me or no?

19             THE COURT:  Yes.  Yes.

20             MR. BASET:  Okay.  What we have here is a

21    situation where Mr. Munchel and Ms. Eisenhart traveled from

22    Tennessee to Washington, DC, on January 5th and 6th to

23    attend the "Stop the Steal" rally in effect to protest at

24    least initially the electoral vote certification of the 2020

25    presidential election.
```

1          Now, they arrived, however, not as one would

2     expect protesters to arrive, but in full combat gear.  For

3     Mr. Munchel, this entailed wearing black camouflage

4     fatigues, a tactical vest, as well as being armed with a

5     Taser that was available and dangling from a holster on his

6     hip.  In addition, he wore a face covering that covered not

7     just his mouth and nose, but his entire face save for his

8     eyes.

9          And Ms. Eisenhart for her part wore a tactical

10    vest while attending this rally.

11         Now, when they arrived at the Capitol or the

12    grounds of the Capitol, they arrived with the understanding

13    that there's tear gas or pepper spray in the air, that

14    police have set up barricades to prevent them from further

15    approaching and advancing on the Capitol.  They know that

16    police officers are lined up and trying to prevent them from

17    entering as well.  And we know this because of Mr. Munchel's

18    video that he was recording that is visible on his chest, at

19    least 50 minutes of it, when they get on the grounds.  And

20    what we see is both of them completely stopping at no end to

21    try to enter that building.

22         Now, as to why they tried to enter that building,

23    the defense would argue for both that they just -- that this

24    is essentially a field trip that -- you know, in which it

25    just went a bit too far in terms of their trespassing and

1    that that's all this was, a field trip to Washington, DC,

2    for mother and son.

3           But when we look more carefully at some of the

4    statements that Mr. Munchel makes, we know, for instance,

5    that he wants to send, in his words, a clear message to

6    senators and congressmen and that he wants them to know that

7    they're not, quote, "playing fucking nice no goddamn more,"

8    that that's the reason why they are entering that building.

9           And moreover, when they come to the grounds, we

10   know from Mr. Munchel's video that they're not only simply

11   carrying a Taser, but they also have weapons, weapons that

12   Ms. Eisenhart recognizes would get both of them into federal

13   prison.  And so we know that these are weapons of a

14   serious -- that present serious danger, and that they knew

15   better than to bring into the Capitol.

16          The clear inference from that is not what the

17   defense asserts, that this was simply a knife that was put

18   in a bag, but rather most likely firearms; certainly

19   something more serious that a Taser, which is what

20   Mr. Munchel felt comfortable to bring inside.

21          We know, too, that in terms of an analysis of

22   dangerousness, they take these weapons and they put them

23   within -- in the stream of commerce.  They don't hide them.

24   They leave them in a pile of other bags around the crowd

25   that are easily accessible.  So they don't think enough to

1  actually protect these weapons, but they make them readily

2  available to the public.

3          Beyond that, when they do continue to advance,

4  they're assisting others to also advance by setting up

5  chairs and helping them cross barricades.

6          When they enter the building, they can hear the

7  sirens or the alarm of the building going off, which they

8  understood meant that they were not supposed to enter.  And

9  even before entering the building, Mr. Munchel makes a

10  statement that, This is the last time I'm going to be able

11  to go in here while wearing full body armor and weapons.

12  And so both Ms. Eisenhart and Mr. Munchel are fully aware

13  that they're entering this building with weapons.

14          And so once they enter, there's zip ties that they

15  find and that they pick up.  Interestingly, a lot of

16  people -- or it seems like these zip ties are visible to

17  many people as they're passing by.  Mr. Munchel and

18  Ms. Eisenhart take glee in picking up these zip ties.  And

19  we know that they are aware of what the implication of this

20  is, because Ms. Eisenhart as they're leaving the building

21  notes to Mr. Munchel that they need to get rid of these zip

22  ties.  She knows full well what the implication is of their

23  having possessed these weapons or these zip ties while

24  inside the Capitol Building.

25          Moreover, they just don't take these zip ties and

1    put them away or stuff them in a backpack, but they have

2    them readily available for use.

3         And so the defense asserts that they just happened

4    to go inside, spend a few minutes and then leave.  But in

5    reality, we know that they actually go to the very chamber

6    where the Electoral College vote was being certified.  They

7    don't just go and take a few selfies in the Rotunda; they

8    don't go and see the artwork; but they go to the location

9    where this vote was being certified.

10         And the assertion that they did not commit

11    violence that day, while it is technically true that they

12    didn't hurt anyone specifically, that they didn't directly

13    assault anyone, but they should not be given credit for

14    that, at which point we know that, but for the good grace

15    and work of police officers that day and law enforcement

16    that day, the people they ostensibly would have been looking

17    for, the people responsible for certifying that vote that

18    they wished to impede and obstruct from occurring, they were

19    gone.  They were whisked away so that people like Lisa

20    Eisenhart and Eric Munchel couldn't get to them.

21         And we know that that was their intention because

22    that's exactly why they went:  to find them.  And they went

23    dressed for combat and they went equipped with zip ties and

24    a Taser to see that through.

25         They weren't there, and so they didn't have to

1   stay very long.  But at some point, they don't immediately

2   leave.  They still continue.

3           They encounter police officers, two of whom are

4   being assaulted several feet away by another mob.  When

5   those officers are chased away, they don't just let them

6   leave, but Lisa Eisenhart sees the mob rushing towards the

7   police officers that are retreating.  And what does she do?

8   She -- when the police officers descend down the stairs, she

9   looks over the rail and starts yelling at them and calling

10  them traitors.  Mr. Munchel is not far behind.

11          And so we know that these are individuals that go

12  to the Capitol, that they want to stop the Electoral College

13  from -- the certification of that vote.  They go to the very

14  place where that vote is going to be consecrated and they go

15  in combat gear.

16          But beyond that, we know as well that when they

17  leave that day, when they leave the Capitol grounds, that

18  they don't have remorse for what occurred.  They don't have

19  any regret for what occurred.  They consider themselves true

20  patriots and have no regret.  And we know this because of

21  what they tell people in the media in an interview with

22  journalists, indicating that they consider themselves

23  revolutionaries and that they're willing to fight for the

24  cause.  That's what they are willing to do.  And this is

25  something reiterated by both Ms. Eisenhart and Mr. Munchel.

1     Moreover, we know, too, that when they leave and

2     they go back, that Mr. Munchel is engaged in communications

3     with an individual that the Government believes is a leader

4     of the Proud Boys in Tennessee.

5         And so the notion that Mr. Munchel does not have

6     extremist views or that this was just an attempt to protect

7     his mother from getting in trouble or in harm's way during

8     this innocuous field trip to the Capitol is just not

9     supported with the evidence that the Government later

10    uncovered from his phone.

11        More specifically, it is a Signal chat that

12    occurred with this individual on January 9th and 10th, well

13    after both Ms. Eisenhart and Mr. Munchel know about the

14    gravity of the chaos that unfolded at the Capitol and the

15    violence that occurred.

16        And what does Mr. Munchel do?  He maintains

17    contact with this leader of the Proud Boys and he indicates

18    a desire to join this group, even after the fact,

19    specifically indicating that "I always wanted to join your

20    ranks, but didn't know how to go about doing it."

21        The response from this Proud Boy is that "You have

22    a fucking good shot."  And at that point, this individual

23    states, "We'll talk about you being a PB later, Bro.  This

24    is a lot of heat."

25        This is all while Mr. Munchel is aware that he is

1    involved or at least the public is aware of his involvement.

2    He is aware of the need to obtain a lawyer in anticipation

3    of federal authorities descending on him; and yet

4    nevertheless he engages a Proud Boy member to join the ranks

5    of the Proud Boys, understanding full well about the

6    depravity in which they were involved in on January 6th.

7             And so we have two individuals who were most

8    certainly upset about the result of the presidential

9    election.  Indeed, millions of people throughout America

10   were.  But they not only had that belief, but they also

11   traveled to Washington, DC, ostensibly to protest this

12   election.  Indeed, thousands of people also joined them and

13   did the same.

14            But what distinguishes Ms. Eisenhart and

15   Mr. Munchel and what ultimately requires their detention is

16   that they then decide to enter into the Capitol Building to

17   forcibly stop that certification of the vote.

18            But moreover, we know that they're even more

19   extreme than that, because they're among the small

20   percentage of people who enter that building armed with a

21   Taser, armed with the actual instruments to be able to

22   effectuate what their goal is that day.  And that is to stop

23   the certification of the vote.

24            And so for all those reasons, the Government is of

25   the position, one, that there are no conditions or set of

1    conditions that would ensure the community's safety,

2    especially in light of unfolding security threats that are

3    occurring in Washington, DC, and throughout the country,

4    including a rally planned for March 4th.  And so we know

5    that these -- the basis for why Mr. Munchel and

6    Ms. Eisenhart went to Washington, DC, that those -- that

7    basis still exists, especially in light of the new president

8    who they did not want to see take power.

9         These sentiments are not decreasing, and the risk

10   of radicalization and the risk of further involvement in

11   future activities is certainly not diminished.  If anything,

12   it becomes more acute in light of this case brought against

13   them and in light of especially the text messages or the

14   messages we see with Mr. Munchel stating his desire to join

15   these ranks for future operations.

16        And so for those reasons, the Government does

17   believe that detention is warranted.

18        One final argument is that we do believe that

19   there are -- that there's a risk that the Defendants may

20   also pose a serious flight risk.  They do not have a respect

21   for government institutions, as evinced by the events of

22   January 6th.  And there's no reason to believe that they

23   would necessarily follow any of the Court's edicts moving

24   forward.

25        THE COURT:  All right.  Ms. Roland?

1            MS. ROLAND:  Thank you, your Honor.

2            Before I begin, can I inquire of the Court whether

3      the Court has had the opportunity to view the videos that we

4      submitted under seal?

5            THE COURT:  I did.

6            MS. ROLAND:  Thank you.  So I won't belabor those.

7            I also appreciate the Court scheduling us as early

8      as possible.

9            Twenty-six days ago, the magistrate judge ordered

10     Mr. Munchel's release.  The Government obtained a three-day

11     stay and asks for an indefinite stay.  And now he's been

12     detained for 26 days despite a judicial order that he should

13     be released and despite the presumption for release.

14           I heard the Court when the Court began this

15     hearing that the Court disagrees with the analysis that I

16     put forth in our opposition to the Government's appeal, so I

17     don't want to spend too much time on that.  I've made my

18     record.

19           What I think the Bail Reform Act requires, I

20     believe, under 3145(a)(1), the Court's task here is to

21     review the magistrate judge's determination and to decide

22     whether the Government has proved that the magistrate

23     court's findings were clearly erroneous.

24           It is our -- the magistrate court found below that

25     the Government failed to present clear and convincing

1    evidence that no combination of conditions of release could

2    protect the community and that the Government failed to

3    provide a preponderance of the evidence that no combination

4    of conditions of release could assure Mr. Munchel's return

5    to court.

6          It is our view now the Court must review those

7    findings and not simply start at square one and substitute

8    its own judgment.

9          I understand the Court has already ruled against

10   me on that point.  So our position now is that the

11   Government has still failed to present clear and convincing

12   evidence that no combination of conditions of release could

13   protect the community and has failed to provide a

14   preponderance of evidence that no combination of conditions

15   of release could assure Mr. Munchel's return to court.

16         THE COURT:  I'm not saying I couldn't reconsider

17   that.  I just was telling you my practice.  I don't know if

18   I previously made a square-on ruling on that or not.  I

19   understand what you're saying.  I may not have made that

20   clear in light of what the defense argument was.

21         MS. ROLAND:  I'm sorry.  I couldn't hear the

22   Court.

23         THE COURT:  I may have -- I'm not sure I've made

24   it clear I'm ruling on that point you just made.  I don't

25   know that I have -- I'm not unwilling to re-look at the

1    point you just made as to whether I have to do that review

2    or not.

3              MS. ROLAND:  Well, I referred to our pleading and

4    the cases cited therein by our --

5              THE COURT:  I'll look.

6              MS. ROLAND:  Regarding the risk of flight, the

7    magistrate court found that the Government had not shown

8    even a preponderance of the evidence that there was any risk

9    of flight.

10             Mr. Munchel contacted the FBI really right away

11   when he learned there was an arrest warrant.  And then he

12   voluntarily surrendered two and a half hours later, even

13   though he had not been able to find an attorney to go with

14   him, which is of course a reasonable thing to want.  But

15   when he couldn't find a lawyer, he went on his own.

16             The magistrate court also found that he

17   purposefully preserved a video that he took; and that

18   obviously is the bulk of evidence both for and against him

19   in this case.  He preserved it and he made arrangements for

20   his phone to be turned over to the FBI.  So he not only

21   turned himself in; he turned all of the evidence that he had

22   in his possession in.

23             That is not the conduct of a man who intends to

24   flee.

25             As the magistrate court found, conduct that

1     deactivated his Facebook account was perfectly reasonable in

2     light of the fact that his social media, which I think

3     consists only of Facebook, was "blowing up," in the Court's

4     words.

5          And he's received threats.  So that was certainly

6     reasonable conduct.

7          The conditions that the magistrate court set are

8     eminently reasonable:  that he be held on home confinement

9     in the third-party custody of a responsible person and with

10    GPS monitoring.  And, of course, there are many, many other

11    conditions that the Court set, such as that he cannot travel

12    except to Washington, DC, for the purpose of court hearings

13    in this case, that he not possess any weapons, et cetera.

14         But those conditions, you know, are sort of

15    virtually jail, except without all the risks of COVID.  He

16    has to stay home in the custody of someone else with GPS

17    monitoring.  Those are very strict conditions.  And the

18    Government has not shown that those conditions can't

19    reasonably assure his appearance in court.

20         With regard to dangerousness, again, the

21    Government failed in the magistrate court, and I contend

22    they fail to here, to show that the conditions of release

23    set by the magistrate court can't assure the safety of the

24    community.

25         Mr. Munchel has been a law-abiding citizen and a

1   gainfully employed citizen.  He's 30 years old.  He has two

2   misdemeanor marijuana charges on his record.  He enjoys gun

3   collecting, which he does in a perfectly lawful and

4   responsible manner.  He is licensed in Tennessee and

5   Florida, which requires taking classes on gun safety.  He's

6   stored his guns in a safe manner.  Of course, those guns are

7   now in the Government's possession.

8        He has no history of violence and he was not

9   violent on January 6th.  Many people were; and I'm sure the

10  Court has seen some of those people.  He was not.  He did

11  not engage in violence.  He did not threaten violence.  He

12  did not encourage anyone else to engage in violence.  He did

13  not shout slogans in the Capitol or shout at all.  He did

14  not encourage anyone else to do anything illegal.  He didn't

15  coordinate anyone else's activities or exercise any

16  leadership role whatsoever.

17       His conduct during the 11 to 12 minutes that he

18  was in the Capitol was the opposite of violence.  He

19  admonished others not to vandalize, not to break anything,

20  to be careful.  Virtually the whole time he spoke was either

21  to ask his mother, "Where are you going?  What's your goal?

22  What are we doing here?" or to admonish other people not to

23  vandalize or break anything in the Capitol and to be

24  careful.

25       The magistrate court found that he was not part of

1    any antigovernment group or militia group.  There is no

2    evidence that he or his mother engaged in any advance

3    planning in coming here.

4          And when he was in the building, Mr. Munchel asked

5    his mother, "What's the goal here?  What are we doing here?"

6          The magistrate court heard evidence that

7    Mr. Munchel's brother said that Mr. Munchel came to DC to

8    keep his mother safe; and his conduct inside the Capitol

9    bears that out.

10         The Government has had Mr. Munchel's cell phone

11   for six weeks and apparently has pored through it.  And yet

12   the only evidence that they can come up with are these

13   communications with someone who they say they think is a

14   Proud Boy member.  They don't even know who this person is,

15   or at least they're not telling the Court and counsel.

16         It appears from those messages that the person

17   contacted Mr. Munchel, not the other way around.  And I

18   suggest that that evidence is actually helpful to

19   Mr. Munchel.  It bears out everything he's been saying, that

20   he came here to make sure his mother was safe, that he had

21   no intention of fleeing, that he has acted -- you know, with

22   the exception of going into the Capitol, he has acted in a

23   peaceful and responsible manner.

24         The Government has suggested that Mr. Munchel was

25   searching for members of Congress, but there's no evidence

1    of that when you look at the videotapes.  He is following

2    his mother.  His mother never says anything about finding

3    members of Congress.  They seem to sort of wander, you know,

4    upstairs, down some stairs, from room to room.  They

5    wandered into the Senate gallery, the second-floor level,

6    where visitors can watch what's happening in the Senate.

7            There is absolutely no indication before they walk

8    in the door that they know what that building is.  They just

9    walk into an open door.

10           A few minutes into that, they tried to leave; but

11   the door they go to is looked.  They go to another door;

12   it's locked.  Then they find the exit.  And a few minutes

13   after that is when Mr. Munchel says to his mother, "We need

14   to find the exit," meaning the exit to this building.  And

15   they do leave.

16           The Government suggests that, you know,

17   Mr. Munchel wanted to send a message.  Well, we are in

18   Washington, DC.  We see this week after week.  And that is

19   why people protest:  to send a message.  That's the whole

20   point of protest.

21           So of course they wanted to send a message.  They

22   wanted to send a message that they thought that the

23   election -- that there was fraud that was not sufficiently

24   investigated.  There was no message of violence on

25   Mr. Munchel's part.  The message was:  We are protesters.

1    We think something went wrong.  And we are protesting that.

2           And, you know, the same goes for using the words

3    like --

4           THE COURT:  I will say this, though:  You have to

5    tell me what message was being sent by carrying around the

6    zip ties.  That sends a message, too, doesn't it?  And they

7    carried them around.

8           MS. ROLAND:  Well, as we now know, Mr. Munchel did

9    not bring those ties to the US Capitol.  I think when we all

10    saw that --

11           THE COURT:  But he's carrying them around.  What

12    was the message in carrying them around?

13           MS. ROLAND:  He found them there, as we know from

14    the video.  He took some.  Other people took them.  We've

15    seen videos of other people with them.  So he took them.  He

16    never threatened anyone with them.  He never referred to

17    them.  He never -- certainly, he obviously never used them.

18    He saw them there and he took some.

19           THE COURT:  He could have left them there.

20           MS. ROLAND:  Yes.  Well, he never said or did

21    anything indicating that he would use them.

22           THE COURT:  Why did he have them?

23           MS. ROLAND:  Pardon me?

24           THE COURT:  Why did he have them?  Why did he pick

25    them up?

1          MS. ROLAND:  The Government has presented --

2          THE COURT:  You haven't explained that.

3          MR. ROLAND:  The Government has presented no

4     evidence of that.  And that, of course, is their burden.

5          THE COURT:  Well, the jury can decide that.

6          MS. ROLAND:  Yes.  But fortunately, we don't have

7     to decide Mr. Munchel's guilt or innocence today.  We only

8     have to decide -- well, not we; you -- only have to decide

9     whether the Government has met its burden in proving no

10    combination of conditions of release can assure the safety

11    of the public.

12          If not for that video that Mr. Munchel took, we

13    would be laughed out of court if we suggested that he didn't

14    bring those zip ties.  When the world saw that photograph,

15    that's what they -- everyone assumed.  But now we know

16    because of that video that that's not true.

17          He did not come there seeking to take hostages.

18    He didn't even raise his voice.  But in the Capitol, they're

19    following the crowd through; and somebody opens a cabinet

20    and there are these zip ties.  He did regrettably take some,

21    without any indication that he was going to use them.

22    There's not a single word he uttered or a single action he

23    took in the Capitol that would indicate he was meaning harm

24    to anyone.  And in fact, every word he uttered indicated the

25    opposite of that.

1          THE COURT:  Carrying them around is an action.

2          MS. ROLAND:  Pardon me?

3          THE COURT:  Carrying them around is an action,

4    isn't it?  What was the point of that?

5          MS. ROLAND:  I don't think there was any point at

6    all in the carrying.  He took them, and that was a

7    regrettable decision.  But I don't think there was any

8    display of them in a threatening way.  He took them, so they

9    were in his hand.  He was carrying them.

10         So there's nothing beyond the taking of them that

11   is suggestive of ill intent or violence.  It really is

12   just -- he came upon them.  He took some.  His mother took

13   one.  And frankly, I can't swear to it, but in my viewing of

14   the video, I don't think he had a backpack on.  I don't

15   think he had a place to store them, having once taken them,

16   you know.

17         But certainly there was no threat there.  There

18   was nothing in his conduct or his words that threatened to

19   use those zip ties.

20         The Government suggests without evidence that he

21   put, I guess, a gun in the backpack outside the Capitol.

22   But the only evidence on that point is that he had a

23   pocketknife.  That's what he had.  There's no other

24   evidence.  The only evidence is that he put a knife in the

25   backpack.  So their assumptions are not warranted.

1          I would refer first to Mr. Munchel assisting

2     others with chairs.  Unfortunately, the Court doesn't have

3     that part of the video.  I didn't send you the whole 50

4     minutes.  I sent the part inside the Capitol.  But I can

5     proffer that, if the Court is hearing proffers, which I

6     would suggest the Court shouldn't.  But when he was setting

7     up the chairs and was helping people, it was actually

8     helping people climb over a very small wall away from the

9     Capitol.  It was not helping people come into the Capitol.

10    He was on the ground and it was people who, I guess, had

11    been closer to the Capitol and who were wanting to leave.

12    And he's helping them over a small wall so that they could

13    move away from the Capitol.

14          The Court's indulgence.  I just want to look at my

15    notes.

16          The magistrate court found that there was no

17    evidence suggesting that Mr. Munchel came to DC with the

18    purpose of entering the Capitol or causing anyone harm.  And

19    in fact, he didn't.

20          Regarding the Taser on Mr. Munchel's belt:  The

21    Court has seen the video from January 5th, when Mr. Munchel

22    encountered the officers from the Metropolitan Police

23    Department on the street, when they thought at first it

24    might be a gun and not a Taser, and so they asked him about

25    it; and he very politely explained to them that it was a

 1    Taser.  He defused the situation when bystanders approached

 2    Mr. Munchel and the police in a hostile way.  He told them,

 3    you know:  I'm okay.  It's okay.  They're just doing their

 4    job.

 5            And the DC police let Mr. Munchel go with his

 6    Taser because possession of Tasers are legal in Washington,

 7    DC.  And they are legal to actually use when you're using

 8    them in a defensive manner for self-defense.  And that is

 9    why Mr. Munchel had a Taser.  And we can see that in the

10    most recent submission by the Government, the exchanges that

11    were on his phone.

12            He anticipated the possibility, not the

13    inevitability, but the possibility that counter protesters

14    would be there, what I think he would refer to as Antifa.

15    And he was prepared to defend himself and defend his mother.

16    He did not come here with any violent intent, but only with

17    the intent to do what DC law allows:  possess a Taser and,

18    if the unfortunate circumstance arises that you need to do

19    self-defense, then you can.

20            As for the plan that he's dressed for combat, he

21    is wearing what they call a tactical vest.  It's a vest that

22    has lots of pockets.  One of those pockets had his cell

23    phone and videotaped all of it.

24            I would ask the Court not to read anything at all

25    into, you know, the pants and shirt he was wearing or the

1    gaiter that he used as a mask.  I'm sure in walking around

2    the streets of Washington, DC, we see lots of people using

3    their gaiters as a mask.

4           The magistrate also noted Mr. Munchel's support

5    for and even his affection for law enforcement.  The Court

6    could see that in the January 5th video, where Mr. Munchel

7    sees the police and called out to them, "Thank you for your

8    service."

9           He did not harass, harm, threaten, speak harshly

10   to any police officers in the Capitol, because that is not

11   who he is.

12          I think that's all that I had prepared to say.  If

13   the Court has questions, of course, I'd like to answer them.

14   But the magistrate court correctly applied the Bail Reform

15   Act and set reasonable, appropriate and actually quite

16   strict conditions of release.  We'd ask this Court to affirm

17   that on review.

18          THE COURT:  Thank you very much, Ms. Roland.

19          Mr. Smith?  Your turn.

20          MR. SMITH:  I want to start by noting and

21   preserving our argument that the statutes that are charged

22   here do not justify detention, because violence is not an

23   element of any of those offenses.  So our position is that

24   the statutes charged do not even authorize detention based

25   on a finding of dangerousness.

1          But let's start with my client.  She is a
2     57-year-old woman who has never been in trouble at any point
3     in her life.  The only issues she's had is she once drove on
4     a suspended license.  That's it in 57 years.  For 30 years,
5     she's been a nurse.
6          THE COURT:  That's pretty remarkable.
7          MR. SMITH:  I'm sorry?
8          THE COURT:  That's pretty remarkable.  I don't see
9     many defendants like that.
10          MR. SMITH:  We don't see many defendants like
11     that.  That's right.
12          And, you know, I've been doing this a while.  And
13     yes.  This is highly unusual.  We have a 57-year-old person
14     who's here where they're seeking detention who has never
15     dealt with -- never had any criminal background pretty much
16     whatsoever.
17          In addition to that, as the Court notes, she
18     self-surrendered.  The Government indicated that there was
19     some sort of flight risk here, and they mentioned the fact
20     that the charges are pending.
21          Well, you know what?  She self-surrendered after
22     she knew about the charges.  Her son had already been
23     charged, and then they amended them to include her.  She was
24     well aware of the charges.  And despite that, she stayed in
25     touch with the FBI on a daily basis; and as soon as the

1    charges were filed, she self-surrendered.

2           She doesn't even have a passport.  So any notions

3    of flight here I would submit are just -- there's no basis,

4    and certainly not a basis to hold her as opposed to having

5    conditions.

6           This Court's statutory mandate is of course to

7    impose the least restrictive conditions that will reasonably

8    assure the appearance and safety of the Defendant and safety

9    of the community.  They only get detention if there's no

10   condition that will reasonably assure community safety.  And

11   any dangerous finding also must be made not simply by a

12   preponderance, but by clear and convincing evidence.  Under

13   the *Salerno* case, it notes that liberty is the norm and

14   pretrial detention is the carefully limited exception.

15          This doesn't fall within that carefully limited

16   exception, and particularly when you look at the sort of

17   conditions that Judge Frensley adopted:  home confinement,

18   location monitoring, a third-party custodian who is

19   committed that if there's any violation, she will

20   immediately contact the Court and the pretrial officer.

21   Also, limits on any travel to the District of Columbia; no

22   travel outside the United States without authorization; even

23   submission to psychiatric treatment at the pretrial services

24   officer's discretion.

25          Wow.  That's not a condition that we see every

1    day.

2            The Tennessee attorney that represented her, after

3    the detention order, the Government asked for a three-day

4    stay.  And the Court down there said they would grant a

5    one-day stay.

6            And then the Government came to this Court; and as

7    the Court has probably seen in the filings, he did not learn

8    of that even though they sent him an email maybe an hour or

9    two before the summary order was granted without any factual

10   findings.  And there have never been any factual findings, I

11   would note, for detention, in this entire case ever.

12           The order was written without counsel, without an

13   adversary hearing and without even any -- without even the

14   Defendant's pleading that had been filed in Tennessee.  The

15   pleading that set forth the arguments in Ms. Eisenhart's

16   defense had been filed before the bond hearing in Tennessee.

17   The Government didn't even bother to submit that written

18   opposition to Judge Howell before it asked her to simply

19   summarily stay, and relatively pretty much indefinitely, the

20   release order that Judge Frensley had reached.

21           So let's look at how long that's been.  My client

22   has now been held for two weeks since my emergency filing,

23   since Judge Frensley's release order more than three weeks

24   ago.  She's been held without due process now for more than

25   three weeks, without due process, especially after Judge

1    Frensley had held that even a three-day stay would be too

2    long.  And since her self-surrender and the self-surrender

3    of these Defendants, they've now been held more than a month

4    without any factual findings to justify their detention,

5    Judge Lamberth.

6              I've never seen anything like this.

7              And despite the judge -- Judge Howell's order,

8    which did specifically note in the transportation order that

9    these Defendants were supposed to be brought here, quote,

10   "forthwith," despite the forthwith order, they were not

11   transported to the District of Columbia for 17 days after

12   the forthwith order.

13             For Mr. Munchel, it was 19.  And it's not because

14   they needed to be shuttled to prison.  It just took them a

15   long time to get up here.

16             I spoke to Ms. Eisenhart in Kentucky last

17   Thursday.  The Government said she was going to be here on

18   Friday, and she got here on Friday.  One day.  One day to

19   bring her here.  And Mr. Munchel, too, I assume, but after

20   sitting on a forthwith order for 17 days.

21             That's the posture that we're now in.

22             The Government in its stay order also told Judge

23   Howell that part of the reason she ought to grant the

24   stay -- the filing said:  Well, you know, we may bring

25   additional charges.  They specifically told Judge Howell in

1    their motion for emergency stay -- they said:  The evidence

2    amassed so far subjects the Defendant and Munchel to

3    felonies beyond that with which they've been charged so far,

4    meaning the complaint, including obstructing Congress,

5    interstate travel in furtherance of rioting activity,

6    sedition and other offenses.

7           Well, now we have the indictment.  An obstruction

8    charge replaced one charge in the complaint.  And there's no

9    sedition charge.  There's no interstate travel.

10          THE COURT:  Are you waving --

11          MR. SMITH:  What we have before us is --

12          THE COURT:  That's a dangerous argument to make.

13   I wouldn't be waving any --

14          MR. SMITH:  Well, what the Court has to look at

15   is:  What are the charges before you?  I understand the

16   Court's point.  But one assumes that they went to the grand

17   jury and the evidence didn't at least at this time support

18   those charges.

19          And what we have before the Court -- let's look at

20   the charges we have before the Court.  The obstruction

21   charge is a 20-year max.  That's less than a wire fraud

22   charge.  No mandatory minimum.

23          The second charge, the 1752 charge, restricted

24   building, is a ten-year max.  But if there's not a dangerous

25   weapon that they can prove, it's a misdemeanor.

 1                And the third charge, the 5104 charge --

 2                THE COURT:  A Taser is a dangerous weapon, isn't

 3     it?

 4                MR. SMITH:  -- if it's a dangerous weapon, it's a

 5     five-year charge.  And if it's not, if it's an (e)(1)

 6     offense, it's a six-month charge.

 7                So those are the charges before the Court.  Those

 8     are the indicted charges.  And they're not really materially

 9     different to what Mr. Eisenhart was looking at back in

10     Tennessee, despite the Government suggesting to Judge Howell

11     otherwise.

12                But let's look at the facts, too.  The Government

13     has said, for example:  Well, Ms. Eisenhart chased a police

14     officer down the stairs.

15                Well, you know, they made that argument in front

16     of the judge in Tennessee, too.  And here's what he said.

17     And let's look at what the judge in Tennessee did.  It

18     wasn't just the proffer there.  I mean, I understand the

19     Court is going to make its own independent findings, and I

20     respect the Court's decision there.  But, you know, you said

21     you were going to give consideration to the magistrate

22     judge's findings; and there's good reason for that.  Maybe

23     there's especially good reason here, because he didn't hear

24     the proffer; he heard actual evidence.  He heard sworn

25     testimony from the agent under oath and cross-examination.

1    And he specifically listened to the video and watched the

2    video, spent an hour doing that.

3              And the reality he found, as the Court probably

4    also knows from watching the video, is they were in the

5    Capitol, what, ten minutes tops.  Ten minutes.  Ten minutes.

6    That's it.

7              The Government says that during that time my

8    client -- and they tried out this argument again -- that my

9    client chased the officers down the stairs.

10             Here's what Judge Frensley found.  He explained in

11   considerable detail that their pleadings making that

12   argument had not been borne out by the evidence.  He

13   specifically referenced in his statements, in his factual

14   findings, that Eisenhart had been following after two

15   Capitol police officers.

16             And he noted -- he said:  These allegations on

17   their face seem very serious and very significant.  But,

18   quote:  "Upon questioning, the Government conceded the

19   evidence doesn't suggest or support a theory that

20   Ms. Eisenhart was giving chase to these Capitol police

21   officers.  In fact, it doesn't support the contention that

22   she even had any idea that those officers were there."

23             THE COURT REPORTER:  Mr. Smith, I'm having trouble

24   hearing you.  Please give me a minute to turn up my volume.

25             Thank you.

1          MR. SMITH:  There are other factual findings that

2     Judge Frensley said.  Quote:  "She didn't appear to" --

3     despite -- and this is in response to the Government's

4     allegations she stormed the Capitol.  Judge Frensley found

5     after hearing the evidence firsthand under oath, he said,

6     quote:  "She didn't appear to fight her way into the Capitol

7     other than fight her way through the crowd.  She walked

8     through an unsecured door, passed law enforcement, none of

9     whom said to her to stop or turn around or not go in," end

10    quote.

11         He also said, quote:  "It appears clear from the

12    video evidence that the Court's reviewed that there was no

13    grand master plan that she was part of in advance of that."

14         He went on to say, quote:  "The Government's

15    admitted they have no evidence of her making any plans to

16    storm the Capitol before the circumstances and events on

17    January the 6th.  There is no evidence or record of her

18    having ever engaged in any prior conduct of a similar nature

19    to that."

20         Again, we're talking about 57 years of good

21    conduct in her life, the rest of her life except for that

22    ten minutes in the Capitol, and maybe the hour -- the 50

23    minutes in the video.

24         He also addressed the zip tie issue.  And I

25    understand the Court's concern.  But here's what Judge

1     Frensley said after watching the evidence and having the

2     opportunity to hear the evidence firsthand.  Quote:

3     "Possession of the zip ties seems to be clearly by chance.

4     Everyone has acknowledged that she didn't bring the zip ties

5     into the Capitol," end quote.

6             She found them in the cabinet and took them from

7     inside the Capitol itself.

8             He goes on, quote:  "Her motive and intent with

9     the zip ties are far from clear in this case.  The Court's

10    heard evidence contemporaneous with the events when speaking

11    with other insurgents" -- and this is key.  "The Court's

12    heard evidence contemporaneous with the events when speaking

13    with other alleged insurgents that Ms. Eisenhart made the

14    statement that she was just trying to keep them from bad

15    people or words to that effect," end quote.

16            Quote:  "She certainly didn't tell all those

17    insurgents that she had any intent to use those zip ties to

18    capture or take hostages or take any other action against

19    anybody, quite frankly.  And again, there is no evidence in

20    advance of having gone in there that that was her intention

21    to do so," end quote.

22            Quote:  "So the Court's not convinced that her

23    picking up the zip ties is evidence of anything that's

24    consistent with any sort of grand plan in advance to fight

25    or die in this cause.  Likewise, there's no evidence that

1    she was engaged in any assaultive behavior while she was in

2    the Capitol.  The Government concedes that they have no

3    evidence at this time that she exercised physical violence

4    against anyone, law enforcement, members of Congress, staff

5    of the Congress, other insurgents or anyone, for that

6    matter."

7            He goes on to say -- again, talking about the

8    supposed access to weapons, he noted, quote:  "Again, rather

9    than take those weapons that one might use to die and fight

10   into the Capitol, Ms. Eisenhart and her son apparently left

11   the weapons they had other than the Taser gun outside the

12   Capitol.  This undercuts the Government's suggestions of her

13   stated intent."

14           So those were the considered findings.

15           Now, as I noted, Judge Frensley was not condoning

16   this conduct.  He was very clear.  They were very thoughtful

17   opinions he issued.  And it had, as I say, extraordinarily

18   strict conditions that he placed on her.

19           But this is what he said.  It was -- he said, "We

20   witnessed an attack" -- and it's worth repeating, and I

21   appreciate the Court's indulgence.  He said -- and he's

22   speaking from the heart here.  He said, quote:  "We

23   witnessed an attack on the Capitol that many of us could

24   never have imagined.  The sight of Confederate flags in the

25   Capitol and anti-Semitic messaging is unthinkable.

1    Understandably, people are angry and they're scared by what

2    they saw.  They feel like the rioters attacked our

3    Constitution and our democracy, and they rightfully want

4    accountability for that.

5         "However, the time for accountability for that

6    conduct is not what's before the Court.  My decision to

7    detain or not to detain is not to be based on whether I

8    think Ms. Eisenhart is guilty of the crimes for which she

9    has been accused.

10        "Protecting the rights of the accused is often

11   difficult and unpopular.  But when we disregard those rights

12   based on anger and fear, we damage the very Constitution and

13   democracy that we seek to protect.

14        "Even as I talk about the events on January 6th

15   and what happened at the Capitol, I feel my own emotion in

16   dealing with this issue.  But that's why it's so important

17   to make these decisions based only on the law and the

18   evidence.

19        "Based on the law and the evidence in this case,

20   the Court finds there are conditions of release that will

21   reasonably assure the Defendant's appearance and the safety

22   of the community."

23        And that leads me to my final point.  Let me find

24   my notes.  This is what I want to say in conclusion, your

25   Honor:  The Government has laid out a lot of claims, some of

1   which have panned out and some of which haven't.  But all of

2   them pretty much are looking back at what she did.  Only one

3   day, maybe only one hour, and only ten minutes in the

4   Capitol.

5           But looking back is not the key question here.

6   And that's what Judge Frensley recognized in the comments

7   that I just mentioned.  The key question here is not what

8   she did before, but what she's going to do.  What is she

9   going to do between now and the trial?

10          So please, Government, paint a picture.  What

11  exactly is it that you fear that this 57-year-old woman with

12  no criminal record other than driving on a suspended license

13  and 30 years as a nurse -- what is it that you fear she's

14  going to do between now and trial if released?  Now that

15  Donald Trump is no longer in office, now that the electoral

16  vote has been confirmed, now that there's a fence around the

17  Capitol, now that she's even on a no-fly list; and

18  especially, Frensley placed her on it.

19          As I mentioned before, liberty is the norm.

20  Pretrial detention is a carefully defined exception.  Yes,

21  her past activities on January 6th during that hour or ten

22  minutes or whatever may be relevant with respect to the

23  plausibility of any picture that the Government paints here

24  about what they fear or think she's going to be doing

25  between now and the trial.

 1              But they must ultimately show that she is a danger

 2     or risk going forward and that no pretrial special

 3     conditions can sufficiently ameliorate that risk so as to

 4     reasonably assure the safety of the community.  Not

 5     absolutely assure, but reasonably assure.

 6              Plus, they must establish this, Judge Lamberth,

 7     not just by a preponderance, but by a clear-and-convincing

 8     standard.

 9              Why is it that they believe that no special

10     pretrial conditions can sufficiently ameliorate whatever

11     risk may remain between now and her trial?  That is the

12     Court's role.  That is the Court's statutory mandate.  It's

13     the same standard Judge Frensley was faced with.  And his

14     findings of fact stand, or should stand, I submit, unless

15     they're clearly erroneous.  But regardless, he wasn't

16     convinced that this heightened standard had been met.  And

17     neither should this Court.

18              THE COURT:  Thank you, Mr. Smith.

19              It is the Government's burden, so I'll let the

20     Government have the last word.

21              MR. BASET:  (No audible response.)

22              THE COURT:  You're muted, if you're trying to

23     talk.

24              MR. BASET:  My apologies.  I'm suffering from a

25     bit of technical difficulties.

1          But I'll start by stating that defense counsel's

2     arguments about release are predicated on an assumption that

3     the threat that existed on January 6th has since subsided,

4     that there is no risk to the stability of our democracy and

5     the institutions that support it, that there's no risk to

6     the communities that rely on these institutions, that

7     there's no risk at all.

8          And this is as we look outside in Washington, DC,

9     with National Guard troops still stationed, as we still

10    prepare for threat assessments of potentially violent

11    rallies protesting President Biden's ascension to the

12    presidency.  And that's in the early part of March that

13    these types of threat assessments are being made.

14         So it's very much the case that the conditions

15    that give rise to what occurred on January 6th are still

16    present in this country.  And so it is in this world that

17    defense counsel are asking for Ms. Eisenhart and Mr. Munchel

18    to be released.

19         Now, if it were the case that both Ms. Eisenhart

20    and Mr. Munchel had regret for what occurred, had shown any

21    sort of sympathy or solace for the destruction and chaos

22    that the events on January 6th impacted or had effect, if

23    they had any remorse, I could at least appreciate the

24    diminished risk that their release would pose.

25         But rather than that, they doubled down on their

1    conduct.  They doubled down on what happened on January 6th,

2    knowing full well what the effect was.  Moreover,

3    Ms. Eisenhart doubled down by even saying that she would die

4    for this cause.

5            And so it's not -- we are not in a position,

6    necessarily, to be able to risk the release of individuals

7    that are willing to die for a cause.  That still remains a

8    cause.  And the fact that President Trump is no longer in

9    power does nothing to diminish that.  If anything, the risk

10   is all the more acute because the fraudulent presidency of

11   President Biden is now -- it's now in control, and it's

12   still a fraud.  That does not diminish.  And so it is not

13   the case that this happened in a vacuum and that the threat

14   does not exist anymore.

15           Moreover, counsel makes it appear that there was a

16   violent insurgency and that their clients had nothing to do

17   with the violence or the insurgency.  To be clear, they were

18   very much a part of that insurgency and they were part of

19   the reason that that insurgency was violent.  They were

20   among the few people that had access to very powerful

21   weapons while inside the Capitol Building.

22           And so we know that they were among the tip of

23   this violent insurgency because they had the ability to

24   carry it out.

25           Now, a lot of argument has been made about the

1   fact that neither of them actually did carry out that

2   violence.  To be clear, a lot of people who entered that

3   building that day didn't act violently towards individuals.

4   But it's not because they chose not to, but because the

5   opportunity never arose because of the quick action of

6   police officers to make sure that the people that everyone

7   was looking for, the legislators and their staff, were

8   whisked away and weren't in a position to be in danger.

9        Now, your Honor asked a very significant and

10   important central question in this case:  Why possess the

11   zip ties?  In fact, Ms. Eisenhart knew that they shouldn't

12   have them, that she knew the implications.  It's not as if

13   they picked up some innocuous or benign object as a

14   souvenir.  They picked up zip ties, ostensibly -- or I think

15   the inference is very much supported in this case -- because

16   they wanted to -- they wanted their objective to be borne

17   out.

18        And if they had the opportunity to use those zip

19   ties, the inference is supported that they would have.  We

20   know that.  How?  Because despite counsel's assertions that

21   these are just some protesters, we know that they showed up

22   dressed for combat.  We know that they actually, in

23   Mr. Munchel's words, didn't want to "play fucking nice

24   anymore," that they were here to, quote, "fuck shit up,"

25   that they were going to enter that building no matter what,

1      including by force.

2              There is the notion that you can't glean anything

3      from the motives of Ms. Eisenhart by virtue of holding these

4      zip ties.  We know as they're approaching the Capitol that

5      they are both pushing and saying, "Let's go, let's go," that

6      at one point when they smelled the tear gas or the pepper

7      spray, they made comments about how the face masks that

8      they're wearing are good to repel or to deal with that type

9      of pepper spray.  And they know in Ms. Eisenhart's words

10     that "This is our people and we're going in.  This is our

11     house and we are the people," to which Mr. Munchel responds,

12     "Hell, yeah, it is."

13             And so the notion that they grabbed the zip ties

14     to keep them away from Antifa or other people who are there

15     to supposedly cause harm, it's just not borne out by their

16     understanding that the people they are with are people of

17     like mind.

18             And so the reason they took those zip ties was not

19     for a benign reason, to keep them away, as the judge in

20     Tennessee indicated or that they are now claiming, but it

21     was because they sought to use them.  They just didn't have

22     the opportunity.

23             Now, to go back a bit and address a few of the

24     more specific points:  The first is the notion that what the

25     Defendants were getting rid of before entering the Capitol

1   was simply a knife.  That is evidence that is supplied by

2   W-2, a friend with significant bias for Mr. Munchel.  And

3   it's W-2 during the hearing that states that Mr. Munchel

4   told her that it was actually a knife that they were getting

5   rid of.  I believe that's what the record is below.

6          But it is quite interesting that of all the things

7   that Mr. Munchel informs this woman, it is an explanation of

8   the very probative evidence in that video that he knows that

9   he's handing over to her.  And so in effect, he's explaining

10   to her or trying to explain away or provide a defense for

11   something that he knows is pretty much damning.

12          And we know that because the statement that "This

13   could lead us to federal prison" is not a statement that

14   would be uttered by Ms. Eisenhart if all they had was a

15   knife.  That is a reasonable inference, and it is the only

16   inference that's really supported by those statements.  She

17   says that "We could go to prison," that "We should get rid

18   of them," suggesting that there are, plural, weapons.

19          And so we know that these are not just things like

20   a knife.  They are more serious weapons than a Taser most

21   certainly, which is why they got rid of it.

22          Now, when it comes to Ms. Eisenhart's criminal

23   history then and the fact that she doesn't have any, the

24   inference is supported that indeed she was actually breaking

25   DC law when she was on the Capitol grounds at the time in

1    possession of these weapons that she knew would land her in

2    federal prison; and yet she is still in possession of them

3    while in DC.

4         So the fact of her lack of criminal history is but

5    a mere fact that they never -- she was never caught for that

6    crime that was occurring while she was in DC.

7         Now, aside from that, the notion as well or the

8    argument that Mr. Munchel was someone who was respectful

9    towards law enforcement, who was somebody who entered

10   without the intent to vandalize, is just -- it's a bit, as

11   the judge in Tennessee put it, counterintuitive.  And the

12   reason is quite simple:  As Justice Scalia once noted, you

13   can't ride with the cops and then root for the robbers.  And

14   that is exactly what Mr. Munchel and Ms. Eisenhart are doing

15   in this case.

16        While they might be sweet and kind to a police

17   officer that they might be passing by, they were rooting for

18   the people and supporting the very people that are making

19   these law enforcement officers' jobs impossible.

20        And there are points during Mr. Munchel's video

21   where he's pointing out to people that police have retreated

22   from a certain area.

23        And you have statements by Ms. Eisenhart, for

24   instance, when approached by an individual who says that "I

25   had to punch two officers" and that "We got to do what we

1   got to do" and that "We were ripping down fences,"

2   Ms. Eisenhart responds, "Good," not, "Why did you do that?"

3        The notion that these are people who are being

4   respectful of officers who are overrunning officers who were

5   trying to protect the Capitol and the people inside is

6   absolutely -- it's just not supported by the record.

7        Moreover, the notion that when they are entering

8   the building that nobody is telling them that they shouldn't

9   be entering, that this was just an open building for them to

10  enter and they wouldn't have known any better, is also not

11  supported by the evidence.  As they are entering, they can

12  hear the alarm going off.  As they are entering, they can

13  smell the pepper spray in the air trying to prevent them

14  from entering.  As they're entering, they see lines of

15  officers trying at least to keep guard.  But they are

16  overwhelmed.  And they know that.

17       And so at the end of the day, they were, if

18  anything, making officers' lives far more difficult and were

19  part of the reason why they couldn't do their job that day.

20       As well, the notion that they did not vandalize

21  anything and they should be given some sort of credit for

22  that is anathema as to how our system works.  If a robber or

23  a burglar enters a home and doesn't break a vase, we don't

24  credit that burglar for not breaking the vase.  They're

25  spill responsible and culpable for the crime that they're

1    committing.

2          And that's essentially what the defense is arguing

3    in terms of being able to credit Mr. Munchel because he

4    states a few times, "Don't vandalize anything."

5          And the vandalism isn't necessary, because the

6    objective is -- it doesn't require vandalizing anything.  It

7    requires stopping the vote.

8          In addition, counsel for Mr. Munchel indicates

9    that he was actually helping people leave.  But I think if

10   the video is viewed in full, it's clear that he's also

11   helping people approach, advance on the Capitol.

12          As far as conditions of release and why the

13   conditions that were set on Mr. Munchel are not sufficient,

14   I think the Signal chat that was found on Mr. Munchel's cell

15   phone speaks to why there are no conditions that can

16   actually ensure the community safety in this case, because

17   there are no conditions that could preclude Mr. Munchel from

18   engaging with other elements, extremist elements, that he

19   already, we know, wants to join.

20          There is no limitation to that.  There is no

21   limitation to his ability to coordinate and plan and move

22   forward, to join groups like the Proud Boys.

23          While the Government does not provide the name of

24   the individual who he is speaking with, I think it is clear

25   also from the context of that conversation that the Proud

 1    Boys are exactly the group that he's trying to join, as

 2    evidenced by the initials PB and his desire to join such a

 3    group.

 4          And the fact that the person indicates to him "Now

 5    is not the right time, because you're hot" speaks volumes

 6    about where Mr. Munchel's mindset is in all of this.  It's

 7    not fear or concern about being locked up; it is the desire

 8    to be, in his mind, a true patriot and see through his

 9    objective, which is an objective that Ms. Eisenhart shares

10    with him.

11          And so there are no conditions that could preclude

12    such a reality arising.

13          In addition, as far as Ms. Eisenhart is concerned,

14    I think a similar type of argument applies, especially in a

15    world where the conditions that gave rise to what occurred

16    on the Capitol on the 6th are conditions that still exist,

17    if not are further exacerbated by the transition of power to

18    President Biden.

19          So that Ms. Eisenhart indicating that she's

20    willing to die for this cause, that this is not a risk that

21    we as a society take, this release of individuals like this

22    who violently stormed the Capitol and sought to overrun an

23    election that was fair and that was being certified that

24    day, those attitudes, those beliefs led them to go to the

25    Capitol.

1          And Ms. Eisenhart, someone who doesn't have a

2     criminal history, she is willing to go through much less,

3     which underscores her extremism on this issue.  That

4     extremism hasn't subsided.  If anything, it's been

5     exacerbated in light of their experience with the criminal

6     justice system here.

7          The argument as well that they would be

8     law-abiding citizens, the fact that they did not flee or try

9     to hide, I think it does not really square with the reality

10    of if they tried to hide, then they knew the entire world

11    had identified them and was talking about them and was

12    looking for them and was trying to get in touch with them.

13         Mr. Munchel in his conversation with the

14    individual on the Signal chat is being told that if the

15    media knows, the FBI certainly knows and is after you as

16    well.

17         And so the idea that Ms. Eisenhart and Mr. Munchel

18    would run from a world that is at that moment pretty keyed

19    in and focused on them, it shouldn't be given any credit.

20    If anything, what should be looked at is the fact that

21    Mr. Munchel, for instance, goes to the lengths of deleting

22    his Facebook account.

23         Now, counsel states that the reason he did that is

24    because he wanted to stop the media from kind of bombarding

25    him.  But make no mistake:  Mr. Munchel gave an interview to

1    that same media that he sought to run away from, supposedly.

2    And Mr. Munchel didn't have to delete his Facebook account

3    to run away from the media.  That was something that he

4    decided to do on advice from W-2, which, by the way, the

5    release conditions fashioned would have Mr. Munchel actually

6    staying at the house of W-2, who suggested the deletion of

7    his Facebook account.  That was a step that was taken not to

8    avoid the public's scorn and focus on them, but to get rid

9    of evidence.

10           Moreover, one thing that has subsequently been

11   learned by the Government is the 50-minute video obtained or

12   retrieved from his phone was actually a clip of a larger

13   video.  Now, beyond that, we didn't know of any additional

14   evidence.  But we know that the 50-minute clip was not the

15   full clip to begin with, which is to say that, while

16   Mr. Munchel is indicating that he's giving this phone over

17   so that it can be protected, there was also no reason for

18   him not to be able to just provide this phone to the FBI or

19   to the defense counsel.  It's to provide it to the

20   Government.

21           And so, if anything, these are acts that suggest

22   that, rather than trying to help law enforcement or being

23   cooperative with law enforcement, that indeed maybe that's

24   not the full reality.

25           I would note as well with respect to Ms. Eisenhart

1    that at the end of the day, these are individuals, both

2    Mr. Munchel and Ms. Eisenhart, that felt entitled.  They

3    felt entitled to walk into the Capitol Building knowing full

4    well that a vote was occurring that day that they did not

5    agree with.  And they were entitled so far as they wanted

6    and were willing to use force to enter that building and to

7    stop that vote from being certified.

8            And so they went, dressed for combat, dressed for

9    violence and in possession of an item that would have

10   allowed them to commit the violence if they were in a

11   position to have to do so.

12           And for that, these are extraordinary

13   circumstances, the conditions of which still exist in our

14   country.

15           And so releasing Ms. Eisenhart and Mr. Munchel

16   through those circumstances would certainly be a danger to

17   the community that the community cannot risk at this point.

18           THE COURT:  All right.

19           MR. SMITH:  Your Honor --

20           THE COURT:  The Court has to --

21           MR. SMITH:  Your Honor --

22           THE COURT:  Yes.

23           MR. SMITH:  After that lengthy rebuttal, can I at

24   least make -- I mean, it was a very long rebuttal.

25           THE COURT:  Yes.

1          MR. SMITH:  I do have a couple of comments, if the

2     Court would allow me.

3          THE COURT:  Go ahead.

4          MR. SMITH:  Thank you, your Honor.

5          There were some factual assertions made that

6     simply are not so.  The Government claims that my client

7     cheered when she was told that someone had punched two

8     police officers.  That wasn't what she was told.  Even by

9     the Government's brief on Page 5, it says that she

10    understood that someone had punched two of them.  It says

11    "them," quote-unquote.  It never specifies police officers.

12    The Government surmises that must have been what they meant

13    and what she understood, but that's not what the evidence

14    is.

15         Second:  The Government has claimed that --

16    repeatedly now that my client said that she was willing to

17    die for the cause.

18         That is also false.  What my client said was

19    basically -- I was trying to find the quote, but it's

20    something far different, that she would rather die than live

21    under a country of oppression.

22         There is no "cause," quote-unquote, that they have

23    ever connected her with.  There's no evidence in the record

24    that she's ever -- that she ever was involved with any group

25    before or even after January 6th.  They have cited

1    Mr. Munchel and his supposed phone records, showing that he

2    had contacted someone.  There's no evidence of that related

3    to my client whatsoever.  None.

4         Finally, you know, the comment they just made that

5    these Defendants felt entitled:  Well, even if it was true

6    before -- and I don't concede the point -- that certainly is

7    no longer so.  She self-surrendered to the FBI.  She has now

8    been in custody, as I mentioned, over a month without any

9    factual findings to justify it.

10         She's been sitting in a 55-degree-temperature cell

11   here.  Apparently, there's some special order that she can't

12   be in the general population as a result of these Capitol

13   cases.  She's spending 23 hours in a cell.  One hour of

14   recreation is just putting her in a larger cell.  She was

15   prohibited from making any phone calls out even on her

16   mother's birthday this past Sunday.

17         And the notion that -- you know, the Government

18   has said that these two have not shown remorse.  Well, I'm

19   not going to get into discussions I may have had and the

20   Government may have had with me, because I understand that's

21   not appropriate.  But the Court should not necessarily

22   assume, and it would be wrong for the Court to assume, that

23   these are defiant clients, particularly now that they've

24   been incarcerated, to where they somehow would not adhere to

25   societal standards that my client has now been following,

1    except for this one day, for 57 years of her life, including

2    30 years as a registered nurse.

3            So the question is going forward, getting back

4    again, not looking in the past after that day, but the

5    pertinent issue before this Court, which is going forward:

6    Are there reasonable conditions that can reasonably assure

7    that my client will show up -- and that's after she

8    self-surrendered -- and the safety of the community can be

9    assured, given the very special conditions that Judge

10   Munchel [sic] carefully went through?  I don't think that

11   there's any question about it.  But certainly it has not

12   been established beyond a preponderance to a

13   clear-and-convincing standard that no conditions exist that

14   could place my client back into the community that she's

15   been in for 57 years.

16           And I hope the Court will consider my arguments

17   and my client's lengthy good service in the community,

18   including 30 years of serving others in a nurse capacity,

19   when it decides what to do here.

20           THE COURT:  Ms. --

21           MS. ROLAND:  Your Honor, may I also be heard for

22   just one moment?

23           THE COURT:  Yes.

24           MS. ROLAND:  So much of what Mr. Baset argued in

25   rebuttal really is more appropriate at a sentencing hearing.

1           Mr. Munchel seeks no credit because he doesn't

2    need to.  The fact that he turned himself in -- he's not --

3    he doesn't point that out seeking credit.  He points that

4    out because the Government must prove that there are no

5    conditions that would assure -- reasonably assure the safety

6    of the community or his return to court.  And there

7    certainly are relevant factors.

8           Regarding Mr. Baset's proffer that Mr. Munchel has

9    not shown remorse:  I don't know if bench conferences are

10   possible or appropriate in this forum.  If so, I can make

11   representations about that.  But I vigorously disagree with

12   the proffer that Mr. Munchel has no remorse.  I have had

13   conversations with the Government which I am happy to talk

14   about in a bench conference.

15          And finally, the Government has really made no

16   arguments why these conditions that Judge Frensley set and

17   that this Court might set of being on home confinement, in

18   third-party custody of a responsible person and with GPS

19   monitoring, why that wouldn't ensure the safety of the

20   community, why it wouldn't ensure that Mr. Munchel will not

21   be back in DC in March, will not endanger the community in

22   any way.  They simply haven't made the arguments why those

23   specific very strict conditions aren't enough.

24          Thank you.

25          THE COURT:  All right.  I will rule as promptly as

```
 1    I can, but with written findings and conclusions.  So it'll

 2    probably be tomorrow before I get it out.

 3           I understand that it's far overdue, but I will

 4    support it with written findings and conclusions.

 5           Can I have you give me an idea about discovery and

 6    what will be the time frame for setting our next status?

 7    Are we talking about something like March 5th or can we do

 8    something sooner than that in terms of the status

 9    conference?

10           MR. BASET:  The Government is amenable to a status

11    conference at the Court's pleasure.  It's my understanding

12    if we can push it out about two or three weeks, the

13    Government anticipates providing a substantial amount of

14    discovery within that interim time.  We will need to work

15    out a protective order with counsel.  But we'd propose that

16    in the interm, while working out a protective order, that

17    the Government starts production with the understanding that

18    that order would be in effect until counsel decides to

19    challenge it.

20           And so we would be asking to set the matter out

21    three weeks for some of that discovery to be produced.

22           THE COURT:  That would be March 10th or 11th.

23    Would that work for counsel?

24           MS. ROLAND:  Either of those dates are fine with

25    me, your Honor.
```

1              MR. SMITH:  The 10th or the 11th are free on my

2      calendar right now.

3              THE COURT:  Ms. Jenkins, can I do it on the 10th?

4              THE COURTROOM DEPUTY:  Yes, we can, actually.

5              THE COURT:  Okay.

6              THE COURTROOM DEPUTY:  One second.  This is March

7      10th?  I have the wrong date.  No.  That's not available.

8      Unfortunately, Judge, only the afternoon is available on the

9      10th.  Anything after 1:00.

10             THE COURT:  1:00 p.m. on the 10th?

11             MR. BASET:  That works for the Government.

12             MS. ROLAND:  That works for me.  Thank you.

13             THE COURT:  We'll set it for 1:00 p.m., March

14     10th, then.

15             We'll call it a status and we'll see where we are

16     and what remains to be done.  I'll get out a ruling on the

17     pretrial in the meantime.

18             Is there anything else you all want to raise

19     today?

20             MR. SMITH:  I did want to especially thank the

21     Court for being expeditious in setting this up.

22             THE COURT:  In light of the --

23             MR. BASET:  Your Honor, the Government would

24     request for a tolling of time for applicable clocks at this

25     stage in the interest of justice.

```
 1              THE COURT:  Are the Defendants willing to waive
 2     time for speedy trial purposes until March 10th, both of the
 3     Defendants?
 4              MS. ROLAND:  Yes, your Honor.
 5              MR. SMITH:  I would want to speak to my client
 6     before consenting to that, Judge.  I don't think necessarily
 7     it's going to be a problem, but --
 8              THE COURT:  If you can notify the Court.  I'll
 9     enter a minute order after you notify my chambers of whether
10     it's agreeable to both sides, then.  I'll enter a minute
11     order later today, so you can talk separately to your
12     clients.
13              You can reach her by phone, I take it?
14              MR. SMITH:  It's been difficult, Judge.  I'll see
15     what I can do to try to get out there.  They're not allowing
16     show-up visits, so it's been a little more challenging.
17              THE COURT:  I'll see if Ms. Jenkins can put you in
18     a separate room.
19              Does that work?
20              THE COURTROOM DEPUTY:  Are we trying to do that
21     now?
22              THE COURT:  Yes.  But perhaps you can't because
23     the other Defendant is in the same room.
24              THE COURTROOM DEPUTY:  One moment.
25              THE COURT:  We'll see if they can do it, just the
```

1      two of them.

2                  THE COURTROOM DEPUTY:  Hold on one second.  I have

3      the wrong Defendant.  Let's see there.  One second, Judge.

4      I have issues with this.  The system for whatever reason is

5      not --

6                  MR. SMITH:  It might help me to understand the

7      Government's -- why the Government feels it needs the speedy

8      trial extension.

9                  THE COURTROOM DEPUTY:  They've been placed in

10     there, your Honor.

11                 MR. BASET:  We do believe at this time it is

12     appropriate in light of the discovery that's been provided

13     to both counsel and the consideration of that discovery in

14     terms of the advancement --

15                 THE COURT:  Mr. Baset, Mr. Smith is in the

16     breakout room at this time.  He's no longer in the open

17     meeting.

18                 MR. BASET:  Understood.

19                 (Thereupon a brief pause ensued, after which the

20     following proceedings were had:)

21                 THE COURT:  You were asking if you could explain

22     something, Mr. Smith.

23                 MR. SMITH:  Well, your Honor, I think I can give a

24     response.  I guess I should wait for my client to appear.

25                 Okay.  Good.

1          Your Honor, we would be agreeable to consent to

2     speedy trial being extended if she isn't incarcerated.  If

3     she is incarcerated, I don't think that we would be inclined

4     to a speedy trial waiver, particularly without knowing more

5     specifically why the Government feels like that's necessary.

6          And if possible, as I say, part of that is based

7     on conditions.  If there is an order that's been entered,

8     we've not seen it as to why she's being kept in these

9     unusual segregated conditions at CTF.  And so if we could

10    ask that any such order be produced, I would appreciate

11    that.

12         THE COURT:  So if there's any --

13         MR. SMITH:  Basically, it's an --

14         THE COURT:  You should talk to -- there's no order

15    from the Court.  So if there's any order, you need to talk

16    to Eric Glover first, who's the general counsel of the DC

17    Jail.  And if it can't be worked out, I will give you a

18    hearing after you talk to Eric Glover.  As I did with

19    Chansley, I'll give you a hearing here in court and we'll

20    see what happens.  But I don't know what -- all I can do is

21    see if you can work it out with Mr. Glover first before I

22    hear you.  And I'm willing to hear you then.

23         I couldn't work it out there and I had an order

24    they wouldn't comply with, so I had to move the person to

25    another jail when DC refused to comply with my orders.  So

```
 1      we'll see what happens.
 2                  MR. SMITH:  I have not --
 3                  MS. ROLAND:  Your Honor, having -- I'm sorry.
 4                  Go ahead, Mr. Smith.
 5                  MR. SMITH:  I was just going to say, I have not
 6      seen the order.  I appreciate your point.  I'll do what I
 7      can to get it.  Thank you.
 8                  THE COURT:  I don't know what you're talking about
 9      for an order.
10                  MS. ROLAND:  Your Honor, having heard Mr. Smith's
11      representations regarding the Speedy Trial Act, we will take
12      the same position.
13                  THE COURT:  That's fine.
14                  I will rule as promptly as I can, then.  In any
15      event, I'll see you back on March 5th.  Thanks very much,
16      counsel.
17                  MS. ROLAND:  Thank you.
18                  MR. SMITH:  Thank you, your Honor.
19                  THE COURT:  Let me go off the record one
20      minute.
21                  (Proceedings concluded.)
22
23
24
25
```

1                              **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4     certify that the foregoing constitutes a true and accurate

5     transcript of my stenographic notes, and is a full, true,

6     and complete transcript of the proceedings produced to the

7     best of my ability.

8                    Please note:  This hearing occurred

9     during the COVID-19 pandemic and is therefore subject to the

10    technological limitations of reporting remotely.

11

12                    Dated this 19th day of February, 2021.

13

14               /s/ Lisa Edwards, RDR, CRR
                 Official Court Reporter
15               United States District Court for the
                   District of Columbia
16               333 Constitution Avenue, NW, Room 6706
                 Washington, DC 20001
17               (202) 354-3269

18

19

20

21

22

23

24

25