APPEAL,CAP,CAT B

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: <u>1:21−cr−00118−RCL</u>−1

Case title: USA v. MUNCHEL et al
Magistrate judge case number:  1:21−mj−00071−ZMF

Date Filed: 02/12/2021

Assigned to: Judge Royce C. Lamberth

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **ERIC GAVELEK MUNCHEL** | represented by | **Sandra Gayle Roland** |
| | | FEDERAL PUBLIC DEFENDER FOR D.C. |
| | | 625 Indiana Avenue, NW |
| | | Suite 550 |
| | | Washington, DC 20004 |
| | | (202) 208−7500 |
| | | Fax: 202−208−7515 |
| | | Email: <u>sandra_roland@fd.org</u> |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Public Defender or Community Defender Appointment* |

| **<u>Pending Counts</u>** | **<u>Disposition</u>** |
|---|---|
| 18 U.S.C. 1512(c)(2), (k); TAMPERING WITH A WITNESS, VICTIM OR INFORMANT; Obstruction of an Official Proceeding (1) | |
| 18 U.S.C. 1752(a)(1)−(2), (b), 2; TEMPORARY RESIDENCE OF THE PRESIDENT; Restricted Building or Grounds (2) | |
| 40 U.S.C. 5104(e)(1), (2), 2; FEDERAL STATUTES, OTHER; Violent Entry or Disorderly Conduct (3) | |

**<u>Highest Offense Level (Opening)</u>**

1

Felony

**Terminated Counts**                                **Disposition**

None

**Highest Offense Level**
**(Terminated)**

None

**Complaints**                                      **Disposition**

COMPLAINT in Violation of
18:371, 18:231(a)(3), 18:1752(a),
and 40:5104(e)(2)

---

**Plaintiff**

**USA**                           represented by   **Ahmed Muktadir Baset**
                                                   U.S. ATTORNEY'S OFFICE
                                                   United States Attorney's Office for the
                                                   District of Col
                                                   555 Fourth Street, N.W.
                                                   Room 4209
                                                   Washington, DC 20530
                                                   202−252−7097
                                                   Email: ahmed.baset@usdoj.gov
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*
                                                   *Designation: Assistant U.S. Attorney*

                                                   **Leslie A. Goemaat**
                                                   U.S. ATTORNEY'S OFFICE
                                                   555 4th St. NW
                                                   Washington, DC 20530
                                                   202−803−1608
                                                   Email: leslie.goemaat@usdoj.gov
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*
                                                   *Designation: Assistant U.S. Attorney*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 01/15/2021 | 1 | | COMPLAINT as to ERIC GAVELEK MUNCHEL (1), LISA MARIE EISENHART (2). (Attachments: # 1 Affidavit in Support) (bb) [1:21−mj−00071−ZMF] (Entered: 01/16/2021) |
| 01/24/2021 | 3 | | APPEAL of Release Order and Emergency Motion for Stay Pending Appeal as to by USA as to ERIC GAVELEK MUNCHEL. (Attachments: # 1 Proposed Order)(ztg) [1:21−mj−00071−ZMF] (Entered: 01/24/2021) |

| 01/24/2021 | 4 | | ORDER, as to ERIC GAVELEK MUNCHEL, GRANTING the government's 3 Motion to Stay. Signed by Chief Judge Beryl A. Howell on January 24, 2021. (lcbah1) [1:21−mj−00071−ZMF] (Entered: 01/24/2021) |
| --- | --- | --- | --- |
| 01/24/2021 | 5 | | TRANSPORT ORDER as to ERIC GAVELEK MUNCHEL. Signed by Chief Judge Beryl A. Howell on January 24, 2021. (lcbah1) [1:21−mj−00071−ZMF] (Entered: 01/24/2021) |
| 02/03/2021 | 12 | | NOTICE OF ATTORNEY APPEARANCE: Sandra Gayle Roland appearing for ERIC GAVELEK MUNCHEL (Roland, Sandra) [1:21−mj−00071−ZMF] (Entered: 02/03/2021) |
| 02/04/2021 | 14 | | MOTION to Adopt and Join Motion Filed by Co−Defendant re 13 Emergency MOTION to Rescind Stay of Release Order or to Conduct an Immediate Review of Detention by ERIC GAVELEK MUNCHEL as to ERIC GAVELEK MUNCHEL, LISA MARIE EISENHART. (Roland, Sandra) Modified relief on 2/8/2021 (znmw). [1:21−mj−00071−ZMF] (Entered: 02/04/2021) |
| 02/05/2021 | | | MINUTE ORDER (paperless), as to ERIC GAVELEK MUNCHEL and LISA MARIE EISENHART, DIRECTING, upon consideration of defendant Eisenhart's 15 Corrected Motion to Rescind Stay of Release Order or to Conduct an Immediate Review of Her Detention ("Eisenhart Motion") and defendant Munchel's 14 Motion to Adopt and Join Motion Filed by Co−Defendant ("Munchel Motion"), in particular defendants' representations that they both remain detained in the Middle District of Tennessee and have not been transported to Washington, DC, *see* Eisenhart Motion at 8; Munchel Motion at 3, the government to submit, by February 9, 2021, a status report informing the Court of the status of defendants' transport to this District and their anticipated arrival date. Signed by Chief Judge Beryl A. Howell on February 5, 2021. (lcbah1) [1:21−mj−00071−ZMF] (Entered: 02/05/2021) |
| 02/09/2021 | 18 | | STATUS REPORT by USA as to ERIC GAVELEK MUNCHEL, LISA MARIE EISENHART (Baset, Ahmed) [1:21−mj−00071−ZMF] (Entered: 02/09/2021) |
| 02/10/2021 | 19 | | Memorandum in Opposition by ERIC GAVELEK MUNCHEL re 3 MOTION to Review MOTION to Stay (Attachments: # 1 Exhibit)(Roland, Sandra) [1:21−mj−00071−ZMF] (Entered: 02/10/2021) |
| 02/11/2021 | 20 | | NOTICE OF ATTORNEY APPEARANCE Justin Todd Sher appearing for USA. (zltp) [1:21−mj−00071−ZMF] (Entered: 02/11/2021) |
| 02/12/2021 | 21 | | INDICTMENT as to ERIC GAVELEK MUNCHEL (1) count(s) 1, 2, 3, LISA MARIE EISENHART (2) count(s) 1, 2, 3. (zltp) (Main Document 21 replaced on 2/17/2021) (zltp). (Entered: 02/16/2021) |
| 02/17/2021 | | | MINUTE ORDER. Detention Hearing set for 2/17/2021 at 01:00 PM as to ERIC GAVELEK MUNCHEL (1) and LISA MARIE EISENHART (2). <br><br> The hearing will proceed by videoconferencing for the parties and by telephone for members of the public. Pursuant to Standing Order 20−20 (BAH), the Court will provide public access to the hearing. It is hereby ORDERED that the participants using the public access telephone line shall adhere to the rules set forth in Standing Order 20−20 (BAH), available on the Court's website. Toll Free Number: 888−636−3807; Access Code: 6967853. |

| | | | |
|---|---|---|---|
| | | | Signed by Judge Royce C. Lamberth on 02/16/2021. (lcrcl2) (Entered: 02/17/2021) |
| 02/17/2021 | 23 | | NOTICE OF ATTORNEY APPEARANCE Leslie A. Goemaat appearing for USA. (Goemaat, Leslie) (Entered: 02/17/2021) |
| 02/17/2021 | | | Minute Entry for video Arraignment held before Judge Royce C. Lamberth as to ERIC GAVELEK MUNCHEL (1) and LISA MARIE EISENHART (2). Defendants arraigned and enters a Plea of Not Guilty as to Counts 1, 2 and 3 and further waives the formal reading of the Indictment. Oral arguments submitted on detention; forthcoming Order. Status Conference set for 3/10/2021 at 1:00 PM by VTC before Judge Royce C. Lamberth. Bond Status of Defendants: committed. Court Reporter: Lisa Edwards. Defense Attorneys: Sandra Gayle Roland (1) and Gregory Stuart Smith (2); US Attorneys: Ahmed Baset, Justin Sher and Leslie Goematt; Pretrial Officer: Christine Shuck. (zlsj) (Entered: 02/17/2021) |
| 02/17/2021 | 24 | | MEMORANDUM OPINION as to ERIC GAVELEK MUNCHEL (1) and LISA MARIE EISENHART (2). Signed by Judge Royce C. Lamberth on 02/17/2021. (lcrcl2) (Entered: 02/17/2021) |
| 02/17/2021 | 25 | | ORDER OF DETENTION PENDING TRIAL – Defendant Held Without Bond as to ERIC GAVELEK MUNCHEL (1). Signed by Judge Royce C. Lamberth on 02/17/2021. (lcrcl2) (Entered: 02/17/2021) |
| 02/17/2021 | 27 | | ORDER denying as moot 3 Motion for Review as to ERIC GAVELEK MUNCHEL (1); denying as moot 6 Motion for Review as to LISA MARIE EISENHART (2); granting 14 Motion to join as to ERIC GAVELEK MUNCHEL (1); denying as moot 15 Motion to Revoke Stay as to ERIC GAVELEK MUNCHEL (1) and LISA MARIE EISENHART (2); denying as moot 16 Motion for Review as as to ERIC GAVELEK MUNCHEL (1) and LISA MARIE EISENHART (2). Signed by Judge Royce C. Lamberth on 02/17/2021. (lcrcl2) (Entered: 02/17/2021) |
| 02/17/2021 | 28 | | ORDER as to ERIC GAVELEK MUNCHEL (1) and LISA MARIE EISENHART (2) excluding time from 02/17/2021 to 03/15/2021 under the Speedy Trial Act in the interest of justice. Signed by Judge Royce C. Lamberth on 02/17/2021. (lcrcl2) (Entered: 02/17/2021) |
| 02/18/2021 | 31 | | NOTICE OF APPEAL – Final Judgment by ERIC GAVELEK MUNCHEL re 25 Order of Detention Pending Trial– Defendant HWOB. Fee Status: No Fee Paid. Parties have been notified. (Roland, Sandra) (Entered: 02/18/2021) |
| 02/19/2021 | 32 | | TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING CONDUCTED VIA ZOOM in case as to ERIC GAVELEK MUNCHEL, LISA MARIE EISENHART before Judge Royce C. Lamberth held on February 17, 2021; Page Numbers: 1–65. Date of Issuance: February 19, 2021. Court Reporter/Transcriber: Lisa Edwards. Telephone number (202) 354–3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcri pt may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. |

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/12/2021. Redacted Transcript Deadline set for 3/22/2021. Release of Transcript Restriction set for 5/20/2021.(Edwards, Lisa) (Entered: 02/19/2021)

Notice of Appeal Criminal

CO-290
Rev. 3/88

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        :

     v.        :        Cr. No. 21-118 (RCL)-1

ERIC MUNCHEL,        :

     Defendant.        :

# NOTICE OF APPEAL

Name and address of appellant:        Eric Munchel
                                Correctional Treatment Facility
                                1901 E St., S.E.
                                Washington, DC 20002

Name and address of appellant's attorney:        Sandra Roland
                                Assistant Federal Public Defender
                                625 Indiana Avenue, NW, Suite 550
                                Washington, DC 20004

Offense:        18 U.S.C. § 1512(c)(2) – Tampering with a witness;
                18 U.S.C. § 1752(a)(1)-(2) – Temporary residence of the president;
                40 U.S.C. § 5104(e)(1) Violent Entry or Disorderly Conduct

Concise statement of judgment or order, giving date, and any sentence:

        02/17/2021: Order of Detention Pending Trial.

Name and institution where now confined, if not on bail:    Correctional Treatment Facility

I, the above named appellant, hereby appeal to the United States Court of Appeals
for the District of Columbia Circuit from the above-stated judgment.


   02/18/2021                                Eric Munchel
      DATE                                  APPELLANT


CJA, NO FEE _____FPD_____        _____Sandra Roland_____
PAID USDC FEE ___No___        ATTORNEY FOR APPELLANT
PAID USCA FEE ___No_____

Does counsel wish to appear on appeal?  _X_ Yes  ___ No
Has counsel ordered transcripts?  ___ Yes  _X_ No
Is this appeal pursuant to the 1984 Sentencing Reform Act?  _X_ Yes  __ No

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | Case No. 1:21-cr-118-RCL |
| **ERIC GAVELEK MUNCHEL** and **LISA MARIE EISENHART,** *Defendants.* | |

### <u>MEMORANDUM ORDER</u>

Before the Court are the government's motions [3, 6] to review the orders releasing the defendants, defendant Lisa Marie Eisenhart's motions [15, 16] to rescind the stay of her release order and for immediate review of her detention and defendant Eric Gavelek Munchel's motion [14] to join those motion.

Munchel's motion is **GRANTED**.

Because the defendants have been arraigned on a new indictment and the Court has granted the government's oral detention motion, the government's motions for review are **DENIED AS MOOT**.

To the extent that the defendants argue that the motions are not moot because the Court is required to review a magistrate judge's detention ruling only for clear error, that argument fails.

First, the Court ruled on a new motion following an indictment, not on the government's motion for review.

Second, the standard for review by a district court judge of magistrate judge orders, under 18 U.S.C. § 3142, has been uniformly considered to be *de novo*, *see, e.g., United States v. Henry*, 280 F. Supp. 3d 125, 128 (D.D.C. 2017) ("The Court reviews de novo whether there are conditions of release that will reasonably assure the safety of any other person and the community."); *United*

1

*States v. Hunt*, 240 F. Supp. 3d 128, 132-33 (D.D.C. 2017) (noting that "although the D.C. Circuit has not yet addressed the issue, the many circuits that have agree[d] that the district judge should review de novo a detention decision rendered by a Magistrate Judge" and collecting cases); *United States v. Robinson,* 952 F. Supp. 2d 225, 226 (D.D.C. 2013); *United States v. Beauchamp-Perez*, 822 F. Supp. 2d 7, 9 (D.D.C. 2011); *United States v. Burdette*, 813 F. Supp. 2d 1, 2 (D.D.C. 2011); *United States v. Hudspeth*, 143 F. Supp. 2d 32, 36 (D.D.C. 2001), and the DC Circuit has upheld district judges' *de novo* review of magistrate judges' detention decisions, without questioning application of this standard, *see e.g., United States v. Carter*, 865 F.2d 1330 (D.C. Cir. 1988); *United States v. Laing*, 851 F.2d 1501 (D.C. Cir. 1988); *United States v. Fafowara*, No. 87-3063, 1987 U.S. App. LEXIS 17590, at *1 (D.C. Cir. Oct. 8, 1987).  This conclusion is supported inferentially by two other considerations.  The Federal Magistrate's Act authorizes magistrate judges to "issue orders pursuant to section 3142 of title 18 concerning release or detention of persons pending trial," 28 U.S.C. § 636(a)(2), without delineating the specific standard of review, when, by contrast, a deferential review standard is specified for matters referred by a judge to an magistrate judges. And 18 U.S.C. § 3145(a)(1)(2) and (b) authorize the government and the defendant to seek "*Review* of a release order" (emphasis added) or "*Review* of detention Order," (emphasis added) respectively, with the "court having original jurisdiction over the offense" for revocation or amendment of the MJ order, but differentiates such "review" from an "*Appeal* from a release or detention order," (emphasis added) under 18 U.S.C. 3145(c), to a court of appeals, that latter of which would be subject to the normal deferential standard for fact finding that normally used by a court of appeals.

The government's motions for review are moot.

As to both defendants, the motions to rescind the stay and for immediate review are also **DENIED AS MOOT**. The Court's denial today of the government's motions for review dissolves the stay. Accordingly, the defendants have been granted all the relief they seek—dissolution of the stay and review of detention.

**IT IS SO ORDERED.**

Date:   2/17/21

Royce C. Lamberth
United States District Judge

3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.                                                          Case No. 1:21-cr-118-RCL

ERIC GAVELEK MUNCHEL and
LISA MARIE EISENHART,
*Defendants.*

### MEMORANDUM OPINION

On January 6, 2020, a large mob stormed and breached the United States Capitol.  Shortly thereafter, the government charged defendants Eric Gavelek Munchel and Lisa Marie Eisenhart with offenses stemming from their alleged participation in the January 6 events.  Both defendants were subsequently arrested in Nashville, Tennessee.  Following separate hearings in the Middle District of Tennessee, a magistrate judge ordered both defendants released pending trial over the government's objections.  The Court temporarily stayed the release orders, ordered the defendants transported to this District, and arraigned the defendants on a grand jury indictment.  Now before the Court is the government's oral motion for pretrial detention.

For the reasons stated below, the Court concludes that no condition or combination of conditions of release will reasonably assure the safety of the community if it releases the defendants pending trial.  Therefore, it will **GRANT** the government's motion and **ORDER** the defendants detained pending trial.

I.   **BACKGROUND**

   A. **Factual Background**

Munchel is a thirty-year-old resident of Nashville.  He is Eisenhart's son.  He is currently unemployed, but previously worked for Brewhouse South and Kid Rock's Big Ass Honky Tonk and Rock 'N' Roll Steakhouse.  Munchel has twice been convicted for possession of marijuana in

1

Georgia state courts. He once failed to appear in court during the proceedings in his most recent conviction, but Munchel's counsel represented—and the government accepted—that Munchel did not receive notice of the hearing and promptly corrected his omission. *See* Hr'g Tr. 83:2–8, 129:10–12, 148:24–149:2, No. 3:21-mj-2668 (M.D. Tenn. Jan. 22, 2021), ECF No. 19-1 ("Munchel Tr.").

Eisenhart is a fifty-six-year-old resident of Woodstock, Georgia. She is Munchel's mother. She works as a traveling nurse for Cross Country Nurses and has been employed as a nurse for approximately thirty years. Eisenhart has no criminal history.

### 1. Preparations

Angry over the 2020 Presidential election, Munchel and Eisenhart traveled to Washington, D.C. on January 4, 2021 to attend a "stop the steal" rally. Hr'g Tr. 64:16–19, No. 3:21-mj-2679 (M.D. Tenn. Jan. 25, 2021) ("Eisenhart Tr."). Munchel and Eisenhart have asserted that they decided to travel to Washington at the last moment, and the government has not refuted that assertion. Munchel Tr. 35:12–16p. They brought with them a pair of tactical vests, which can be worn over regular clothing to provide protection and carry items, *see* Eisenhart Tr. 54:6–22, and Munchel brought a taser and a knife, *id.* at 36:21–23 (taser); Munchel Tr. 109:12–15 (knife).

Munchel and Eisenhart arrived in Washington on January 5 and checked into a hotel. *See* Eisenhart Tr. 32:15–18. On the evening of January 5, Metropolitan Police officers stopped Munchel and inquired about the taser he was carrying in a holster; Munchel had a polite interaction with them, and they allowed him to keep his taser. Munchel Tr. 36:9–38:23; Munchel Ex. 2.

### 2. The Capitol Insurrection

On January 6, Munchel and Eisenhart attended President Trump's rally and then marched to the Capitol. *See* Munchel Tr. 39:4–40:13. Munchel and Eisenhart wore the tactical vests. *See*

Gov't Appeal Ex. 3, ECF No. 3 at 7.  Munchel carried a taser, holstered on his right hip.  Munchel

Tr. 26:13–20; *see also* Gov't Appeal Ex. 5, ECF No. 3 at 8.  He also wore an iPhone in his vest

and filmed a 50-minute long video on the device.  Munchel Tr. 40:19–41:14.

As they approached the Capitol, Munchel and Eisenhart pushed through the crowd.  *See*

Munchel iPhone Video.  They met members of the Oath Keepers militia, and Munchel bumped

fists with one of the militiamen.  *See id.*  Eisenhart then told Munchel, "We're going straight to

federal prison if we go in there with weapons."  *See id.*  Munchel responded that he would not go

into the Capitol, but Eisenhart suggested that they stash "'em" in their backpacks.  *See id.*  Munchel

removed a fanny pack and put it in a tactical bag, which he stashed outside the Capitol.  *See id.*

Munchel admits that he stashed a knife, *see* Munchel Tr. 109:12–15; the reference to federal prison

and plural weapons suggests he may have put other, more dangerous, weapons in the bag as well.

And he kept his taser holstered on his hip.  Eisenhart Tr. 43:7–11.  Eisenhart then encouraged him

to enter the Capitol, saying "the [tear] gas isn't bad."  *See* Munchel iPhone Video.

Having apparently partially disarmed themselves, Munchel and Eisenhart again pushed

towards the Capitol.  *See id.*  Eisenhart encouraged a man who claimed to have "punched two of

them in the face," telling him "[w]hile everyone else is on their couch, you guys are training, and

getting ready for it."  *See id.*  Munchel told another member of the crowd that he is "fucking ready

to fuck shit up" and that "we're not playing fucking nice no god damn more".  *See id.*  And when

Eisenhart heard a report that Congress was "shut down" by tear gas she exclaimed that "they got

tear-gassed, motherfuckers" and proclaimed it her "best day to know they got tear-gassed."  *See*

*id.*  In front of the Capitol, Munchel told Eisenhart that this is "probably the last time I'll be able

to enter the building with armor and . . . fucking weapons."  *See id.*

3

Munchel and Eisenhart breached the Capitol. *See id.* After they have been in the building for several minutes, they spotted plastic handcuffs. *See id.* Munchel shouts "Zip ties! I need to get me some of those motherfuckers." *See id.* Munchel and Eisenhart took a handful and carried the plastic handcuffs into the Senate gallery. *See id.* After leaving the gallery, Eisenhart told Munchel not to carry the plastic handcuffs, concluding that they "need[ed] to get them out of [their] hands." *See id.* Later, Munchel took some home with him to Tennessee. *See* Munchel Tr. 16:15– 17:5. While in the Capitol and after she left, Eisenhart claimed that she took the plastic handcuffs to keep them away from "bad actors." Eisenhart Tr. 46:1–7; *see* Munchel iPhone Video.

At one point, Munchel and Eisenhart entered the gallery above the Senate chamber. *See* Munchel iPhone Video. Both stepped over a railing that separated portions of the gallery. *See id.* Eisenhart chanted "Treason! Treason!" *Id.* And before he left the gallery, Munchel looked down at the dais and said, "I want that fucking gavel," referring to the Senate's priceless ivory artifact. *See id.*; *see also* U.S. Senate, *The Senate's New Gavel*, https://www.senate.gov/artandhistory/ history/minute/The_Senates_New_Gavel.htm. Munchel made no effort to steal the gavel. *See* Munchel iPhone Video.

As they moved through the Capitol, Munchel followed Eisenhart. *See* Munchel iPhone Video. He asked his mother what she hoped to accomplish while there. *See id.* And he eventually encouraged her to leave the Capitol. *See id.* But he never disapproved of her actions. Munchel Tr. 75:17–22.

The record contains no evidence indicating that, while inside the Capitol, Munchel or Eisenhart vandalized any property or physically harmed any person. *See* Munchel Tr. 45:3–8, 49:1–17; Eisenhart Tr. 35:6–15, 36:11–15.

4

### 3. Aftermath

After Munchel and Eisenhart left the Capitol, a Metropolitan Police officer stopped Munchel and seized his taser. Munchel Tr. 26:25–27:10.

In the aftermath of the insurrection, Munchel and Eisenhart boasted to the media. Eisenhart told *The Times* (of London) that:

> This country was founded on revolution. If they're going to take every legitimate means from us, and we can't even express ourselves on the internet, we won't even be able to speak freely, what is America for? I'd rather die as a 57-year-old woman than live under oppression. I'd rather die and would rather fight.

Laura Pullman, *Trump's Militias Say They Are Armed and Ready to Defend Their Freedoms*, *The Times* (of London) (Jan. 10, 2021), https://www.thetimes.co.uk/article/trumps-militias-say-they-are-armed-and-ready-to-defend-their-freedoms-8ht5m0j70. Munchel too justified the events of January 6, saying:

> We wanted to show that we're willing to rise up, band together and fight if necessary. Same as our forefathers, who established this country in 1776.
>
> . . .
>
> It was a kind of flexing of muscles. The intentions of going in were not to fight the police. The point of getting inside the building is to show them that we can, and we will.

*Id.*

Munchel and Eisenhart returned to Tennessee, and Eisenhart continued on to her home in Georgia. *See* Eisenhart Tr. 11:23–12:1.

Upon returning home, Munchel gave the iPhone he wore into the Capitol to a friend for safekeeping. Munchel Tr. 21:17–23:7. He also confirmed to the friend that he was the person pictured in an image of a man jumping a railing in the Senate gallery. *Id.* at 111:12–18; *see also* Gov't Appeal Ex. 1, ECF No. 3 at 6. Aware that he had been identified in social media posts

as a participant in the events at the Capitol, Munchel left his home and stayed with friends for several days. Munchel Tr. 104:21–105:24. He also deactivated his Facebook account.

On the morning of January 10, FBI agents executed a search warrant at the apartment Munchel shares with his brother. Munchel Tr. 14:23–15:3, 15:15–18. The agents found a tactical vest with patches matching the vest Munchel wore on January 6, "four or five" sets of plastic handcuffs, fifteen firearms (including a sniper rifle and multiple assault rifles), a drum magazine, and a large quantity of loaded magazines. *Id.* at 16:9–19:10. Munchel has a license to carry those weapons. *Id.* at 65:4–23.

After Eisenhart became aware that she was the target of a criminal investigation, she spoke with a local FBI agent every day to determine whether a warrant had been issued for her arrest. Eisenhart Tr. 56:11–19, 75:12–24.

### B. Procedural History

Magistrate Judge G. Michael Harvey originally approved a complaint charging Munchel with entering a restricted building without lawful authority, *see* 18 U.S.C. § 1752(a), and violent entry on Capitol grounds, *see* 40 U.S.C. § 5104(e)(2). On January 15, Magistrate Judge Zia M. Faruqui subsequently issued a new complaint charging both Munchel and Eisenhart with unlawful entry and violent entry in addition to civil disorder, *see* 18 U.S.C. § 231(a)(3), and conspiracy, *see* 18 U.S.C. § 371. And, on February 12, a grand jury returned an indictment charging Munchel and Eisenhart with obstruction of an official proceeding, *see* 18 U.S.C. §§ 1512(c)(2), (k), unlawful entry, violent entry, and aiding and abetting violent entry, *see* 18 U.S.C. § 2.

Munchel surrendered to the FBI in Tennessee, which arrested him on a warrant supported by the first complaint. After Munchel's arrest, the government sought pretrial detention of Munchel. Magistrate Judge Jeffrey S. Frensley denied the motion and released Munchel subject

to a number of conditions. *See* Order Setting Conditions of Release, No. 3:21-mj-2668 (M.D. Tenn. Jan. 22, 2021) (restricting travel, prohibiting possession of firearms and contact with co-defendants, requiring weekly contact with pretrial services, imposing home detention, and imposing other conditions). Relying on Munchel's voluntary surrender to the FBI and limited criminal history, Judge Frensley held that Munchel did not pose a flight risk. *See* Munchel Tr. 175:20–178:3. Concluding that Munchel was not violent and that he "respected" law enforcement, Judge Frensley also held that Munchel did not pose an unmitigable threat to the community. *See id.* at 181:12–182:21.

Eisenhart surrendered to the FBI in Tennessee, which arrested her on a warrant supported by the second complaint. The government also sought pretrial detention of Eisenhart. Judge Frensley again denied the motion and conditionally released Eisenhart. *See* Order Setting Conditions of Release, No. 3:21-mj-2679 (M.D. Tenn. Jan. 25, 2021) (restricting travel, prohibiting possession of firearms and contact with co-defendants, requiring weekly contact with pretrial services, imposing home detention, and imposing other conditions). Based on Eisenhart's lack of criminal history, her pre-arrest contact with the FBI, and her self-surrender to the FBI, Judge Frensley concluded that Eisenhart did not pose a flight risk. *See* Eisenhart Tr. 151:14–152:20. Judge Frensley also held that the government did not meet its burden to show that Eisenhart posed a danger to the community. *See id.* at 161:18–21.

Judge Frensley briefly stayed each of his release orders, *see id.* at 171:17–20; Munchel Tr. at 198:24–199:4, and the government promptly appealed both orders, *see* ECF Nos. 3, 6. Chief Judge Beryl A. Howell stayed both release orders pending appeal, *see* ECF Nos. 4, 7, and ordered both defendants transported to this District, ECF Nos. 5, 8, 9. Chief Judge Howell granted the

7

government's motions almost immediately after they were filed, so the defendants did not have the opportunity to file oppositions to the government's stay motions in this Court.

COVID-19-related complications slowed the defendants' transportation to this District. *See* Status Report ¶ 11, ECF No. 17. Eisenhart moved to rescind the stay or to conduct an immediate review of her detention. Munchel moved to join that motion.

Finally, on February 17, the Court arraigned the defendants on the indictment, and the government made a new oral motion for pre-trial detention.

## II.   LEGAL STANDARD

The government may seek pretrial detention in one of two scenarios. First, the government may seek pretrial detention if the case involves any of an enumerated set of offenses, including a crime of violence or a felony that involves use of a dangerous weapon.[1] 18 U.S.C. § 3142(f)(1). Second, the government may seek pretrial detention if the case involves serious risk of flight, obstruction of justice, or witness intimidation. 18 U.S.C. § 3142(f)(2).

If pretrial detention is available, the judicial officer shall, upon a motion of the government, hold a hearing to determine whether there are any conditions or combinations of conditions that will reasonably assure the appearance of the defendant as required and the safety of any person in the community. *Id.* at § 3142(f)(1). After the hearing, a "judicial officer shall order the pretrial release of the [defendant] . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the [defendant] as required or will endanger the safety of any other person in the community." 18 U.S.C. § 3142(b); *see id.* at § 3142(e)(1).

---

[1] In determining whether an offense is a crime of violence, courts look to the elements of the offense, not the real-world conduct. *United States v. Singleton*, 182 F.3d 7, 11 (D.C. Cir. 1999).

To determine whether conditions exist that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the judicial officer shall consider four factors: (1) "the nature and the circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).  A finding that a defendant poses a risk of flight must be supported by a preponderance of the evidence.  *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).  And a finding that a defendant poses a danger to the community must be supported by clear and convincing evidence.  18 U.S.C. § 3142(e) (flush language).

If a defendant is ordered released, the government may file a motion for revocation of the order with the court having original jurisdiction over the offense.  18 U.S.C. § 3145(a).  The court having original jurisdiction over the offense shall promptly decide the motion.  *Id.*  Its review of the magistrate judge's order of release is de novo.  *United States v. Little*, 235 F. Supp. 3d 272, 277 (D.D.C. 2017).  Furthermore, the reviewing court has discretion to call witnesses, review transcripts, or proceed by proffer.  *Id.*

III.   **DISCUSSION AND FINDINGS**

   **A. Detention of Eric Gavelek Munchel**

      **1.  Subject to Detention**

Because the indictment alleges that Munchel carried a dangerous weapon while committing the alleged offenses, each of the counts charged is a felony.  *See* 18 U.S.C. §§ 1512(c), 1752(a)–

9

(b); 40 U.S.C. §§ 5104(e)(1), (2); *see also* 40 U.S.C. § 5109(a).  Therefore, the government may seek Munchel's pretrial detention.[2]  *See* 18 U.S.C. § 3142(f)(1).

## 2.  Risk of Flight

Munchel's risk of flight is minimal.  He does not have a passport or the financial means to flee the country.  Munchel Tr. 148:21–24.  And he voluntarily surrendered to the FBI in Nashville. *Id.* at 70:20–22.  While Munchel faces a potentially lengthy sentence—under both statutory maxima and the sentencing guidelines—if convicted, that fact alone does not render him a flight risk.  *See United States v. Hanson*, 613 F. Supp. 2d 85, 90–91 (D.D.C. 2009) (releasing defendant despite twenty-year maximum sentence).

The government argues that Munchel briefly took actions consistent with attempted flight or obstruction when he left his home to stay with friends and turned his cell phone over to a friend. But Munchel has offered plausible explanations for those actions.  *See* Munchel Tr. 104:3–17 (describing unwanted media attention and doxing); Munchel Ex. 4.  And his voluntary surrender after these events is telling.

Accordingly, the government has not established that Munchel is a flight risk.

## 3.  Safety of Others and the Community

In determining the risk a defendant poses to others and the community, the Court must consider four factors.

### *(i)  Nature and Circumstances of the Charged Offense*

The grand jury charged Munchel with grave offenses.  In charging Munchel with "forcibly enter[ing] and remain[ing] in the Capitol to stop, delay, and hinder Congress's certification of the

---

[2] None of the offenses is a crime of violence because none of the offenses requires as an element physical force.  *See* 18 U.S.C. § 16.

Electoral College vote," Indictment 1, ECF No. 21, the grand jury alleged that Munchel used force to subvert a democratic election and arrest the peaceful transfer of power. Such conduct threatens the republic itself. *See* George Washington, Farewell Address (Sept. 19, 1796) ("The very idea of the power and the right of the people to establish government presupposes the duty of every individual to obey the established government. All obstructions to the execution of the laws, all combinations and associations, under whatever plausible character, with the real design to direct, control, counteract, or awe the regular deliberation and action of the constituted authorities, are destructive of this fundamental principle, and of fatal tendency."). Indeed, few offenses are more threatening to our way of life.

Munchel's alleged conduct demonstrates a flagrant disregard for the rule of law. Munchel is alleged to have taken part in a mob, which displaced the elected legislature in an effort to subvert our constitutional government and the will of more than 81 million voters. Munchel's alleged conduct indicates that he is willing to use force to promote his political ends. Such conduct poses a clear risk to the community.

Defense counsel's portrayal of the alleged offenses as mere trespassing or civil disobedience is both unpersuasive and detached from reality. First, Munchel's alleged conduct carried great potential for violence. Munchel went into the Capitol armed with a taser. He carried plastic handcuffs. He threatened to "break" anyone who vandalized the Capitol.[3] These were not peaceful acts. Second, Munchel's alleged conduct occurred while Congress was finalizing the results of a Presidential election. Storming the Capitol to disrupt the counting of electoral votes is not the akin to a peaceful sit-in.

---

[3] While Munchel's desire to prevent vandalism may be beneficial, his willingness to threaten violence evinces violent behavior.

For those reasons, the nature and circumstances of the charged offenses strongly support a finding that no conditions of release would protect the community.

### (ii) Weight of the Evidence

Substantial evidence supports the government's arguments that Munchel poses a threat to the community. Munchel's words and actions both inside and outside the Capitol were captured on film by Munchel himself. *See* Munchel iPhone Video. That video captured, in real time, Munchel's aggressive language while approaching the Capitol and once inside, as well as his unrepentant statements once he left. *See* Pullman, *supra*. While the government and Munchel may quibble about how to interpret the evidence, Munchel cannot dispute that these events indeed occurred.

The weight of the evidence thus strongly supports a finding that no conditions of release would protect the community.

### (iii) History and Characteristics

Munchel has a limited criminal history—two minor drug convictions—and no history of violence. There is also no evidence that Munchel is a member of any violent groups, thought the government has presented evidence that Munchel was in contact with a member of the Proud Boys after January 6 and was interested in joining the group. *See* Signal Chat Tr. (Jan. 9–10, 2021).

Munchel's history and characteristics slightly weigh against a finding that no conditions of release would protect the community.

### (iv) Danger to the Community

Munchel's words and actions evince a serious threat to the community.

Munchel gleefully entered the Capitol in the midst of a riot. He did so, the grand jury alleges, to stop or delay the peaceful transfer of power. And he did so carrying a dangerous

12

weapon.  Munchel took these actions in front of hundreds of police officers, indicating that he cannot be deterred easily.

Moreover, after the riots, Munchel indicated that he was willing to undertake such actions again.  He compared himself—and the other insurrectionists—to the revolutionaries of 1776, indicating that he believes that violent revolt is appropriate.  *See* Pullman, *supra*.  And he said "[t]he point of getting inside the building is to show them that we can, and we will."  *Id.*  That statement, particularly its final clause, connotes a willingness to engage in such behavior again.

By word and deed, Munchel has supported the violent overthrow of the United States government.  He poses a clear danger to our republic.

The potential danger Munchel poses to the community strongly supports a finding that no conditions of release would protect the community.

### 4.  Potential Release Conditions

All of the release conditions available to the Court depend—at least in part—on voluntary compliance.  A determined defendant can cut off an ankle monitor, ignore travel restrictions, elude a third-party custodian, unlawfully rearm, and endanger his community.

Given Munchel's brazen actions in front of hundreds of law enforcement officers and manifest disrespect for the rule of law, the Court is not satisfied that Munchel would comply with any release conditions.  Munchel has indicated that he would be willing to act against Congress again, and nothing short of pretrial detention can prevent him from doing so.

* * *

The Court finds that the nature and character of the charged offenses, the weight of the evidence, and the danger Munchel poses to the community weigh strongly in favor of pretrial detention. The Court further finds that Munchel's history and characteristics slightly weigh against

13

pretrial detention. On balance, the Court concludes that no release conditions it could set would reasonably assure the safety of the community if it were to release Munchel. Therefore, the Court must order Munchel's detention pending trial.

### B. Detention of Lisa Marie Eisenhart

#### 1. Subject to Detention

The indictment alleges that Munchel carried a dangerous weapon while committing the alleged felonies. *See* 18 U.S.C. §§ 1512(c), 1752(a)–(b); 40 U.S.C. §§ 5104(e)(1), (2); *see also* 40 U.S.C. § 5109(a). The indictment also alleges that Eisenhart aided and abetted Munchel in unlawfully entering and violently entering the Capitol while carrying a dangerous weapon. Indictment 2. Because a person who aids or abets an offense is liable as if she were a principal, *see* 18 U.S.C. § 2, Eisenhart's case includes felonies involving the use of dangerous weapons, *cf. United States v. Lee*, 206 F. Supp. 3d 103, 111 (D.D.C. 2016). Therefore, the government may seek Eisenhart's pretrial detention. *See* 18 U.S.C. § 3142(f)(1).

#### 2. Risk of Flight

Eisenhart's risk of flight is minimal. She does not have a passport or the financial means to flee the country. *See* Eisenhart Tr. 75:3. Once she was aware that she was a suspect, she contacted the FBI every day to determine whether she should self-surrender. *Id.* at 75:12–24. And once the Court issued a warrant, she surrendered immediately. *Id.*

While Eisenhart faces a potentially lengthy sentence—under both statutory maxima and the sentencing guidelines—if convicted, that fact alone does not render her a flight risk. *See Hanson*, 613 F. Supp. 2d at 90–91. And the government offers no other colorable reason to believe Eisenhart will flee.

Accordingly, the government has not established that Eisenhart is a flight risk.

### 3. Safety of Others and the Community

In determining the risk a defendant poses to others and the community, the Court weighs four factors.

#### (i) Nature and Circumstances of the Charged Offense

Eisenhart is charged with the same conduct as Munchel or with aiding and abetting that conduct, subjecting her to the same liability. *See* 18 U.S.C. § 2. Her charged offenses are therefore just as grave. Thus, for the same reasons as explained with respect to Munchel, the nature and circumstances of the charged offenses strongly support a finding that no conditions of release would protect the community.

#### (ii) Weight of the Evidence

Just as with Munchel, substantial evidence supports the government's argument's about Eisenhart's conduct and of the threat she poses to the community. The best evidence of her conduct is Munchel's video. *See* Munchel iPhone Video. The best evidence of the threat she poses to the community are the unrepentant statements she gave following the assault on the Capitol. *See* Pullman, *supra*. While the government and Eisenhart may quibble about how to interpret the evidence, just as with Munchel, the evidence itself is largely uncontested.

The weight of the evidence strongly supports a finding that no conditions of release would protect the community.

#### (iii) History and Characteristics

Eisenhart has no limited criminal history and no history of violence. There is also no evidence that Eisenhart is a member of any violent groups.

Eisenhart's history and characteristics weigh against a finding that no conditions of release would protect the community.

*(iv) Danger to the Community*

Eisenhart's words and actions evince a serious threat to the community.

Eisenhart gleefully entered the Capitol in the midst of a riot. She did so, the grand jury alleges, to stop or delay the peaceful transfer of power. And she did so accompanying her son, who was carrying a dangerous weapon. Eisenhart took these actions in front of hundreds of police officers, indicating that he cannot be deterred easily.

Moreover, after the riots, Eisenhart indicated that she was willing to undertake such actions again. Her words were chilling:

> This country was founded on revolution. If they're going to take every legitimate means from us, and we can't even express ourselves on the internet, we won't even be able to speak freely, what is America for? I'd rather die as a 57-year-old woman than live under oppression. I'd rather die and would rather fight.

Pullman, *supra*. The Court takes Eisenhart at her word. She, like her son, invoked the American Revolution, indicating support for violent revolt. In fact, she even indicated that she was willing to give her life in support of her cause. Thus, Eisenhart too has indicated that she is willing to repeat her behavior.

By word and deed, Eisenhart has supported the violent overthrow of the United States government. As a self-avowed, would-be martyr, she poses a clear danger to our republic.

The potential danger Eisenhart poses to the community strongly supports a finding that no conditions of release would protect the community.

### 4.  Potential Release Conditions

For the same reasons as with her son, no release conditions can ensure that Eisenhart would not pose a danger to the community. Indeed, Eisenhart's willingness to die for her cause indicates that release conditions may be even less effective for her. If Eisenhart does not fear the ultimate consequence, the consequences for disobeying release conditions are unlikely to deter her.

16

* * *

The Court finds that the nature and character of the charged offenses, the weight of the evidence, and the danger Eisenhart poses to the community weigh strongly in favor of pretrial detention.  The Court further finds that Eisenhart's history and characteristics weigh against pretrial detention.  Having considered the relevant factors, the Court concludes that no release conditions it could set would reasonably assure the safety of the community if it were to release Eisenhart.  Therefore, the Court concludes that it must detain Eisenhart pending trial.

## IV.   CONCLUSION

Based on the foregoing, by separate order the Court will **GRANT** the government's detention motion and **ORDER** the defendants detained pending trial.

Date:   2/17/21

Royce C. Lamberth
United States District Judge

17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 21-mj-71 (ZMF)** |
| | : | |
| ERIC MUNCHEL, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

APPEAL OF RELEASE ORDER AND
EMERGENCY MOTION FOR STAY PENDING APPEAL

The United States appeals a Middle District of Tennessee Magistrate Judge's release order, which takes effect Monday, January 25, at 11:00 a.m. EST, and moves for an emergency stay until the appeal is resolved.

## INTRODUCTION

Armed with a taser and clad for battle in fatigues, a tactical vest, combat boots, gloves, and a gaiter that revealed only his eyes, the defendant, Eric Munchel, stormed the United States Capitol on January 6, 2021.  Upon penetrating the building through a door breached by insurgents, the defendant grabbed a handful of Capitol Police flexicuffs and exclaimed: "Zip ties.  I need to get me some of them mother----s!"  Then, with his co-conspirator, Lisa Eisenhart—who also wore a tactical vest and took flexicuffs—the defendant joined a group of insurgents searching for Members of Congress.  Surrounded by insurgents exhorting veiled threats such as "Treason!", "Anybody home?", "They're cowards!", and "Are you afraid?", the defendant infiltrated the Senate chamber—only minutes after the Senate body, including the Vice President of the United States, had been evacuated.  The invasion halted the proceedings of a Joint Session of Congress, which had convened to certify the Electoral College vote as required by the Twelfth Amendment.

Government Appeal Exhibit No. 1



Four days after the Capitol insurrection, on January 10, 2021, the FBI executed a search warrant at the defendant's Nashville home, where they found the tactical gear he wore on January 6, five pairs of plastic flexicuffs, a black taser holster, and an arsenal of firearms—including assault rifles, a sniper rifle with a tripod, other rifles, a double barrel shotgun, other shotguns, pistols, a drum style magazine, and hundreds of rounds of ammunition. The defendant was later taken into custody in the Middle District of Tennessee under a criminal complaint issued by a Magistrate Judge of this Court. He is charged with civil disorder by impeding law enforcement and federally protected functions, entering restricted grounds, felony violent entry, and conspiring with Eisenhart to commit those offenses. The investigation continues.

The government moved for pretrial detention. On January 22, 2021, a Magistrate Judge in the Middle District of Tennessee ordered the defendant's release to home confinement, but stayed the order's execution until 11:00 a.m. on Monday, January 25, to afford the government the chance to appeal. The government appeals and requests an emergency stay until the appeal is resolved.

2

## BACKGROUND

### I.      Procedural History

On January 10, 2021, the defendant was arrested in Tennessee under a complaint/warrant

issued by Magistrate Judge G. Michael Harvey.   The complaint charged the defendant with

entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a) (a

misdemeanor), and violent entry on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2) (a

felony).  The defendant made his initial appearance in the Middle District of Tennessee on January

11, and the government moved for detention.   Based on subsequently obtained evidence, the

government applied for, and Magistrate Judge Zia M. Faruqui approved, a new criminal complaint

jointly charging the defendant and Eisenhart with the same offenses, along with civil disorder (a

felony), in violation of 18 U.S.C. § 231(a)(3), and conspiracy to commit that and the two offenses

in the original complaint, in violation of 18 U.S.C. § 371.   On January 22, Magistrate Judge Jeffrey

S. Frensley of the Middle District of Tennessee conducted a preliminary and detention hearing.

Magistrate Judge Frensley found probable cause, denied the government's detention motion, and

ordered the defendant released to home confinement.   At the government's request, Magistrate

Judge Frensley stayed the release order until Monday, January 25 at 11:00 a.m. EST.[1]

### II.      The Government's Allegations

The government's investigation—to date—establishes the following:

### A.      The Capitol Incursion

On January 6, 2021, at approximately 1:00 p.m., a Joint Session of the House of

Representatives and the Senate convened to certify the Electoral College vote in the 2020

---

[1] The government ordered a copy of the transcript of the hearing on an expedited basis and
will deliver it to the Court upon receipt.  The only government exhibit marked at the hearing was
the affidavit in support of the criminal complaint.  ECF No. 1.

Presidential Election.  Vice President Michael R. Pence, in his constitutional duty as President of the Senate, presided over the Joint Session.  The Capitol's exterior plaza was closed to the public, but a large crowd began to gather outside as the Joint Session got underway.

As the House and Senate proceedings ensued, crowd members forced their way through, up, and over Capitol Police barricades and advanced to the building's exterior façade.  Capitol Police officers attempted to maintain order and stop the crowd from entering the Capitol building, to which the doors and windows were locked or otherwise secured.  Nonetheless, shortly after 2:00 p.m., crowd members forced entry into the Capitol building, including by breaking windows and assaulting Capitol Police officers, while others in the crowd encouraged and assisted those acts. The crowd was not lawfully authorized to enter or remain inside the Capitol, and no crowd member submitted to security screenings or weapons checks by Capitol Police or other security officials.

Shortly thereafter, at approximately 2:20 p.m., House and Senate Members (including Vice President Pence)—who had withdrawn to separate chambers to resolve an objection—were evacuated from their respective chambers.  Less than 30 minutes after the evacuation, some of the crowd that had breached the Capitol, including the defendant, stormed into the Senate chamber. The Joint Session and all proceedings of the Congress remained suspended while Capitol Police and other law enforcement agencies worked to restore order and clear the Capitol of the unlawful occupants.  Later that night, law enforcement regained control of the Capitol.  At approximately 8:00 p.m., the Joint Session reconvened, presided over by Vice President Pence, who had remained hidden within the Capitol building throughout the insurrection.

In the course of the insurrection, approximately 81 Capitol Police and 58 MPD officers were assaulted, including one Capitol Police officer who died.  Additionally, four citizens died; many media members were assaulted and had cameras and other news gathering equipment

destroyed; and the Capitol suffered substantial damage—including broken windows and doors, graffiti, and residue of various pepper sprays, tear gas, and fire extinguishers deployed both by insurgents who stormed the Capitol and by Capitol Police officers trying to restore order.

**B.      The Defendant's Conduct at the Capitol**

        *1.      The Criminal Complaint*

As set forth in the affidavit in support of the complaint, ECF No. 1, on January 4, 2021, the defendant and his mother, Eisenhart, traveled from Nashville to Washington to participate in the January 6 "March for Trump."  Shortly after 2:00 p.m. that day, the defendant and Eisenhart, dressed in combat attire, stormed the Capitol.  They eventually breached the Senate chamber alongside other insurgents searching for Members of Congress.  The below photographs depict the defendant and Eisenhart in their tactical gear, inside and outside of the Capitol.  Government Appeal Exhibit No. 1 shows the defendant in the Senate chamber, equipped with plastic zip ties, or "flexicuffs" (which are used by law enforcement as hand restraints), a cell phone strapped to his chest (which the FBI would later confirm was videotaping the incursion), and a holster on his right hip; Government Appeal Exhibit No. 2 also depicts the defendant in the Senate chamber; Government Appeal Exhibit No. 3 shows the defendant and Eisenhart together outside the Capitol before the building was breached; and Government Appeal Exhibit No. 4 shows both the defendant and Eisenhart approaching the Senate chamber, equipped with flexicuffs.

Government Appeal Exhibit No. 1



Government Appeal Exhibit No. 2



6

Government Appeal Exhibit No. 3



Government Appeal Exhibit No. 4



7

Later that night, January 6, 2021, MPD officers encountered the defendant in the area of the Grand Hyatt Hotel, where he and Eisenhart stayed from January 4 to 7.  One of the officers observed a black holster on the defendant's right hip, along with the black grip of what appeared to the officer at that time to be a firearm.  Officers spoke with the defendant, who allowed them to remove the item from the holster.  The item turned out to be a black and yellow "Taser Pulse," a weapon designed to administer an electrical shot.  Officers confiscated the weapon.  The taser is shown in Government Appeal Exhibit No. 5, below.  The defendant told the officers that he possessed the taser for his own protection while he participated in "First Amendment assemblies" earlier that day.  The defendant was identified at that time by his Tennessee concealed weapons permit.  *See* ECF No. 1, ¶ 21.

Government Appeal Exhibit No. 5



The day after the insurrection, January 7, 2021, the defendant told a reporter for *The Times* (of London) that he had traveled to Washington "to show that we're willing to rise up, band together and fight if necessary.  Same as our forefathers, who established this country in 1776." *See*  https://www.thetimes.co.uk/article/trumps-militias-say-they-are-armed-and-ready-to-defend-their-freedoms-8ht5m0j70 (last viewed January 23, 2021).  He elaborated that the insurgence upon

8

the Capitol was "a kind of flexing of muscles," and specified that"[t]he point of getting inside the building [was] to show them that we can, and we will." *Id.* He told the reporter that he was a gun owner, but asserted that he had left his guns in Tennessee due to the District's strict gun laws. *Id.* For her part, Eisenhart claimed to *The Times* reporter that she and the defendant entered the Capitol as "observers"—a claim belied by their combat attire, the flexicuffs they carried to the Senate chamber, the defendant's taser, and further video evidence described below. *See* ECF No. 1, ¶ 27.

### 2.   *Subsequently Obtained Video/Audio from the Defendant's Cell Phone*

In the course of its investigation, the FBI obtained the defendant's cell phone, which he had mounted to his chest during the insurrection. *See* Government Appeal Exhibit No. 1.  The cell phone contained video and audio from the Capitol insurrection, which was not available at the time the current complaint was obtained.  The video, which will be made available to the Court, shows Eisenhart in a large crowd outside the Capitol and depicts her and the defendant walking towards the front side.  At one point, the video shows an encounter with apparent members of the "Oath Keepers."[2]  The defendant, upon recognizing the group can be heard to state: "Oath

---

[2] In *United States v. Jessica Marie Watkin*s, et al, 21-mj-119 (ZMF), the government alleged that at least three Oath Keepers conspired to obstruct the Joint Session in an effort to stop the certification of the Electoral College vote. According to the affidavit supporting the operative criminal complaint (ECF No. 1 at ¶ 12) in that case:

> Law enforcement and news media organizations observed that members of a paramilitary organization known as the Oath Keepers were among the individuals and groups who forcibly entered the U.S. Capitol on January 6, 2021.  The Oath Keepers are a large but loosely organized collection of militia who believe that the federal government has been coopted by a shadowy conspiracy that is trying to strip American citizens of their rights.  Though the Oath Keepers will accept anyone as members, what differentiates them from other anti-government groups is their explicit focus on recruiting current and former military, law enforcement and first responder personnel.  The organization's name alludes to the oath sworn by members of the military and police to defend the Constitution "from all enemies, foreign and domestic."

9

Keepers," and bumps fists with one of them.  One apparent Oath Keeper can be heard asserting that, "There's 65 more of us coming."

Around that point in the video, it is evident that crowd members are breaching or attempting to breach the Capitol.  Eisenhart can be heard stating, "We're going straight to federal prison if we go in there with weapons."  The defendant can be heard replying with words to the effect of, "Yeah, that's why I'm not going in there," and Eisenhart can be heard stating, "Let's go put it—we can put 'em in the backpacks."  The video then depicts the defendant and Eisenhart walking towards a low stone wall, where the defendant sets up plastic chairs and helps others climb over the wall towards the Capitol while offering words of encouragement.  Eisenhart likewise can be seen encouraging crowd members to climb the wall and enter the Capitol: "Yeah, go up in there. You can go up in there now."  Moments later, the defendant can be heard stating the words, "take my weapons off before I go in there."  The defendant and Eisenhart then appear to retreat through the crowd to a location where a tactical bag and other items appear to have been stashed.  Once at that location, the defendant and Eisenhart appear to remove items from their clothing and place them in or near the bag.  Eisenhart can then be heard to say: "We're going in"; "the [tear] gas isn't bad"; and "Let's go in, let's go in."

The video then depicts the defendant and Eisenhart pushing through a crowd to draw closer to a Capitol egress.  An unidentified woman can be heard making a reference to "treason," to which the defendant can be heard to reply: "Hell yeah it is!"  Eisenhart can be heard telling a man—who stated that he had been "maced" and claimed to have "punched two of them in the face"—"Good . . . . While everyone else is on their couch, you guys are training, and getting ready for it."  Soon thereafter, the defendant can be heard saying, "We ain't playing fucking nice no god damn more," to which Eisenhart can be heard to reply: "That's right."  Moments later, the video depicts a person

10

in the crowd telling the defendant and Eisenhart, "You guys look like y'all ready to go."  The defendant can be heard to reply: "F---ing ready to f--k s--t up."  At another moment, a man can be heard shouting, "Congress is shut down! Tear gas packages thrown in the Congress!" Eisenhart can then be heard to exclaim: "They got tear-gassed, mother---ers!  Oh my God.  That is [unintelligible] my best day, to know that they got tear-gassed."  Other people in the crowd can be hear screaming, "F--k that, this is our house!"

The video further shows the defendant and Eisenhart crawl through a broken metal guardrail outside the Capitol, as the defendant exclaims, "Hell yeah, baby!"  Once they reach the front of the Capitol, Eisenhart can be heard exclaiming, "The story of how we got in is going to be great—who got us in the house," and the defendant replying, "Probably the last time I'll be able to enter the building with armor and . . . f---ing weapons."  With the sounds of shattering glass and breaking windows in the background, the defendant can be heard shouting, "I guess they thought we were playing!"  The defendant and Eisenhart can then be seen breaching the Capitol entrance amidst a throng of insurgents.  Eisenhart and others can be heard shouting, "Treason!"  Around this point on the video, the defendant can be heard to state: "Don't break s--t,"; "No vandalizing s--t,"; and "We ain't no god damn Antifa, mother---ers."

Finally, the video shows the defendant spot plastic zip ties—flexicuffs—on a cabinet inside a hallway in the Capitol and exclaim: "Zip ties! I need to get me some of them mother---ers."  The defendant can then be seen grabbing several plastic flexicuffs and Eisenhart can be seen carrying flexicuffs as well.  Later, the defendant and Eisenhart are depicted entering the Senate gallery, while other crowd members seeking Members of Congress can be heard yelling— "Anybody home?"; "They went into the tunnels"; "Where'd you go?"; "They're cowards!"; "Are you afraid?"; and "Treason!"  The video also shows the defendant and Eisenhart leaving the Senate

gallery, and Eisenhart stating, "Don't carry the zip ties, just get 'em out of their hand, out of [unintelligible] get 'em out of our hands."

### C.   **Reported Assault by Defendant**

On the evening of January 6, 2021, after the insurrection, an individual posted a video of the Grand Hyatt hotel lobby on Twitter.  The person then posted a message that read: "After I took this video, several Trump supporters harassed me and tried to follow me to my room.  One accused me of being 'antifa.'[3]  Hotel security intervened and moved me to new room.  What a weird day." *See*  https://twitter.com/WilliamTurton/status/1346980284252745729 (Last accessed on January 23, 2021).  The person added: "The Trump supporters demanded that I delete the video.  One woman flashed her taser at me, and threatened to mace me."  *See* https://twitter.com/WilliamTurton/status/1347024856416714752 (last viewed January 23, 2021). Two days later, on January 8, based on another video from the Grand Hyatt posted to social media, the person identified the defendant as "one of the people in the hotel lobby who demanded I delete the video, put his hands on me, and screamed at me . . . ."  *See* https://twitter.com/WilliamTurton/status/1347699125408641024 (last viewed January 23, 2021); https://twitter.com/WilliamTurton/status/1347699345345417217 (last viewed January 23, 2021). Evidence of this encounter was not presented at the preliminary and detention hearing in the Middle District of Tennessee.

---

[3] According to the Anti-Defamation league, antifa is a loosely organized anti-fascist protest movement that, in some instances, has engaged in violent confrontations.  *See* https://www.adl.org/antifa (last accessed January 24 2021).

**D.**      **Search Warrant Execution and Additional Investigation**

The government obtained a search warrant for the defendant's Nashville residence, which the FBI executed on January 20, 2021.  Inside, the FBI found the tactical gear the defendant wore when he stormed the Capitol and five pairs of plastic flexicuffs:

Government Appeal Exhibit No. 6

  

The FBI also discovered a safe in the defendant's bedroom, which contained approximately 15 firearms, including assault rifles, a sniper rifle with a tripod, a double barrel shotgun, other rifles, shotguns, pistols, and hundreds of rounds of ammunition.  The FBI also found inside the bedroom a .22-caliber pistol, dozens of rounds of ammunition, a drum style magazine, and multiple empty and full magazines. The defendant's arsenal is depicted below.

13

Government Appeal Exhibit No. 7



Additionally, around the same time that the FBI executed the search warrant and it was clear that the defendant was a criminal suspect, it appears that he took steps to evade detection, including: avoiding his residence and workplace, deactivating his Facebook account, and giving his cell phone—which contained highly inculpatory footage of the Capitol siege—to an associate.

14

## ARGUMENT

### A.    Legal Standard

Because this Court has original jurisdiction over the defendant's prosecution, it has sole authority to review the Magistrate Judge's release order and may stay that order pending review. *See* 18 U.S.C. § 3145(a)(1) ("If a person is ordered released by a magistrate, . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release."); *see also, e.g.*, *United States v. El-Edwy*, 272 F.3d 149, 152-54 (2d Cir. 2001) ("With respect to the decision whether to detain or conditionally release the defendant, . . . section 3145(a) makes clear that the ultimate authority lies with the district that has the primary interest in the question—the district in which the prosecution is pending.").  The review of a magistrate's release order is *de novo*.  *See, e.g., United States v. Tortora*, 922 F.2d 880, 883-84 (1st Cir. 1990); *United States v. Hudspeth*, 143 F.Supp.2d 32, 35-36 (D.D.C. 2001) (Kennedy, J.).

The government may move for pretrial detention in any case, among others, charging "any felony . . . that involves the possession or use of . . . any [ ] dangerous weapon," 18 U.S.C. 3142(f)(1)(D), or involving "a serious risk that such person will flee," *id.* § 3142(f)(2)(A).  The defendant is subject to a pretrial detention request by the government in this case, because (1) he is charged with felony offenses arising from his participation in the Capitol insurrection while armed with a taser, and (2) he poses a risk of flight.  If the Court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, [the Court] shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).  A finding of either risk of flight or danger is sufficient for detention.  *See e.g., United States v. Ferranti*, 66 F.3d 540, 543-44 (2d Cir. 1995).  The former

must be established by a preponderance of the evidence, *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996), and the latter by clear and convincing evidence.  18 U.S.C. § 3142(f)(2)(B).  The government may proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).  The Court should consider: (1) the nature and circumstances of the offense, (2) the weight of the evidence, (3) the defendant's history and characteristics, and (4) the nature and seriousness of the danger the defendant poses to any person or the community.  18 U.S.C. § 3142(g).

B.  **Analysis**

Each of the four statutory factors favor detention.

First, the nature and circumstances of the offense involve fear, intimidation, and violence— directed at law enforcement, elected public officials, and the entire country.  The defendant can make no serious claim that he went to the Capitol on January 6 intending to engage in peaceful protest or civil disobedience.  Instead, the evidence supports the conclusion that he intended to contribute to chaos, obstruct the Electoral College certification, and sow fear.  This is illustrated by the defendant's preparation before reaching the Capitol and expressly stated intent: the defendant dressed in combat attire from head to toe; armed himself with a taser (and, appearing from his own cell phone video and audio recording, a more dangerous weapon); and told a reporter that his intent in going to the Capitol was "a kind of flexing of muscles" and that he was ready to "fight if necessary."  Once at the Capitol, the defendant's conduct was consistent with that expressly stated intent: the defendant helped and encouraged other insurgents to ascend a wall to access the Capitol; exclaimed that he was "F---ing ready to f--k s--t up"; affirmed cries of "Treason" by other insurgents; responded to the chaos by exclaiming, "I guess they thought we were playing!"; stormed into the Capitol through a breached door; grabbed Capitol Police plastic flexicuffs, comprehending that they are instruments of restraint and kidnapping; marched

16

throughout the Capitol searching for Members of Congress who he believed had committed "Treason"; and infiltrated the Senate chamber.  The nature and circumstances of the alleged offenses all indicate forethought and specific intent to obstruct a congressional proceeding through fear, intimidation, and, if necessary, violence.  These threads—planning, forethought, intent—are all indicative of a capacity and willingness to repeat the offense and pose a clear threat to community safety.  As the defendant himself told *The Times* reporter, "[t]he point of getting inside the building [was] to show them that we can, and we *will*" (emphasis added).

Second, the weight of the evidence against the defendant is immense: he has been photographed and caught on tape inside the Senate chamber in battle fatigues and equipped with flexicuffs; admitted to being armed with a taser; confessed to traveling to Washington to "fight if necessary" and to "show them that we can, and we will" take the Capitol; been recorded on his own cell phone inciting and encouraging other insurgents to breach the Capitol, seeking out Members of Congress once inside the Capitol, and making and endorsing veiled threats; etc.  The evidence amassed so far subjects the defendant to felonies beyond that with which he has been charged so far, including obstructing Congress, interstate travel in furtherance of rioting activity, sedition, and other offenses.  These offenses carry substantial penalties, which incentivizes flight and evading law enforcement—a thought that the defendant already appears to have contemplated by virtue of avoiding his residence and workplace, terminating his Facebook account, and leaving his cell phone with an associate.

Third, the defendant's history and characteristics animate the conclusions drawn from the facts above.  The defendant appears to have assaulted a person whom he, for no reason, associated with a rival extremist group.  He also keeps what can only be described as an arsenal of firearms and ammunition in his home.  Although Tennessee law permits the defendant to maintain such an

arsenal, it nonetheless indicates the continued capacity to carry out the sort or fear and intimidation campaign in which he partook on January 6.  Moreover, the defendant has had several prior contacts with law enforcement.  According to the Pretrial Services Report, he has been arrested on drug possession charges three times, convicted twice, and failed to appear once.

Finally, it is difficult to fathom a more serious danger to the community—to the District of Columbia, to the country, or to the fabric of American Democracy—than the one posed by armed insurrectionists, including the defendant, who joined in the occupation of the United States Capitol. Every person who was present without authority in the Capitol on January 6 contributed to the chaos of that day and the danger posed to law enforcement, the Vice President, Members of Congress, and the peaceful transfer of power.  The defendant's specific conduct aggravated the chaos and danger.  It was designed to intimidate Members of Congress and instigate fear across the country.  Make no mistake: the fear the defendant helped spread on January 6 persists—the imprint on this country's history of a militia clad insurrectionist standing over an occupied Senate chamber is indelible.  Only detention mitigates such grave danger.

## CONCLUSION

There is no release condition or combination of release conditions that will reasonably assure the community's safety or the defendant's return to court.  This Court should stay the Middle District of Tennessee Magistrate Judge's release order and, after a hearing, order the defendant detained pending a trial.  To effectuate the stay, it must be entered before 11:00 a.m. EST on Monday, January 25, 2021.  Proposed stay and transportation orders are attached.

18

Respectfully submitted,

MICHAEL R. SHERWIN
ACTING UNITED STATES ATTORNEY


AHMED M. BASET
Assistant United States Attorney
IL Bar 630-4552
U.S. Attorney's Office for the District of Columbia
Public Corruption & Civil Rights Section
555 4th Street, N.W.
Washington, D.C. 20530
Email: ahmed.baset@usdoj.gov
Phone: 202-252-7097


J.P. COONEY
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
Public Corruption & Civil Rights Section
555 4th Street, N.W.
Washington, D.C. 20530
D.C. Bar No. 465429
Email: joseph.cooney@usdoj.gov
Phone: 202-252-7281


JUSTIN SHER
Trial Attorney
D.C. Bar No. 974235
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20004
Email: justin.sher@usdoj.gov
Office: 202-353-3909

19

## <u>CERTIFICATE OF SERVICE</u>

I certify that I will provide a copy of the foregoing Appeal of Release Order and Emergency Motion for Stay Pending Appeal to the Federal Public Defendant in the Middle District of Tennessee, which is currently representing the defendant in proceedings before that court.

J.P. COONEY
Assistant United States Attorney
Public Corruption & Civil Rights Section