# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) )  ) |
| v. | ) Case No. 1:21-cr-118 (RCL) ) |
| LISA MARIE EISENHART | ) ) ) |

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF HER MOTION FOR RELIEF FROM CONFINEMENT CONDITIONS OR FOR TRANSFER TO A MORE SUITABLE JAIL FACILITY

NOW COMES Defendant Lisa Marie Eisenhart, through undersigned appointed counsel, and files this Reply Brief in support of her request for this Court to end her solitary confinement, either by directing her return into the D.C. Jail's general population or placing her at another jail.

In its Order (ECF #42), this Court set an accelerated briefing schedule and directed the parties to be prepared to address three specified issues at the upcoming Status Conference, where this Motion will be heard. The Government responded and the D.C. Department of Corrections (DOC) has also intervened and filed a response. Ms. Eisenhart now files this Reply Brief.

## ADDITIONAL BACKGROUND

Since the filing of Ms. Eisenhart's Motion, the DOC has filed papers further explaining not only its position, but also this pretrial situation more generally. It is now quite clear that the placement of Ms. Eisenhart into segregated detention has nothing at all to do with her individualized circumstances. Instead, the DOC has submitted a Declaration from D.C. Jail's Deputy Warden, submitted under penalty of perjury, which openly admits that "all of the detainees who are being held at the Jail in connection with the events that occurred on January 6, 2021 at the Capitol Building have been placed in restrictive housing." A group decision has been made by the DOC to give *all* such Defendants a "maximum" security designation.

1

The Deputy Warden also claims Ms. Eisenhart was "mistakenly transferred" into restrictive housing on March 3, 2021, after which "DOC discovered the mistake and transferred Defendant Eisenhart back to a restrictive housing unit on March 4, 2021." The DOC also claims that Mr. Munchel is also in restrictive housing, although it does not deny Ms. Eisenhart's other understandings that Mr. Munchel (unlike Ms. Eisenhart) is receiving regular interactions with other inmates, and also is not shackled during all of his movements throughout DOC facilities.

## ARGUMENT AND CITATIONS OF AUTHORITY

### A. Jurisdiction Exists to Consider this Motion During Ms. Eisenhart's Appeal

As the Government's brief correctly concedes, Ms. Eisenhart's current appeal in the D.C. Circuit should not deprive this Court of jurisdiction to decide the instant motion. That appeal only legally divests this Court of its control "over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). The only issue in the D.C. Circuit is *whether* Ms. Eisenhart should be detained – not what the *conditions* of that detention should be. While Ms. Eisenhart's release by the D.C. Circuit could moot this motion, the subject of that appeal (as the Government concedes) is "distinct" from the subject of the instant motion. And even if jurisdiction were lacking, this Court should still issue an indicative ruling under Fed. R. Crim. P. 37(a), as has been done in numerous cases then pending on appeal when a compassionate release motion has been filed in the various courts of this District.

### B. The Motion Presents Questions Legally Cognizable by this Court

This Court also has jurisdiction to decide the present issues, not only pursuant to its constitutional authority but also pursuant to its other statutory and supervisory powers.

### 1. This Court Has Jurisdiction to Address These Issues

This Court itself has previously found jurisdiction in this very setting, in a published opinion. In *United States v. Medina*, 628 F. Supp. 2d 52, 55 (D.D.C. 2009), it held "that this Court has jurisdiction to grant the defendants relief," rejecting the DOC's argument "that this Court is without jurisdiction to grant pretrial detainees relief when the actions of a correctional facility violate the Constitution *or impede the Court from administering justice*." *Id.* at 55 (emphasis added); *id.* at 56 ("the Court determined that it has the jurisdiction to grant the defendants relief"). Here, the Government openly "agrees that the Court has jurisdiction to review constitutional claims relating to conditions of confinement." ECF #45, at 6.

The DOC, however, separately disagrees, arguing – as it did in *Medina* – that the Prison Litigation Reform Act (PLRA) prevents this Court from exercising jurisdiction, at least before Ms. Eisenhart exhausts administrative remedies. But this Court rejected that same argument in *Medina*, specifically finding that the PLRA's provisions do not even apply in a pretrial context:

> The PLRA applies to "suits by prisoners"; these defendants have challenged their classification status in connection with their criminal case, in which they are being held pending trial. This is not a civil action, and the PLRA is wholly inapplicable.

*Id. See also id.* at 54 ("the defendants in this case are in a unique position because they have not been convicted of a crime. Cases cited and relied on by the DOC that relate to convicts, therefore, have little or no relevance here").[1] This Court also noted in *Medina* the "sound

---

[1] Even if the PLRA did apply, and required exhaustion of administrative remedies, jurisdiction would still be proper because any administrative efforts by Ms. Eisenhart would be futile. As Ms. Eisenhart noted in her Motion, she has already been advised that the decision to place her back into segregation is likely not challengeable through the D.C. Jail's grievance process, and the Policy and Procedures attached to the DOC's latest filing appear to confirm this. This is not some mere "housing" dispute; rather, Mr. Glover's emails specify that Ms. Eisenhart's segregation arises from the "maximum" security classification issued by "the agency's Case

reasons why the DOC should heed Court orders" in this context, since this Court may learn of situations that "might necessitate a transfer." *Id.* at 55-56. In fact, this Court apparently felt so strongly about this issue that it expressed dissatisfaction with a "disturbing trend" of the DOC not "consistently heed[ing] transfer orders," and explicitly warned the DOC not to "unilaterally resolve this issue" simply because "the DOC believes the Court does not have jurisdiction," since "simply ignoring court orders that pertain to inmates at its facilities" could render DOC officials "subject to contempt proceedings for willfully disobeying Court orders." *Id.* at n.6.

Alternatively, Ms. Eisenhart's Motion can and should be treated as a habeas petition under 28 U.S.C. § 2241, so her requested relief can be heard. *See United States v. Basciano*, 369 F. Supp. 2d 344, 348 (E.D.N.Y. 2005) ("The courts of this circuit consistently have held that a habeas petition is the appropriate vehicle for prisoners challenging their placement in pretrial administrative detention and seeking release into general population").[2] In that § 2241 setting, "the statutory exhaustion requirement set forth under the [PLRA] is [also] not applicable." *Id.* And while *judicial* exhaustion requirements of habeas would apply, there a "court may excuse exhaustion if it appears that an administrative appeal would be futile, or because the appeals process is shown to be inadequate to prevent irreparable harm to the defendant." *Id. See* note 1, *supra* (administrative review here is futile). As in *Basciano*, Ms. Eisenhart should not be "faced with the prospect of perpetual detention without access to judicial review under circumstances that raise a serious and urgent constitutional question while the [jailer] fiddles." *Id.* at 349.

---

Management staff." And DOC Policy No. 4030.1L § 10(b)(2) makes clear that such "Classification Committee decisions" are "Non-Grievable Issues."

[2] If this Court determines that such a habeas filing must be submitted in a different format, or if it deems the various arguments made herein by Ms. Eisenhart's counsel to be improperly raised in a reply brief, leave should properly be granted to Ms. Eisenhart's counsel so that these arguments can be reformatted as deemed necessary, rather than denying the instant motion with prejudice.

Finding jurisdiction to consider Ms. Eisenhart's requested relief would not be unusual at all, as *Medina* and Basciano attest, and as our Circuit's published opinion in *Jones v. Horne*, 634 F.3d 588 (D.C. Cir. 2011) also verifies. That case involved a different (i.e., civil) action, by an inmate suing the D.C. Jail and other officials for having deprived him, for several months, of his liberty interests after he was placed in separated lockdown conditions at the D.C. Jail, at the behest of a prosecutor. While the D.C. Circuit did affirm a dismissal of that *civil* Complaint,[3] it made clear that legal relief had been *granted* by the District Court *handling the criminal case*:

> Jonas remained in "lockdown" from December 2, 2005, without mail or telephone or visitor privileges until April 26, 2006, *when the district court ordered Jones returned to the general population at the D.C. Jail* subject to certain restrictions on his mail, telephone and visitor privileges.

*Id.* at 592. The Circuit expressed no surprise or disapproval of this order of the presiding criminal judge, who had "ordered Jones returned to the general population at the D.C. Jail." In short, the specific relief Ms. Eisenhart seeks here is not only possible – it has already been done in other cases, and as *Jones* reveals, even in at least one criminal case within this Circuit.

### 2. Ms. Eisenhart Raises Viable Constitutional and Other Claims

Ms. Eisenhart submits that the DOC's latest disclosure – revealing that "*all* of the detainees who are being held at the Jail in connection with the events that occurred on January 6,

---

[3] The D.C. Circuit found that the plaintiff's claims of a right to be free of restrictions that did not exceed the general jail population, and to a pre-deprivation hearing, were not so "clearly established" at the time that he could sue the civil defendants, who were entitled to immunity. 634 F.3d at 599. *See also id.* ("the court need not decide whether either asserted right exists"); *id.* at 600 ("Jones failed to allege in his complaint any punitive change…or that a District of Columbia government policy or custom caused the alleged violation of his constitutional rights," as required by *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978). Qualified immunity and *Monell* are civil doctrines that limit lawsuits for damages; they do not restrict criminal courts.

2021 at the Capitol Building have been placed in restrictive housing" – represents an arbitrary classification, and one designed to improperly punish all such defendants.

As this Court noted in *Medina*, deference to DOC's classification decisions has limits: "Of course, the Court cannot defer if the decisions as to pretrial detainees are punitive, if the decisions appear so arbitrary that they are a pretext for a punitive decision, or if DOC's decisions are infecting the Court's ability to administer justice because the defendants are being denied access to counsel or discovery." 628 F. Supp. 2d at 58.

This case is not a situation like *Medina*, where the DOC had explained that "classification is a process that takes into account a number of categories of information, including but not limited to, the inmate's record, an interview of the inmate, information from correctional and other law enforcement officers, the severity of the offense charged, prior felony convictions, age, and history of disciplinary problems." 628 F. Supp. 2d at 57. In *Medina* the "offense was not viewed in isolation, but in combination with the other factors listed by the DOC." *Id.* But this case is the opposite: we now know the offense *is* being viewed in isolation, with all other classification factors deemed irrelevant. By the DOC's own admission, if a defendant is charged with a January 6th U.S. Capitol offense and detained, they automatically get placed in restrictive housing – and are treated as "maximum" security detainees. That arbitrary branding cannot pass constitutional muster, particularly without any prior process provided.

From these facts, several constitutional violations arise. First, Ms. Eisenhart's substantive due process (liberty interest) rights have been violated by the DOC's automatic "maximum security" classification and placement of her in restricted housing at D.C. Jail. Based on the DOC's latest filing, it appears obvious that every January 6th U.S. Capitol defendant, once detained at the D.C. Jail, is in fact being "punished" even before they get convicted, by being

*automatically* given a "maximum" security classification, and the punitive restrictions of the D.C. Jail restrictive housing, regardless of their own individualized circumstances.  Other non-U.S. Capitol detainees are classified based on their individualized circumstances, but defendants like Ms. Eisenhart are not; this can only properly be viewed as an unconstitutional punishment prior to conviction:  No "alternative purpose to which [the restriction] may rationally be connected is assignable for it," and "it [also] appears excessive in relation to the alternative purpose assigned to it."  *Id.*   Stated simply, it is "excessive" for the D.C. Jail to declare every U.S. Capitol defendant is unable even to be *considered* for housing in general population, and its across-the-board, generic disqualification cannot fairly be seen as incident to any legitimate governmental purpose, as *Bell v. Wolfish*, 441 U.S. 520, 538 (1979) requires.  *See also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (pretrial detainee can establish she has been "punished" by showing "government action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose").

Second, and in addition to her substantive due process interest in being free from "punishment" unless and until convicted, Ms. Eisenhart also has been denied procedural due process.  This right prevents the Government from taking actions that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" absent certain procedural protections – viz., "notice and an adequate opportunity to be heard." *Wilkinson v. Austin*, 545 U.S. 209, 218 (2005).  Here, Ms. Eisenhart's housing placements were made without any notice, or right to be heard.  As noted above, the initial decision was made by the D.C. Jail generically, and automatically, with no process at all.  And later, even after Ms. Eisenhart had been placed into D.C. Jail's general population, and this benefit had therefore *vested*, it was stripped away, once again with no due process.  She has never been heard.  She has

been denied any right to even see the Orders that keep her in solitary confinement, as has her lawyer.  This procedural deprivation thus represents a separate constitutional due process violation.  At a minimum, all underlying materials related in any way to the D.C. Jail's decision to place Ms. Eisenhart and all other U.S. Capitol detainees into "maximum" security status should be disclosed to the defense, to see if any expressed motivations of the decisionmakers support a claim of unconstitutional punishment.  *See, e.g., Ouahman v. O'Mara*, 2011 U.S. Dist. LEXIS 133756, at *14 (D.N.H. 2011) (where plaintiff alleged he had done nothing to merit a transfer from general population to maximum security housing, and was told this had been done to "fuck with" him, plaintiff adequately alleged intent to punish and stated a viable claim that his undeserved placement in maximum security violated his Due Process rights).

      Finally, Ms. Eisenhart's solitary confinement also represents an unconstitutional Equal Protection violation, since she is being selectively being treated differently, and facing greater isolation, than others similarly situated (her male peers) who have regular interactions with other inmates and enjoy far greater freedoms inside the D.C. Jail.  *See Hernandez v. New York*, 500 U.S. 352, 360 (1991) (Equal Protection violation arises from selective treatment, based on an improper factor such as sex).  *See also Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (Equal Protection violation violation can also be established by a "class of one" if she alleges "intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment").

      Beyond these constitution's requirements, 18 U.S.C. § 4042(a)(2) also separately imposes on the Bureau of Prisons, under the direction of the Attorney General, a requirement to "provide suitable quarters and provide for the safekeeping, care and subsistence of all persons charged with … offenses against the United States."  This statutory "suitable quarters" requirement was

never before the Court in *Bell*. *See* 441 U.S. at 531 n.13 ("we have no occasion to reach [this statute] in this case"). *See also id.* at 562 (the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution *or, in the case of a federal prison, a statute.*") (emphasis added). Here, in addition to her constitutional claims, Ms. Eisenhart intends to argue at this Status Conference that solitary confinement for a first-time offender, set to continue "indefinitely," does not represent "suitable quarters" under 18 U.S.C. § 4042(a)(2).

Moreover, unlike in *Bell*, which was a civil case (class action), this is a criminal case in which particularized relief is being sought from the presiding judge.[4]  This Court therefore also has supervisory powers it may exercise to promote judicial administration and uniformity. *See* McNabb v. United States, 318 U.S. 332, 341 (1943); United States v. Thomas, 449 F.2d 1177, 1187 (D.C. Cir. 1971) (en banc). Here, the exercise of such supervisory authority is warranted.

The Government nevertheless claims this Court's authority is limited to constitutional questions, and it notes how this Court in *Medina* had "declined to address the defendant's request (e.g., the format of discovery) that did not rise to a constitutional dimension." ECF #45, at 4. But the Government is overly selective; it ignores another, *non*-constitutional argument of the *Medina* defendants that this Court *did* address, in order to ensure that the DOC had properly applied its classification factors. In particular, in *Medina*, this Court "agree[d] with the defendants" that there was no basis to treat that case as a high-profile matter, such that this factor could override DOC's other classification factors, "even if this [being a high-profile case] is an

---

[4] The instant case is thus distinct from the primary cases relied on by the Government, *see* ECF #45, at 5-6 (discussing *Hewitt v. Helms*, 459 U.S. 460 (1983); *Hatch v. District of Columbia*, 184 F.3d 846 (D.C. Cir. 1999); *Marshall v. Reno*, 915 F. Supp. 426 (D.D.C. 1996); and *James-Bey v. Freeman*, 638 F. Supp. 758 (D.D.C. 1986) – all of which involved civil lawsuits).

acceptable classification factor." *See id.* at n.11.[5] This Court stated that this issue did not rise to the level of constitutional import, *id.* ("The Court does not believe … that incorrect consideration of this factor violated the Constitution or was a pretense for arbitrary or punitive action"), but it still directed affirmative relief: if this "was the determinative factor in classifying the defendants as 'maximum,' the DOC should undertake a new review of their classification status." *Id.*

The same should occur here. A new classification review of Ms. Eisenhart's status should be ordered. Alternatively, she can be ordered transferred to another jail where this defendant with no exposure to the criminal justice system in 57 years need not endure life in solitary confinement, apparently "indefinitely," simply because the D.C. Jail has arbitrarily decided to classify all January 6th Capitol pretrial detainees as "maximum" security risks.

"Indefinite detention in the [special housing unit] is an exceptionally harsh method." *Basciano*, 369 F. Supp. 2d at 351. *See also id.* at 352-53 ("it is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee") (quoting 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1977): "Direct studies of the effects of prison isolation have documented a wide range of harmful psychological effedts, including increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity, rumination, cognitive dysfunction, hallucinations, loss of control, aggression,

---

[5] To be clear, Ms. Eisenhart submits that a case's designation as "high profile" or one that has "a high level of attention from DOJ" is *not* a legitimate classification factor, but one that is arbitrary and unconstitutional. Two different systems of justice, one for "regular" cases and another for "high-profile" cases, cannot exist in a society of "equal justice under law," and it would be unconstitutional for DOC's security classifications to codify such a distinction. Worse, it is undeniable that its application here will disproportionately affect supporters of one Presidential candidate. The fact that this rule is being imposed by officials of the one jurisdiction that voted most strongly against that same candidate will likely be viewed with great skepticism by much of the public who will view this as pretrial "punishment" of these defendants, thereby undermining needed confidence that our system is handling these cases fairly and impartially. It is vital to the "administration of justice" that these U.S. Capitol cases *not* be handled *different from all others*.

rage, paranoia, hopelessness, lethargy, depression, emotional breakdowns, self-mutilation, and suicidal impulses…. There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects."). "[T]he 'nuclear option' of indefinite solitary confinement," *id.* at 353, "must be reserved for the most extreme cases." *Id.* at 351. Ms. Eisenhart's case is not one of those. *Cf. id.* at 353 (ordering Basciano "released into general population forthwith under such conditions as the government deems necessary," because "Basciano's detention in the [special housing unit] is not reasonably related to the government's legitimate objective … [and] less restrictive means of doing so are available to the government").

The D.C. Jail has stated that it "takes no position on Defendant's request to be transferred to a different jail facility," DOC Opposition Brief, at 1 n.1, so no good reason exists not to grant that relief. In the recent past, when CTF was being managed independently from the D.C. Jail, judges overseeing criminal cases in this District would not infrequently issue orders directing that criminal defendants appearing before them should be transferred from D.C. Jail to CTF (a tradition that *Medina*'s warning to the DOC appeared to reference). A similar transfer order should now be issued here, as part of this Court's acknowledged authority to "administer justice." The request is reasonable; Ms. Eisenhart previously spent almost a month in a detention facility in Kentucky, most of it in general population, with no problems whatsoever. Nor did any problems arise from her one day when she was "mistakenly" released into the D.C. Jail's general population. Surely a jail facility exists nearby, at one of the many contract facilities (including Alexandria, Northern Neck, and a regional jail in Orange, VA) that have regularly been utilized for D.C. federal pretrial detainees, where Ms. Eisenhart can be placed into the general jail population, after having already shown that such a placement is workable. No legitimate reason

11

exists to keep Ms. Eisenhart detained in her current situation, which is the equivalent of solitary confinement, any longer, much less "indefinitely," as she has been told. Good cause exists to grant Ms. Eisenhart this requested relief, and this Court has sufficient authority to grant it.

### C. 18 U.S.C. § 3142(i)(2) Does Not Prohibit Such Relief

In answering this Court's inquiry about 18 U.S.C. § 3142(i)(2), the Government finds no relevant case law, but after quoting § 3142(i) as a whole, it claims that "[b]y a plain reading," § 3142(i) "provides no statutory basis to direct any specific condition of confinement, including transfer to a different facility, that is not explicitly enumerated in Section 3142(i)." *Id.* at 8.

The problem with the Government's analysis is that it focuses only on what this statute affirmatively requires. But § 3142(i)'s language is limited to a discussion of what a detention order "shall" include – it never addresses what that order "may" also include, or more importantly, what it may "not" include. There are no words of exclusion, and no prohibitions here whatsoever, as even the Government elsewhere acknowledges, when it says § 3142(i)(2)'s language ("to the extent practicable") "suggests that the provision itself is not an absolute bar if the Court otherwise had authority and basis to grant the relief sought." ECF #45, at 7. Nor does § 3142 address what other orders (i.e., orders *other* than a "detention order") may direct.

No court has apparently ever held that § 3142(i) bars such relief, *see* ECF #45, at 6 (Government acknowledges it is "unaware of any case law addressing the interplay between § 3142(i)(2) and a Court's authority" here), and this Court should not lightly become the first, thereby tying its hands forever against potentially needed relief in all future cases, and ceding the jurisdictional ground it had appeared to carefully try to preserve in *Medina*. As noted, this Court does possess constitutional, as well as statutory and inherent supervisory authority here, arising from the Due Process Clause, the Equal Protection Clause, and 18 U.S.C. § 4042(a)(2).

Accordingly, even if § 3142(i)(2) did set forth restrictions – which it does not – those restrictions on what "shall" be in a "detention order" (only) cannot override this Court's higher obligations to ensure compliance with Ms. Eisenhart's constitutional and other legal rights in any event.

WHEREFORE, Ms. Eisenhart's motion to review of her conditions of confinement so as to remove her from solitary confinement, or for a transfer to a different jail, should be granted.

Dated   March 10, 2021                              Respectfully submitted,


                                             ___/s/_ Gregory S. Smith_____
                                             Gregory S. Smith (D.C. Bar #472802)
                                             Law Offices of Gregory S. Smith
                                             913 East Capitol Street, S.E.
                                             Washington, D.C.  20003
                                             Telephone: (202) 460-3381
                                             Facsimile: (202) 330-5229
                                             Email: gregsmithlaw@verizon.net

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing is automatically being served upon all counsel of record, via the Electronic Case Filing system.  I also am emailing a copy of this motion to D.C. Department of Corrections General Counsel Eric Glover, at eric.glover@dc.gov.

This 10th day of March, 2021.

                                             ___/s/_ Gregory S. Smith_____
                                             Gregory S. Smith