## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
       v.                               )     Case No. 1:21-cr-118-02 (RCL)
                                        )
LISA MARIE EISENHART                     )
_____)

## DEFENDANT'S MOTION TO DISMISS COUNTS ONE, TWO, FOUR, SIX AND TEN OF THE INDICTMENT

NOW COMES Defendant Lisa Eisenhart, by and through undersigned counsel, and pursuant to Fed. R. Crim. P. 12(b), files this motion to dismiss counts one, two, four, six and ten of the Second Superseding Indictment.  For the reasons discussed below, these counts fail to state a viable legal offense and/or fail to give proper due process notice to the defendant.

Ms. Eisenhart understands that some of these issues have already been litigated at the District Court level and that several district court judges (including this Court) have denied similar motions to dismiss in the past.[1]  Ms. Eisenhart nevertheless wishes to adopt certain arguments made in the cases where Judge Nichols granted a motion to dismiss charges brought under 18

---

[1] *See, e.g.*, *United States v. Griffin*, 549 F. Supp. 3d 49 (D.D.C. 2021); *United States v. Sandlin*, 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Mostofsky*, 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Montgomery*, 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean*, 2021 WL 6134595 (D.D.C. Dec. 28, 2021); *United States v. McHugh*, 2022 WL 296304 (D.D.C. Feb. 1, 2022); *United States v. Grider*, 2022 WL 392307 (D.D.C. Feb. 9, 2022); *United States v. Bozell*, 2022 WL 474144 (D.D.C. Feb. 16 2022); *United States v. Robertson*, 2022 WL 969546 (D.D.C. Feb. 25, 2022); *United States v. Andries*, 2022 WL 768684 (D.D.C. Mar. 14, 2022); *United States v. Puma*, 2022 WL 823079 (D.D.C. Mar. 19, 2022); *United States v. Sargent*, 2022 WL 1124817 (D.D.C. Apr. 14, 2022); *United States v. McHugh*, 2022 WL 1302880 (D.D.C. May 2, 2022); *United States v. Bingert*, 2022 WL 1659163 (D.D.C. May 25, 2022) (Lamberth, J.); *United States v. Fitzsimmons*, 2022 WL 1698063 (D.D.C. May 26, 2022); *United States v. Williams*, 21-cr-618 (ABJ).

1

U.S.C. §1512(c)(2) in *United States v. Miller*, 1:21-cr-119 (CJN), *United States v. Fischer*, 1:21-cr-234 (CJN), and *United States v. Hayah*, 1:21-cr-565 (CJN) (these cases are currently on appeal).

In addition to those arguments, Ms. Eisenhart also raises certain additional challenges. Beyond Judge Nichols' ruling that 18 U.S.C. § 1512 obstruction requires the involvement of records or documents, Ms. Eisenhart also challenges 18 U.S.C. § 1512's application herein on the ground that its requirement that a defendant must act "corruptly" involves language that is undefined and vague, on the ground that "corrupt purpose" must properly be limited to a narrow category of situations in which a defendant has personally benefitted (not alleged here), and on the ground that 1512(c)(2)'s "otherwise" clause requires proof of a separate offense, which has also not been alleged here. Ms. Eisenhart also raises certain additional arguments mirroring challenges raised in certain other January 6 cases, such as *United States v. Bingert*, 1:21-cr-91 (RCL) – raised to preserve the record – plus a more recent facial constitutional challenge to Count Ten's 40 U.S.C. § 5104(e)(2)(G) charged offense of Parading, Demonstrating, or Picketing in a Capitol Building.[2]

## BACKGROUND

On January 15, 2021, a Criminal Complaint was filed against co-defendant Eric Munchel and Ms. Eisenhart, alleging illegal activities at the U.S. Capitol on January 6, 2021. Following various legal proceedings, the Government ultimately charged both defendants in a Second Superseding Indictment, filed October 7, 2022. ECF #140. Ms. Eisenhart is charged therein with two felony counts related to alleged Obstruction of an Official Proceeding, in violation of two subsections of 18 U.S.C. § 1512,[3] two misdemeanor counts alleging illegal conduct in a

---

[2] This argument is similar to the one made in *United States v. John Maron Nassif*, 1:21-cr-421 (JDB), where Judge Bates denied a similar motion.
[3] Conspiracy to Commit Obstruction, in violation of 18 U.S.C. § 1512(k) (Count One) and Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2

restricted building, in violation of two subsections of 18 U.S.C. § 1752(a),[4] and three

misdemeanor counts alleging illegal activities at the U.S. Capitol, in violation of three

subsections of 40 U.S.C. § 5104(e)(2).[5]  This matter is currently scheduled for a jury trial

scheduled to begin on April 11, 2023.

## LEGAL AUTHORITY

An Indictment must be a "plain, concise, and definite written statement of the essential

facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  It "must provide the defendant

sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for

the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury."

*United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United

States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)).  A criminal

defendant "may raise by pretrial motion any defense, objection, or request that the Court can

determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(3).  Rule 12 provides that a

defendant may also move to dismiss the Indictment for "failure to state an offense" and "lack of

specificity."  Fed. R. Crim. P. 12(b)(3)(B)(iii), (v).

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair

notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement."

*United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United

---

(Count Two).

[4] Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) (Count Four), and Disorderly and Disruptive Conduct in a Restrictive Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Six).

[5] Entering and Remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B) (Count Eight), Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Nine), and Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Ten).

*States*, 576 U.S. 591, 595 (2015)).  "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997).  The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement.  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

The rule of lenity also applies if a statute's terms ambiguous; once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992).  This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)).  The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id.* (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)).  "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words. Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.  *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

## ARGUMENT

**I.**   **Count Two of the Second Superseding Indictment, Charging a Violation of 18 U.S.C. §1512(c)(2), Fails to State a Viable Criminal Offense**

### A.  Congressional Intent and Statutory Construction of 18 U.S.C. § 1512(c)(2)

Analyzing the congressional intent and plain meaning of this statute, it is clear that 18

4

U.S.C. §1512(c)(2)'s purpose is to protect the integrity of hearings before tribunals by preventing witness tampering and destruction of evidence.

18 U.S.C. §1512(c) provides: "Whoever corruptly –

(1) Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) Otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so…shall be fine….or imprisoned…

18 U.S.C. § 1512(c).  In turn, an "official proceeding" is defined as –

(1) A proceeding before a judge or court of the United States, a United states magistrate judge, bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(2) A proceeding before the Congress;

(3) A proceeding before a Federal Government agency which is authorized by law; or

(4) A proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

18 U.S.C. § 1515(a)(1).

18 U.S.C. § 1512(c) was enacted as part of the Sarbanes-Oxley Act of 2002, which is titled "Corporate Fraud Accountability," and which targets "corporate malfeasance."  Pub. L. No. 107-204, 116 Stat. 745.  Sarbanes-Oxley was designed to "protect investors and restore trust in financial markets following the collapse of the Enron Corporation" after revelations that Enron's outside auditor had "systematically destroyed potentially incriminating documents." *Yates v. U.S.* 574 U.S. 528, 532 (2015). In *Yates*, the Supreme Court narrowly interpreted the

term "tangible object" in 18 U.S.C. § 1519, in keeping with this specific context and purpose of Sarbanes-Oxley.[6]

Recognizing that, in the Sarbanes-Oxley legislation, "Congress trained its attention on corporate and accounting deception and cover-ups," *id.* at 532, the Supreme Court held that the Act did not contemplate penalizing the act of tossing undersized fish overboard to avoid the consequences of an inspection by federal authorities.  Rather, in the context of the statute's purpose, a "'tangible object' must be one used to record or preserve information." *Id*.  So while fish are tangible objects in the ordinary sense of that phrase, they do not qualify as tangible objects for purposes of 18 U.S.C. § 1519.

In an amendment to the pre-existing 18 U.S.C. § 1512, the Sarbanes-Oxley Act added the current subsection (c)(2) to penalize corruptly obstructing, influencing, or impeding "any official proceeding."  The term "official proceeding" is defined in 18 U.S.C. § 1515 to include a proceeding "before a judge or court of the United States" and a proceeding "before the Congress."  Like the phrase "tangible objects" in 18 U.S.C. § 1519 involved in *Yates*, however, this phrase "official proceeding" in 18 U.S.C. § 1512 requires interpretation.

"Dictionary definitions of the term 'proceeding' alone…cannot conclusively resolve" whether a proceeding is an "official proceeding" under 18 U.S.C. § 1512.  *See United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013).  Further, courts have interpreted "official proceeding" to imply something formal.  *See, e.g., United States v. Sutherland*, 921 F.3d 421,

---

[6] 18 U.S.C. §1519 provides: [w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States…..

426 (4th Cir. 2019) (FBI investigation not an official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106; *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) ) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because the term encompasses "events that are best thought of as hearings (or something akin to hearings"). As with the phrase "tangible object" in 18 U.S.C. § 1519, the phrase "official proceeding" must be interpreted in light of the statute's express purpose, which is "to enhance and protect the necessary role of crime victims and witnesses in the criminal justice process." *United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008).

In the context of this "witness tampering" statute, an "official proceeding before the Congress" is logically limited to the same type of "adversarial nature" as court proceedings where there is a potential for witnesses to be influenced or documents destroyed. *See* S. Rep. No. 107-146, at *6 (2002). Not only must "the charged conduct have some reasonable nexus to a record, document or tangible object," *United States v. Singleton*, 2006 WL 1984467 *3 (S.D. Tex. 2006), or to witness testimony, *United States v. Kumar*, 617 F.3d 612, 619-20 (2d Cir. 2010), but the obstruction must also concern a proceeding involving adjudicative or at least "quasi-adjudicative responsibilities." *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009).

In *Ermoian*, for example, the Ninth Circuit held that an "official proceeding" suggests a "formal appearance before a tribunal;" an FBI field investigation did not qualify. 752 F.3d at 1170-71. "[W]hen examining the term 'proceeding' within the grammatical structure of the definition at issue, it becomes clear that the term connotes some type of formal hearing." *Id*. The court focused on the contextual language § 1512 uses when referring to an "official proceeding," explaining that § 1512 refers to "preventing the attendance or testimony of any person";

"preventing the production of a record, document, or other object, in an official proceeding; and being absent from an official proceeding to which that person has been summoned by legal process." *Id*. at 1171-1172.  It was important to the *Ermoian* court that the statute used the words, "testimony," "attendance," "production," and "summons," all of which "strongly implies a hearing before a formal tribunal." *Id.* at 1172.  *Accord United States v. McDaniel*, 2014 WL 2084891 (N.D. Ga. 2014) ("official proceeding" for purposes of §1512(c) did not include an FBI investigation); *Sutherland* at 921 F.3d at 426 (the term "proceeding" implies 'some formal convocation….in which parties are directed to appear") (quoting *United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019)).[7]

### B.  The Electoral Count on January 6, 2021 Was Not an "Official Proceeding"

When considering the legislative history of 18 U.S.C. § 1512 and Congress's role in counting electoral votes pursuant to the Twelfth Amendment of the U.S. Constitution and the Electoral Count Act of 1887, later codified at 3 U.S.C. § 15, the electoral count is a mere ceremonial and administrative event that does not legally qualify as an "official proceeding." The Twelfth Amendment and the Electoral Count Act of 1887 designate Congress as the place where electoral votes are to be counted after the states have already heard any disputes and certified the vote.  *Bush v. Gore*, 531 U.S. 98, 154 (2000) (Breyer, J., dissenting).  Members of Congress may make an objection, in writing, and without argument. 3 U.S.C. § 15.  According to the statute, there is no testimony, no witnesses, no argument, and no evidence.  *Id.*  Given this

---

[7] The D.C. Circuit has not addressed the question, except in a pre-Sarbanes-Oxley version of § 1512, one that did not include the current subsection (c)(2), where the Court held that by entering into a plan to encourage others to falsify documents and to testify falsely before the Inspector General in a matter that was to be passed to the grand jury, the defendant obstructed an official proceeding.  *United States v. Kelley*, 36 F.3d 1118, 1123 (D.C. Cir. 1994).

fact, an electoral count is simply not an adjudicative proceeding of the type that falls within the ambit of a witness tampering statute such as 18 U.S.C. § 1512(c)(2).

The purpose of the Electoral Count Act of 1887 was to resolve years of confusion as to what exactly Congress's role was in counting the electoral votes. The seven sections of the Act attempt to do five things:

> (1) Give the states enough time between election day and elector balloting day to settle controversies over the appointment of their presidential electors (Section 1);
>
> (2) Encourage the states to establish mechanisms for resolving contests over the appointment of presidential electors prior to the day of electoral balloting (Section 2);
>
> (3) Publicize and place on the record the states' determination of the outcome of their electoral appointment process (Section 3);
>
> (4) Minimize congressional involvement in resolving controversies over elector appointment not authoritatively resolved by the states (Section 4); and
>
> (5) Settle procedural issues for conducting the joint session at which Congress counts the states' electoral votes (Sections 4-7).[8]

The sponsors of the Electoral Count Act hoped that "if the disputes touching the Constitution of the Electoral Colleges in the States could be disposed of in advance of their action, the counting of the electoral votes at the seat of government…would be usually a little more than a *formal ceremony*."[9]  Section 5 of the Act provides that the "State's selection of electors "*shall be conclusive*, and shall govern in the counting of the electoral votes" if the procedural rules have been followed. *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, J.,

---

[8] Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLLR 541, 578 (2004).

[9] *Id.* at 585 (quoting Senator George Edmunds in H.R. Misc. Doc. No. 44-13, cited in note 31, at 18).

concurrence) (emphasis added).  Thus, the legislative history of the Act demonstrates that Congress's Electoral Count is intended to be a mere "ceremonial" finalization and recording of votes that have already been certified by the states.  So while Congress was in session on January 6, 2021, it was not an "official proceeding" for purposes of 18 U.S.C. §§ 1512(c) and 1515(b).

Count One of the Superseding Indictment, which charges that the Defendants "attempted to, and did corruptly obstruct, influence and impede an official proceeding," which is specified as "Congress's certification of the Electoral College vote," is based on the Government's apparent belief that this "ceremonial" vote count represents an "official proceeding"  for purposes of 18 U.S.C. § 1512(c).  However, as outlined by the legislative history and purpose of the Electoral Act of 1887, "obstruction of an official proceeding before Congress" was never intended to apply to an event, like this Electoral vote count, that involves no witness testimony, documentary or tangible evidence, or meaningful adjudication.  Many congressional hearings *do* involve witness testimony and documentary evidence, and allow Congress to exercise their investigatory power.  In those instances, 18 U.S.C. § 1512(c) protects the integrity of witness testimony and evidence.  *See generally United States v. Poindexter*, 951 F.2d 369, 382 (D.C. Cir. 1991) (discussing how the Victim and Witness Protection Act of 1982 created a new provision, 18 U.S.C. § 1512, which prohibits various forms of witness tampering).  By contrast, Congress's counting of the Electoral College votes is not an adjudicative proceeding; Congress was merely tasked with a ceremonial/administrative task of confirming the requirements for certification had been followed, *after* the states previously had determined that the votes were lawfully certified.

This administrative and ceremonial proceeding is not the target of 18 U.S.C. § 1512(c) and the government cannot conveniently group the unique tradition of the Electoral Count with every other Congressional hearing, since they are different in nature and possess wholly different

10

functions and characteristics.  The government also cannot fairly ignore years of precedent and legislative history plainly demonstrating that 18 U.S.C. § 1512(c)(2) is limited to adjudicative hearings where there is a potential for destruction of documents and witness tampering.

   **C.  Even if the Court Determines that the Electoral Count is an "Official Proceeding," 18 U.S.C. §1512(C)(2) is Unconstitutionally Vague, and is Especially Vague as Applied to this Case**

Under the principles of *United States v. Johnson,* 576 U.S. 591 (2015) and its progeny, 18 U.S.C. § 1512(c)(2) also violates due process, since it is unconstitutionally vague and did not provide fair notice to Ms. Eisenhart as to the conduct it punishes. The statute provides that:

> "Whoever *corruptly* –
>
> 1.  Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an *official proceeding*; *or*
>
> 2.  *Otherwise obstructs, influences, or impedes any official proceeding*, or attempts to do so…shall be fine….or imprisoned…

18 U.S.C. § 1512(c)(1)(2) (emphasis added).  Section 1512(c)(2) uses words throughout both subsections that require courts – and anyone reading the statute - to speculate as to their meaning in the context of a defendant's particular actions.  More specifically, courts must speculate as to the meaning of the word "corruptly" acted, and the phrase "official proceeding."  Even more problematic is that subsection (c)(2) is a "residual clause," one that is ambiguous and requires courts to determine exactly what line must be drawn in determining if a defendant is "otherwise" obstructing, impeding, or influencing an official proceeding before Congress.

In *Johnson,* the Supreme Court explained that "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." 576 U.S. at 597.  There, the Court found a due process violation where

a defendant's sentence was enhanced by the residual clause in the Armed Career Criminal Act if the prior felony "involved conduct that presented a serious potential risk of physical injury to another." *Id.* at 591.  The residual clause violated due process there because it required speculation in each case as to what could potentially cause injury in each set of circumstances. *Id.* at 598.  The resulting ambiguity caused a wide range of interpretations and disparity among courts over the course of nine years, and the Court acknowledged that the "failure of persistent efforts to establish a standard can [itself] provide evidence of vagueness."  *Id.*

Similarly, the discussion above regarding what constitutes an "official proceeding" illustrates just part of the confusion and lack of cohesiveness among jurisdictions as to what does or does not qualify as an "official proceeding" under 18 U.S.C. § 1512(c)(2).  In each case, the courts have had to speculate and attempt to distinguish "official proceedings" from other proceedings or investigations.  While, as discussed above, many courts have interpreted "official proceeding" to mean something more than an investigation and as involving only something more formal, there is no established standard, leaving ambiguity among the courts.  *See United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006); *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019); *United States v. McDaniel*, 2014 WL 2084891 (N.D. Ga. 2014).

Moreover, the vagueness inherent in 18 U.S.C. § 1512(c)(2) is not simply limited to the confusion surrounding what constitutes an "official proceeding."  The D.C. Circuit itself acknowledged in a similar statute that the word "corruptly" was vague on its face when used in 18 U.S.C. § 1505, which prohibits obstruction of a proceeding before departments, agencies or congressional investigations.  Our appellate court held in that analogous setting that "in the absence of some narrowing gloss, people must guess at its meaning and application."  *United*

12

*States v. Poindexter*, 951 F.2d 369, 398 (D.C. Cir. 1991).  And previously, in *Ricks v. District of Columbia*, 414 F.2d 1097 (D.C. Cir. 1968), that same court held that a statute which criminalized "leading an immoral or profligate life" was unconstitutionally vague because it found "immoral" to be synonymous with "corrupt, depraved, indecent, dissolute, all of which would result in "an almost boundless area for the individual assessment of another's behavior."  *See Poindexter*, 951 F.2d. at 399 (quoting *Ricks*, 414 F.2d at 1097).  The D.C. Circuit explained that various dictionary definitions of the word "corrupt" did not reduce the confusion as to its meaning for purposes of the statute.  *Id.*  After an assessment of the legislative history and a review of judicial interpretations, our Circuit concluded that neither of those inquiries provided defendants with the constitutionally required notice that the statute requires, and thus found the term to be vague as applied to the defendant allegedly making false statements. *Id.* at 406.

Following *Poindexter*, Congress amended 18 U.S.C. § 1515 to define "corruptly," for purposes of 18 U.S.C. § 1505 only, to mean "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information."  18 U.S.C. § 1515(b).  However, this amendment did not resolve the vagueness that still exists in 18 U.S.C. § 1512, since Congress pointedly did not amend § 1515's definition as it applies to § 1512.

Even though the D.C. Circuit later held that the word "corruptly" was not vague as applied, in *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996), that decision was reached only because in that case the defendant had influenced a witness, placing it squarely within the non-vague category that *Poindexter* had established.  In *Morrison*, the defendant tried to influence a witness's testimony and "exhorted her to violate her legal duty to testify truthfully in court."  *Id*.  The Court in *Poindexter* had explained that influencing another to "violate their

13

legal duty" was not vague, because "it would both take account of the context in which the term "corruptly" appears and avoid the vagueness inherent in words like "immorally."  *Poindexter*, 951 F.2d at 379.  However, *Morrison* was not faced with the question of what "corruptly" means in the context of § 1512(c), and it thus does not resolve the ambiguity that the word presents in conjunction with the rest of the statute.  The phrase "corruptly … influence" does not resolve the ambiguity because "influence" alone is another vague word that may mean many things and lacks the definiteness of "influencing another to violate their legal duty" stated in § 1515.  The various meanings of the word "influence" also support the inherent vagueness that exists in the statute, especially within the context of January 6, 2021.  Many individuals who were there and not charged with obstruction were there to protest the vote, and hoped that their voices would be heard, just like thousands of protests that have taken place in this country.  There must be something more, such as physically doing something to influence a proceeding, which is not captured by the statute because it simply says "influence."[10]

The government's ongoing approach to charging defendants with violating §1512(c)(2) based on the events on January 6, 2021, in fact illustrates how vague and arbitrary the enforcement of this statute can be.  While the government may contend it has some bright line rules, for example by charging individuals with a violation of § 1512(c)(2) if defendants entered the Senate floor,[11] taking a look at some of the defendants that have been charged with a

---

[10] *See* Merriam-Webster (2021) defining influence as "the power to change or affect someone or something: the power to cause changes without directly forcing them to happen," "to affect or alter by indirect or intangible means," "to have an effect on the condition or development of."

[11] *See United States v. Paul Hodgkins*, 1:21-CR-188 (RDM); *United States v. Tommy Allan*, 1:21-CR-064 (CKK); *United States v. Jacob Chansley*, 1:21-CR-003 (RCL); *United States v. Bradley Bennett*, 1:21-CR-312 (JEB); United States v. Leo Brent Bozell IV, 1:21-cr-216 (JDB) (not alleged to be a member of the Proud Boys or the Oath Keepers).

14

violation of § 1512(c)(2) reveals how improper inconsistencies remain.[12]

(1) *United States v. Isaac Sturgeon*, 1:21-CR-91.  Defendant alleged to have assisted in pushing a barricade outside the Capitol building but never entered the Senate chamber, never went inside the Capitol building, and never made any threats to law enforcement or statements on social media suggesting he wished to disrupt the vote. Mr. Sturgeon is also not alleged to be a part of the Oath Keepers or the Proud Boys.

(2) *United States v. Kenneth Grayson,* 1:21-CR-224.  Defendant alleged to have entered Capitol building, but not alleged to have entered the Senate chamber.  Prior to January 6, 2021, he allegedly wrote in a private message, "I am there for the greatest celebration of all time after Pence leads the Senate flip! OR IM THERE IF TRUMP TELLS US TO STORM THE FUKIN CAPITOL IME DO THAT THEN!

(3) *United States v. Benjamin Larocca,* 1:21-CR-317.  Defendant allegedly entered Capitol building while screaming "Our House!"  With an individual who allegedly was yelling, "You fucking oath breakers!"  Mr. Larocca is not alleged to have entered the Senate floor and is not a member of the Proud Boys or Oath Keepers.

(4) *United States v. Anthony Puma,* 1:21-CR-454.  Defendant allegedly entered Capitol building while filming with a Go-Pro video.  A day prior to January 6, 2021, he allegedly made certain comments on social media about "storming the house of representatives."  Mr. Puma did not enter the Senate floor and was not met with resistance from law enforcement when he entered the building.  While inside, he was not violent and did not destroy any property.

As these cases illustrate, the government's charging decisions remain inconsistent across the circumstances of each case.  Tellingly, the government does not specify what "influence" these defendants had or how exactly they "impeded."  The inconsistent charging decisions along with the inherently vague words in the statute, as well as the vague "residual clause" that is the basis for charging these defendants, all show that 18 U.S.C. § 1512(c)(2) is unconstitutionally vague and does not provide fair notice to Ms. Eisenhart.

The First Amendment provides that "Congress shall make no law…abridging the freedom of speech."  U.S. Const. amend. I.  The Constitution protects speech "without regard…to the truth, popularity, or social utility of the ideas and believes offered." *National*

---

[12] These are just a few cases out of hundreds that share the same inconsistencies.

*Ass'n for the Advancement of Colored People v. Button*, 371 U.S. 415, 445 (1963).  This American principle is something that rings in the minds of the public every time they express their thoughts, no matter how unpopular those opinions may be.  The obstruction statute is impermissibly vague for reasons already discussed, but also because it invites arbitrary enforcement of a law that could abridge one of the most fundamental principles in our country.

Ms. Eisenhart alleged individual actions inside the Capitol do not appear to have actually obstructed, influenced, or impeded any Congressional proceeding, since the Electoral vote count had already been suspended before she entered the U.S. Capitol.  The circumstances of her case mirror those of many defendants on that day whose mere presence and words did not place them on fair notice they would be committing a felony involving criminal intent to actually "obstruct" or "impede" or "influence" an "official proceeding," as those terms are defined under the law.

While the Supreme Court has excluded "fighting words" First Amendment protection, *see United States v. Stevens*, 559 U.S. 460, 468 (2010), Ms. Eisenhart's case does not fall within the cramped ambit of that narrow exception.  "Fighting words" must "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." *Chaplinsky v. New Hamphire*, 315 U.S. 568, 753 (1942).  Ms. Eisenhart, and others like her, were not directly inciting violence by expressing how they felt about the election and by assembling together to express those opinions.  Ms. Eisenhart's alleged expressions may have been inflammatory, but they were not threats or fighting words as the law defines those terms.  The First Amendment protects verbal criticism lobbed at police, and "the freedom of individuals to verbally oppose or challenge police action without thereby risking arrest is one of the principle characteristics by which we distinguish a free nation from a police state." *City of Houston, Tex v. Hill*, 482 U.S. 451, 461-463 (1987).  Moreover, Ms. Eisenhart's expressions were addressed to

16

the entire group of law enforcement rather than an individual, and thus, did not have a direct tendency to incite any individual, targeted officer to violence. *Chaplinksy*, 315 U.S. at 753.

The government may argue that the collective presence of individuals chanting together was part of "obstructive" behavior. However, the First Amendment prohibits placing liability on one for their association with another person. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 887 (1982). A person in the presence of others who took action to obstruct cannot be held responsible for those actions unless he/she incited or directed those other individuals to take those obstructive actions. That is not the case here. The obstruction statute should not apply so broadly as to encompass individuals like Ms. Eisenhart who lacked the mens rea required to commit a crime, and did not utilize legally-recognized "fighting words" in exercising her broad and fundamental right to free speech.

Other obstruction statutes have been deemed unconstitutional for infringing on protected expression. *See, e.g., City of Houston v. Hill*, 482 U.S. 451 (1987).[13] In *Hill*, the Supreme Court dealt with the question of whether a municipal ordinance prohibiting interrupting police officers in the performance of their duties was overbroad and unconstitutional. *Id.* The Supreme Court held that part of the ordinance did not deal with criminal conduct, but speech. *Id.* at 460. In its decision, the Court acknowledged that "speech is often provocative and challenging…[But it is] nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. *Id.* (citing *Terminello v. Chicago*, 337 U.S. 1, 4 (1949). For that reason,

---

[13] *See also Lewis v. City of New Orleans*, 415 U.S. 130 (1974) (invalidating ordinance prohibiting individuals from cursing at police officers while in performance of their duties); *Wilson v. Kittoe*, 229 F. Supp. 2d 520 (W.D. Va. 2002) (obstruction statute for disobeying police orders violated protected expression).

the Court invalidated the ordinance as vague and unconstitutional. *Id.* Similarly, the opinions allegedly expressed by Ms. Eisenhart were speech, and no matter how unpopular, cannot be considered "criminal conduct" punishable by the government. *See also Lewis v. City of New Orleans*, 415 U.S. 130 (1974) (invalidating ordinance prohibiting individuals from cursing at police officers while in performance of their duties); *Wilson v. Kittoe*, 229 F. Supp. 2d 520 (W.D. Va. 2002) (obstruction statute for disobeying police orders violated protected expression).

### D.  Ms. Eisenhart's conduct fails to fit within the scope of 18 U.S.C. § 1512(c)(2)

The reasoning in *United States v. Garret Miller*, 1:21-cr-119 (CJN), ECF No. 72, equally applies to Ms. Eisenhart's case. In *Miller*, Judge Nichols found the word "otherwise" in § 1512(c)(2) "critical to determining what § 1512(c)(2) covers." *Id.* at 11.  He rejected the Government's suggestion that "otherwise" "serve[d] as a clean break between subsections (c)(1) and (2)." *Id.* at 11-12.  Judge Nichols explained that the Government's proffered reading failed to "give meaning to the word 'otherwise,'" and rendered the word "pure surplusage." *Id.* at 12. He further reasoned that the government's reading was inconsistent with *Begay v. United States*, 553 U.S. 137 (2008), in which the Supreme Court had concluded that the Armed Career Criminal Act's ("ACCA") use of the word "otherwise" tied together the preceding and following words. *Id.* at 12-13. Specifically, the Supreme Court in *Begay* had concluded that "the text preceding 'otherwise' influenced the meaning of the text that followed: it 'limited the scope of the clause to crimes that are *similar to the examples themselves*.'" *Id.* at 13 (quoting *Begay*, 553 U.S. at 143). Judge Nichols in his Opinion went on to explain why opinions in other cases that had adopted the "clean break reading of 'otherwise' in §1512(c)(2)" were incorrect. *Id.* at 14-15.

The Court also rejected the Government's alternative reading of the statute – "that subsection (c)(1) contains specific examples of conduct that is unlawful under subsection (c)(2)"

such that that the "link between" the two subsections "is that the unlawful conduct must relate to an 'official proceeding.'" *Id.* at 15 (citing *United States v. Montgomery*, 2021 WL 6134591, at *12). As Judge Nichols explained, the problem with this alternative reading is that it renders the word "otherwise" superfluous because both subsections contain the phrase "official proceeding." *Id.* at 15-16.

Judge Nichols concluded that "[s]ubsection (c)(2) is a residual clause for subsection (c)(1)," operating as a "catchall for the prohibition contained in subsection (c)(1)." *Id.* at 17. Under this interpretation, consistent with the Supreme Court's holding in *Begay*, the link between the two subsections is the conduct prescribed in subsection (c)(1), and "subsection (c)(2) operates to ensure that by delineating only certain specific unlawful acts in (c)(1) . . . – Congress was not 'underinclusive'" by allowing other ways to violate the statute that are similar to the conduct prohibited in (c)(1). *Id.* at 17-18.

Delving deeper, Judge Nichols reasoned that the structure and scope of § 1512 suggests that subsection (c)(2) has a narrow focus, because the other subsections criminalize specific conduct in narrow contexts. *Id.* at 20. He further reasoned that while subsections (c)(2) and (c)(1) are different than the other subsections, because they prohibit an individual from taking certain actions directly rather than towards another person, the language in subsection (c)(1) still "homes in on a narrow, focused range of conduct." *Id.* at 21. Judge Nichols explained that, by contrast, if § 1512(c)(2) "signals a clean break" from subsection (c)(1), it would be inconsistent with the statute as a whole because it would be the only provision to not contain a narrow focus. *Id.* He also reiterated that any different reading would improperly render subsection (c)(2) unnecessary. *Id.* at 21-22.

Judge Nichols also discussed how the historical development of § 1512 supports the

conclusion that § 1512(c)(2) operates as a catchall to (c)(1). *Id.* at 23-25. Per the Court, the

revisions to § 1512(c) in 2002 filled a gap that had existed because § 1512(b) made it unlawful to

cause "another person" to take certain actions but not for a person to take such action directly.

The 2002 enactment of § 1512(c) fixed that problem and took much of its language directly from

§ 1512(b).  *Id.* 23-24. The fact that Congress took much of the language from a provision already

contained in subsection (b), shows Congress's intent for subsection (c) to have a narrow, limited

focus – just like subsection (b)(2)(B). *Id.* at 25.

Lastly, Judge Nichols found that the legislative history also supports a narrow reading of

subsection (c)(2). *Id.* at 26-28. He explained in his opinion that the evolution of § 1512(c)

resulted in a statute that ensured that individuals acting alone would be liable for the same acts

that were prohibited in other parts of § 1512. *Id.* at. 27-28.

For all those reasons, the Court in *Miller* held that § 1512(c)(1) limits the scope of (c)(2)

and "requires that the defendant have taken some action with respect to a document, record, or

other object in order to corruptly obstruct, impede or influence an official proceeding."[14]  *Id.* at

28.  Because the Government did not allege that Mr. Miller took any action with respect to

records or documents or "other objects," Judge Nichols held that the indictment failed to state an

offense against him. *Id.* at 29.

Here, just as in *Miller*, the Second Superseding Indictment does not allege or imply that

Ms. Eisenhart took any action with respect to a document, record, or other object in order to

---

[14] The *Miller* court also explained that, even assuming *arguendo* its interpretation was incorrect, at the very least the Court would be left with "serious ambiguity in a criminal statute," requiring lenity.  *Id.*

corruptly obstruct, impede or influence Congress's certification of the electoral vote.  *See* ECF #140.  Therefore, it fails to allege a viable violation of 18 U.S.C. § 1512(c)(2).

In addition to the fact that there is no allegation that Ms. Eisenhart took any action with respect to records or documents, the word "corruptly" in § 1512 is also never defined and is itself vague and ambiguous.  A "corrupt" purpose in this setting is properly defined as one involving personal benefit, yet no such benefit has been alleged (or exists) as to Ms. Eisenhart.  Moreover, 18 U.S.C. § 1512(c)(2) sanctions "[w]hoever corruptly *otherwise* obstructs, influences or impedes and official proceeding," (emphasis added) but there is no allegation of how Ms. Eisenhart "otherwise" obstructed here.  This word, to be given statutory meaning, properly must require proof of another separate offense, yet the Second Superseding Indictment never alleges or identifies any such "other" offense, as needed for this § 1512(c)(2) charge to be viable.

For the various foregoing reasons, Ms. Eisenhart respectfully requests that this Court adopt the analysis and reasoning set forth in Judge Nichols' opinion in *Miller*, or otherwise declare that Count Two is deficient, and declare that it fails to state an offense against her.

## II.     Count One (Conspiracy to Obstruct an Official Proceeding in Violation of 18 U.S.C. §1512(k)), Also Fails to State a Viable Criminal Offense

For similar reasons, Count One also must be dismissed.  Count One charges Ms. Eisenhart with being part of a conspiracy "to corruptly obstruct, influence and impede an official proceeding," in violation of 18 U.S.C. § 1512(k).  The same arguments set forth above, explaining why the underlying substantive offense is not a viable crime, and is unconstitutionally vague, apply equally to an inchoate offense that references and is dependent upon identical allegations.  More specifically, 18 U.S.C. § 1512(k) states that "[w]hoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the

offense the commission of which was the object of the conspiracy." As Ms. Eisenhart has argued above, 18 U.S.C. § 1512(c)(2) cannot be recognized as a viable (or constitutional) "offense under this section," for the reasons noted. The § 1512(k) charge in Count One must rise or fall with the interpretation of § 1512(c)(2) charge in Count Two, and because the latter cannot be sustained as a matter of law, Count One also must properly be dismissed.

### III.   Counts Four and Six (18 U.S.C. § 1752) Also Fail to State a Viable Offense

**A. The United States Secret Service is the Entity that May Designate "Restricted Areas" Under the Statute, Not the United States Capitol Police**

Ms. Eisenhart is charged with two counts of violating 18 U.S.C. § 1752 for "entering and remaining in a Restricted Building or Grounds," and engaging in "disorderly and disruptive conduct in a Restricted Building or Grounds." *See* ECF #140 at Counts Four and Six. When this statute was enacted, it is clear that the purpose was to designate the United States Secret Service ("USSS") to restrict areas for temporary visits by the President. *See* S. Rep. No. 91-1252 (1970). At the time of enactment, the USSS was part of the U.S. Treasury. Section 1752 grants the U.S. Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. § 1752(d)(1). It also allows the U.S. Treasury Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." 18 U.S.C. § 1752(d)(2). There is nothing in the legislative history (or the statutory language) to suggest that anyone other than the USSS has the authority to so restrict the areas surrounding the Capitol building.

The USSS's duties and responsibilities are outlined in 18 U.S.C. § 3056, which include:

(e)(1): When directed by the President, the United States Secret

22

Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President.

(2) At the end of each fiscal year, the President through such agency or office as the President may designate, shall report to the Congress--

(A) what events, if any, were designated special events of national significance for security purposes under paragraph (1); and

(B) the criteria and information used in making each designation.

18 U.S.C. § 3056(e)(1)(2)(A)(B).  The statute does not state that any other agency is permitted to designate events for security purposes, and only explains that the USSS would be under the designation of the Department of Homeland Security instead of the Treasury Department.  The statute also makes the exclusive role of the USSS even clearer in § 3056(g), which states:

(g) The United States Secret Service shall be maintained as a *distinct entity* within the Department of Homeland Security and shall not be merged with any other Department function. *No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service*, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department.

(emphases added).

### B. The Government Does Not Allege that the Secret Service Restricted the U.S. Capitol Grounds on January 6, 2021

The Indictment charges Ms. Eisenhart with remaining or entering "restricted building or grounds," however it does not allege that the USSS designated that area as being restricted.  Nor could it do so now, because in *United States v. Griffen*, the government conceded that it was the United States Capitol Police that attempted to designate the area as restricted that day, and not the USSS.  1:21-CR-92 (TNM) at Dkt. No. 33.  The court in *Griffen* (as well as other district

courts) denied a motion to dismiss a §1752 charge on the ground that the statute (Congress) did not specifically state who must designate the "restricted areas."  *Id.* at Dkt. No. 41.

However, the plain language of 18 U.S.C. § 1752(c)(B), defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."   Since it is the Secret Service who protects the President or "other person," it is the Secret Service who must designate the area as "restricted."  The legislative history bolsters this interpretation.[15]

The court in *Griffen* also hypothesized that the President would be unable to rely on the military fortification at Camp David already in existence when he visits that facility if the Secret Service is the only entity with the statutory authority to restrict the area.  *See Griffen* ECF Dkt. No. 41 at pg. 11.  However, Camp David is a military installation and is not a "public forum" that needs an entity to "cordon off" areas and restrict them in light of a Presidential visit.  Military bases have inherent security in that they are not otherwise open to the public.  And each military installation is subject to other laws that protect the facility, and those within it, from intruders.  *See, e.g.*, 18 U.S.C § 1382 (barring any person from entering any military installation for any purpose prohibited by law).  Military bases are heavily guarded and have entrance and exit points and are different than federal buildings that need sections "cordoned" off in order for the general public to know which area is restricted.  For these reasons, the example offered by the *Griffen* court is inapposite and does not fairly support the court's decision.

---

[15] Congress enacted 18 U.S.C. §1752 as part of the Omnibus Crime Control Act of 1970.  Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971).  At that time, the USSS was a part of the Treasury Department.  The Senate Judiciary Committee report accompanying the current version of § 1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service.  *See* S. Rep. No. 91-1252 (1970).

Furthermore, if a deficiency in a statute creates an absurd result or creates arbitrary enforcement, it should not be enforced until it is amended to provide clarity and provide fair notice to a defendant. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The *Griffen* court's reasoning creates a different kind of absurd result – namely, that anyone claiming to be a part of law enforcement could post a sign designating an area as restricted, and a criminal defendant could then be penalized for trespassing because they "willfully" ignored the sign.

### C. Even if the Capitol Police were Authorized to Restrict the Grounds, 18 U.S.C. § 1752 is Not Applicable Because Former Vice President Pence Was not "Temporarily Visiting" the Capitol Building on January 6, 2021

Under the plain language of 18 U.S.C. § 1752, the statute does not apply here. Section 1752 prohibits conduct in or near "any restricted building or grounds." The statute expressly defines the term "restricted buildings or grounds" as follows:

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c); *see also United States v. Samira Jabr*, Criminal No. 1:18-0105, Opinion at 12, ECF No. 31 (May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

Counts Four and Six of the Second Superseding Indictment charge Ms. Eisenhart with conduct "in a restricted building and grounds, that is, any posted, cordoned-off and otherwise restricted area *within the United States Capitol and its grounds, where the Vice President was*

*and would be temporarily visiting . . .*" *See* ECF No. 8, (emphasis added).  The Government's attempt to shoehorn Ms. Eisenhart's conduct into this statute fails.  Accordingly, those two counts should be dismissed.

The "United States Capitol and its grounds" do not automatically constitute "restricted buildings or grounds" under any prong of 18 U.S.C. § 1752(c)(1).

Nor did the Capitol grounds become "restricted grounds" on January 6, 2021, because of a "temporary vice-presidential visit," as the government asserts in the Indictment.

The plain meaning of "temporary" is "lasting for a time only."  Black's Law Dictionary (11th Ed. 2019).  "Visiting" is defined as "invited to join or attend an institution for a limited time."  Merriam-Webster (2021).  Together, "temporarily visiting" connotes temporary travel to a location where the person does not normally live or work on a regular basis.

The former Vice President was not "temporarily visiting" the U.S. Capitol on January 6, 2021.  The U.S. Capitol is a federal government building in the District of Columbia, where he holds a title and was expected to work as needed, in accordance with his ongoing constitutional responsibilities adhering from his official position.  The U.S. Capitol Building and grounds were one of his designated places of employment.  In his official capacity as the "President of the Senate," he even had a permanent office "within the United States Capitol and its grounds."  The Vice President was not "visiting" the Capitol Building, he was working there, carrying out his sworn official duties, by "presiding" over the vote count ceremony.  *See also* 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall *meet* in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and *the President of the Senate shall be their presiding officer*.") (emphasis added).

Past cases support this plain, common-sense reading of the statute, as they involve conduct in and near areas where the President and Vice President were clearly only "temporarily visiting." *See, e.g., United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his way through a restricted area where then Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by United States Secret Service agents); *Blair v. City of Evansville,* 361 F. Supp.2d 846 (S.D. Ind. 2005) (defendant charged with 18 U.S.C. § 1752 at protest during then Vice President Richard Cheney's visit to the Centre in Evansville, Indiana). These cases all involve the President and Vice President actually traveling outside of D.C., where they live and work, and "visiting" another location for a "temporary" purpose.  As a result, those cases are entirely consistent with the plain meaning of 18 U.S.C. § 1752(c)(1)(B).

Here, by contrast, former Vice President Pence was not traveling to a speaking event or a political rally.  He was meeting with other government officials in a federal government building where he had a permanent office, as a part of his fulfilling of his official duties as Vice President/President of the Senate.  Thus, he was not "temporarily visiting" the Capitol building – the predicate that is required by the plain language of 18 U.S.C. §1752 for it to be applicable.

Accordingly, 18 U.S.C. § 1752 does not apply as charged, and Counts Four and Six of the Second Superseding Indictment must be dismissed against Ms. Eisenhart.

**IV.    Count Ten Must Also Be Dismissed Because 40 U.S.C. §5104(e)(2)(G) is Unconstitutionally Vague on Its Face**

Ms. Eisenhart is charged in Count Ten with violating 40 U.S.C. §5104(e)(2)(G), which simply states that, "An individual or group of individuals may not willfully and knowingly parade,

27

demonstrate, or picket in any of the Capitol Buildings." This statute is overbroad and unconstitutionally vague on its face. Accordingly, this Court should dismiss Count Ten because it violates the First Amendment and fails to put ordinary people on notice of what is prohibited.

## A. 40 U.S.C. § 5104(e)(2)(G) is substantially overbroad and violates the First Amendment

Section 5104(e)(2)(G) of Title 40 provides a blanket prohibition on all parading, demonstrating, and picketing in a Capitol building, and does not have an element of unlawful entry.  The plain language of this statute is alarmingly broad, and by its own terms covers three modes of recognized First Amendment-protected activity – parading, demonstrating, and picketing.  A law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (*quoting Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008)). In conducting an overbreadth analysis, a court must first construe the statute itself. *United States v. Williams*, 553 U.S. 285, 293 (2008). The next step is to ask whether the statute, properly construed, "criminalizes a substantial amount of protected expressive activity." *Id.* at 297; *United States v. Montgomery*, No. CR 21-46 (RDM), 2021 WL 6134591, at *23 (D.D.C. Dec. 28, 2021).

As an initial matter, Congress itself had concerns that this statute was overbroad when making revisions in 1967. Representative O'Neal openly expressed his concerns, saying he was "a little bit disturbed by the language" that would criminalize parading, picketing, or demonstrating in a Capitol building. Congressional Record, House of Representatives (Oct. 19, 1967) at 29389.[16]  Representative Bingham also expressed concerns about such overbreadth:

---

[16] Available at https://www.govinfo.gov/content/pkg/GPO-CRECB-1967-pt22/pdf/GPO-CRECB-1967-

> I am deeply concerned about the broad scope, vague language, and possible interference with first amendment rights of the bill before us today. It was so hastily conceived and reported out of committee that no official views of the Justice Department or the District government were available. Moreover, there seems to be no disposition on the part of the bill's supporters to accept clarifying amendments.

*Id.,* Cong. Rec. at 29394. He also commented on the overly broad law's potential impact on peaceful, quiet visitors, describing the law as "a case of using a shotgun to eliminate a gnat." *Id.,* Cong. Rec. at 29395.

Courts have also issued rulings identifying the overbreadth of this language. In *Bynum v. U.S. Capitol Police Bd*., 93 F. Supp. 2d 50, 53 (D.D.C. 2000), the court found a Capitol police regulation purporting to implement the instant statute to violate the First Amendment. The Capitol Police regulation explained that demonstration activity included:

> parading, picketing, speechmaking, holding vigils, sit-ins, or other expressive conduct that convey[s] a message supporting or opposing a point of view or has the intent, effect or propensity to attract a crowd of onlookers, but does not include merely wearing Tee shirts, buttons or other similar articles of apparel that convey a message.

*Id.* (quoting Traffic Regulations for the Capitol Grounds § 158). The plaintiff challenged that regulation, arguing it was unconstitutional, and he succeeded on his motion for summary judgment. The *Bynum* Court reasoned:

> The Court, however, cannot conclude that the regulation is reasonable in light of the purposes it could legitimately serve. While the regulation is justified by the need expressed in the statute to prevent disruptive conduct in the Capitol, it sweeps too broadly by inviting the Capitol Police to restrict behavior that is in no way disruptive, such as "speechmaking… or other expressive conduct…" Traffic Regulations for the Capital Grounds §158. Because the regulations proscriptions are not limited to the legitimate purposes set forth in the statue, it is an unreasonable and therefore an unconstitutional restriction on speech.

---

pt22-2-1.pdf

*Id.* at 57 (Citations omitted).  The *Bynum* court focused on the regulation rather than the statute itself, operating under the premise that the statute was limited to disruptive conduct.

This premise that the statute is limited to disruptive conduct, however, was and remains demonstrably false. The text does not include such a limitation, and the legislative history also shows that Congress did not intend to include one.  At the time of the 1967 revision, Representative Edwards expressed that he believed the "parading, picketing, or demonstrating" language violated the First Amendment because it was *not* limited to disorderly or disruptive conduct. *See* Cong. Rec. at 29392. Representative Cramer stated that to add "with intent to disrupt the orderly conduct of official business" would "gut[ ] the section," eliminating any doubt as to whether the failure to include limiting language was inadvertent. *Id.* at 29394.

Perhaps unsurprisingly, the statute continues to give rise to interpretations just like the regulation at issue in *Bynum*. The United States Capitol Police Guidelines now offer the following interpretation:

> Demonstration activity is defined as any protest, rally, march, vigil, gathering, assembly or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution.[17]

Ironically, the current policy is even broader than the unconstitutional regulation. It still defines demonstration to include virtually all protected First Amendment activity, and does not limit its application to disruptive conduct. In *Lederman v. United States*, 89 F. Supp. 2d 29 (D.D.C. 2000), *on reconsideration in part*, 131 F. Supp. 2d 46 (D.D.C. 2001), the court explained the

---

[17] United States Capitol Police Guidelines for Conducting an Event on United States Capitol Grounds, *available at* https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/Guidelin es%20and%20Application%20for%20Conducting%20an%20Event%20on%20U.S.%20C apitol%20Grounds.pdf (last accessed June 9, 2022).

problem with a similarly broad regulation:

> For instance, assuming that the ban was applied literally and even- handedly, a group of congressional staffers or members of the general public who stood outside the Capitol arguing about the latest campaign finance bill, health care initiative, or welfare reform would presumably be risking citation or arrest for engaging in "expressive conduct that conveys a message supporting or opposing a point of view."

89 F. Supp. 2d at 41.  The same is true here. Law enforcement policy indicates that the prohibition applies to nearly all First Amendment activity, and neither the plain language nor legislative history of 40 U.S.C. § 5104(e)(2)(G) supports a contrary interpretation.  The extraordinary breadth of the language cannot be explained away and must be dismissed as unconstitutionally overbroad.

## B.  40 U.S.C. § 5104(e)(2)(G) is Unconstitutionally Vague on its Face

Section 5104(e)(2)(G) also fails to put ordinary people on notice of the conduct that it prohibits, and as such, creates a risk of arbitrary and discriminatory enforcement.  The vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357–58, (1983).  "Where a statute's literal scope, unaided by a narrowing [ ] interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).  Thus, in the First Amendment context, a vagueness challenge can be brought even where a defendant may have been on notice that his particular conduct fell within the bounds of the statute. *See Thornhill v. State of Alabama*, 310 U.S. 88, 97-98 (1940).

Ultimately, "any regulation that allows a police officer the unfettered discretion to restrict behavior merely because it 'conveys a message' or because it has a 'propensity to attract a crowd

of onlookers' cannot survive a due process challenge." *Bynum*, 93 F. Supp. 2d at 58. Although the *Bynum* court placed the blame in that case on the U.S. Capitol Police's regulation promulgated under this statute, holding that the statute itself (misconstrued as noted above) was constitutional, the current Capitol Police regulation is even less specific than the one in *Bynum*, highlighting how subjective the statutory language is. Evidently, even guidance from a federal district court was not enough to narrow the ordinary meaning of the words in the eyes of those charged with enforcing them. It is easy to see why; "demonstrating" is an ambiguous word.

Merriam-Webster defines "demonstration" as, among other things, "an outward expression or display" or "a public display of group feelings toward a person or cause." Even using the narrower definition for the sake of argument, it remains unworkably vague for a criminal statute. Indeed, a child on a field trip remarking "We love our Capitol Police" while on a group tour of that building, or a staffer cheerfully singing "Battle Hymn of the Republic" in the atrium while walking to the office, would both appear to be "demonstrating in the Capitol Building" under this standard dictionary definition.

Even if it may be unlikely that children on field trips or singing staffers would be arrested for parading, picketing, or demonstrating, "[t]he danger, of course, is that such a broadly-worded ban . . . would be selectively employed to silence those who expressed unpopular ideas regardless of whether the speaker created an obstruction or some other disturbance." *Lederman v. United States*, 89 F. Supp. 2d 29, 42 (D.D.C. 2000), *on reconsideration in part*, 131 F. Supp. 2d 46 (D.D.C. 2001).

The legislative history shows that discriminatory and arbitrary enforcement was anticipated and even intended by some lawmakers. This revision to this statutory scheme dealing with conduct in the Capitol Building was in fact revised following a case in which Howard

University students had sat on the floor in response to the Speaker's refusal to commit to taking action on their petition. *See Smith v. D.C.*, 387 F.2d 233, 236 (D.C. Cir. 1967). While the D.C. Circuit Court did not address the constitutionality of the federal statute  in that case (the government had not invoked it), it did advise the legislature to clarify this area of law generally: "[I]n view of the confusion apparent in the enforcement of these and related statutes, we commend to executive and legislative authorities a review of this entire area of the law." *Id.* at 237.

In response, Congress acknowledged the confusion-in-enforcement concern and "revise[d] the statutes relating to improper conduct in the Capitol Buildings."  House Report 90-745 noted that recent federal appeals "decisions highlight[ed] the confusion surrounding the existing laws, their implementation and their administration."  1967 U.S.C.C.A.N. 1739, 1741. Representative Jerome Waldie expressed his minority view of the law as follows:

> I suggested that the qualifying phrase used in a portion of the misdemeanor section of the act, 'with intent to disrupt the orderly conduct of official business' should have been applied to all conduct sought to be controlled. The committee did not approve of this limitation. Without such a limitation, in my view, not only does the act become of questionable constitutionality, but it becomes an instrument capable of ensnaring innocent and well-meaning visitors within its provisions.

*Id.* at 1747.

The Congressional Record provides additional insight. Representative Colmer described as additional reason for the amendment, that "to be perfectly frank about this bill, it is brought about because of the fact that there is another one of the numerous marches upon Washington anticipated here within the next few days."[18] Cong. Rec. at 29388.  Representative Colmer also cited certain peaceful actions—such as sitting outside of a committee room—by the Freedom

---

[18] The March on the Pentagon, a massive protest against the Vietnam War, occurred two days later.

Democratic Party of Mississippi, which he described as "an extreme leftist group."[19] *Id.*  He followed up that statement by contending the bill at issue would protect the Capitol from "these misguided people who are bent on obstructing if not, in fact, destroying this, the world's most democratic form of government." *Id.*  Representative Ryan noted that the law seemed "defective on First Amendment grounds" and "vaguely drafted." Cong. Rec. at 29394.

Whatever the precise contours of this offense are, the plain statutory language "forbid[s] all demonstrative assemblages of any size, no matter how peaceful their purpose or orderly their conduct. A statute of that character is void on its face on both First and Fifth Amendment grounds." *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 587 (D.D.C.), *aff'd*, 409 U.S. 972 (1972).  Here, with no clarity or specificity as to what is meant by "parading, demonstrating or picketing," the statute fails to put ordinary people on fair notice of what is prohibited, and encourages arbitrary and discriminatory enforcement. *Cf. Thornhill v. State of Alabama*, 310 U.S. 88, 100–01 (1940) ("The vague contours of the term 'picket' are nowhere delineated.").  Accordingly, 40 U.S.C. § 5104(e)(2)(G) is unconstitutionally vague on its face, and Count Ten must be dismissed form the Second Superseding Indictment.

---

[19] The Freedom Democratic Party of Mississippi was formed as part of Freedom Summer and was supported by Dr. Martin Luther King. *See* "Mississippi Freedom Democratic Party (MFDP)," *King Encyclopedia*; Stanford University Martin Luther King, Jr. Research and Education Institute.

## **CONCLUSION**

For all of reasons discussed above, this Court should dismiss counts 1, 2, 4, 6 and 10 of the Second Superseding Indictment, filed against Defendant Lisa Eisenhart.

Dated:  March 6, 2023.                    Respectfully submitted,

                                                    _____/s/  Gregory S. Smith_____
                                                    Gregory S. Smith (D.C. Bar #472802)
                                                    Law Offices of Gregory S. Smith
                                                    913 East Capitol Street, S.E.
                                                    Washington, D.C.  20003
                                                    Telephone: (202) 460-3381
                                                    Email: gregsmithlaw@verizon.net
                                                    *Attorney for Defendant Lisa Eisenhart*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing is automatically being served upon all counsel of record, via the Electronic Case Filing system.

This 6th day of March, 2023.

                                                    _____/s/  Gregory S. Smith_____
                                                    Gregory S. Smith