UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA            )
                                    )
        v.                          )        CRIMINAL ACTION
                                    )
LISA EISENHART                      )        NO. 1:21-CR-00118-02 (RCL)
_____)

## DEFENDANT'S SENTENCING MEMORANDUM

NOW COMES Defendant LISA EISENHART, by and through her appointed counsel, and files this Memorandum to assist this Court in its sentencing evaluation.

### PROCEDURAL BACKGROUND

Lisa Eisenhart, a registered nurse for more than 30 years, engaged in the activities at the U.S. Capitol on January 6, 2021, which gave rise to the criminal charges against her in this case. After learning her son Eric Munchel, and later herself, were the subject of such an investigation, Ms. Eisenhart first participated in an FBI interview, and then kept in touch with the FBI. After a Criminal Complaint was filed, Ms. Eisenhart immediately turned herself in voluntarily, and was taken into custody on January 16, 2021, just 10 days after entering the Capitol. She thereafter was held in pretrial detention until March 29, 2021, when she was released on very strict bail conditions. Since then, for almost 2½ years, she has complied fully with all conditions of bond.

On October 7, 2022, the Government filed the final version of its indictment in this case – a Second Superseding Indictment. Ms. Eisenhart was charged therein with:

> Conspiracy to Commit Obstruction, in violation of 18 U.S.C. § 1512(k), a Class C felony (Count One);
>
> Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) & 2, a Class C felony (Count Two);

1

> Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1), a Class A misdemeanor (Count Four);
>
> Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2), a Class A misdemeanor (Count Six);
>
> Entering and Remaining in the Gallery of Congress, in violation of 18 U.S.C. § 5104(e)(2)(B), a Class B misdemeanor (Count Eight);
>
> Disorderly Conduct in a Capitol Building, in violation of 18 U.S.C. § 5014(e)(2)(D), a Class B misdemeanor (Count Nine); and
>
> Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), a Class B misdemeanor (Count Ten).

*See* ECF No. 140.

After obtaining leave from this Court to retain a Georgia nursing lawyer to advise her on the potential collateral consequences she might face as a result of any conviction in this case, Ms. Eisenhart ultimately agreed to waive a jury and resolve her case via a Stipulated Trial, based on a Joint Statement the parties agreed upon, including a lengthy statement of facts.  On April 18, 2023, at that Stipulated Trial, this Court found Ms. Eisenhart (and Eric Munchel) guilty of all charged counts.  It then scheduled this case for a sentencing hearing on September 8, 2023.

## ARGUMENT AND CITATION OF AUTHORITIES

When federal courts are tasked with imposing a criminal sentence, Congress has provided a list of statutory factors they should consider.  Those statutory factors include:

> (a) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (b) the kinds of sentences available;
>
> (c) the Sentencing Guideline range;
>
> (d) the need to avoid unwarranted sentencing disparities;

    (e)  the need for restitution; and

    (f)  the need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from future crimes, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.

18 U.S.C. § 3553(a).  In evaluating these various statutory factors and exercising its discretion, this Court must also recognize the overarching rationale of § 3553(a), for its ultimate directive is that federal courts must "impose a sentence *sufficient, but not greater than necessary* to comply with the purposes" of federal sentencing.  18 U.S.C. § 3553(a) (emphasis added).

### A.  Nature and Circumstances of the Offense and Characteristics of the Defendant

The nature and circumstances of Ms. Eisenhart's offense have previously been considered by this Court, and also were videotaped by the Defendants themselves.  Most actual facts are not in dispute.  Ms. Eisenhart was not a member of any suspect group, did not do any advance planning, nor did she use force to enter the Capitol on January 6.  The charges in this case did lead to her spending months in pretrial incarceration, however, and she now will have a felony conviction for the first time in her life, with that conviction almost certain to jeopardize her 30-year nursing certification and livelihood, once this case becomes final.  Also, more incarceration also may be imposed at sentencing – the key question now is, how much more?

When considering that issue, as noted, Congress via § 3553(a) has instructed this Court to look not only at this offense committed on a single day, but also at the many other days of Ms. Eisenhart's 59-year old life – by also examining the characteristics of the Defendant.  Those characteristics here call for mitigation and a far less severe sentence than the Government seeks.

It is more than a cliché that each of us is more than the worst thing we have ever done.  This Sentencing Memorandum cannot give you 59 years of Ms. Eisenhart's life.  But it will try

to summarize her general background and provide the experiences from many who know her well,[1] and hopefully, provide a broader window into her general character.

As the Presentence Report reveals, Ms. Eisenhart has not had an easy life.  She was born and grew up in East Chicago, Indiana.  Her parents divorced when she was just 3, and she was mostly raised by her mother.  Her biological father had abused alcohol and drugs, and also was sexually inappropriate towards young Lisa Eisenhart; their sporadic interactions ended during her teen years.  A stepfather later adopted her, but he and Ms. Eisenhart's mother also separated and divorced when Ms. Eisenhart was 15 years old.  PSR ¶ 104-06.

Ms. Eisenhart moved away to the Florida Gulf Coast, and later to Georgia.  PSR ¶ 115.  Unfortunately, the father of her children was physically abusive to her and the young boys.  The abuse was so severe that it included breaking her son Alex's collarbone at one point, and Ms. Eisenhart eventually fled with the children to a women's shelter to escape.  PSR ¶ 112.  By 1992, the father was apparently convicted in Catoosa County and sentenced to jail time for this abuse.

While in this battered women's shelter in Dalton, Georgia, Ms. Eisenhart received care and support, including from a church that ultimately provided grants to her so that she could attend Dalton College and obtain a nursing degree.  She enrolled as a young mother, worked hard and persevered, completing her degree in 1994.  PSR ¶ 127.  Since then she has worked as a registered nurse and often a traveling nurse.  As the Presentence Report confirms, the only crowdfunding effort established on Ms. Eisenhart's behalf (not by her, but by her mother) involved an effort to try to raise money to try to pay for an attorney to assist with her upcoming nursing licensure risks – no funds were ever sought to fund this criminal case.  *See* PSR ¶ 119.

---

[1] All personal identifiers, including email addresses used, are being redacted from the public filing of these exhibits in order to protect Ms. Eisenhart's character witnesses from potential harassment, because of previous incidents experienced by the Defendants and their family during this litigation.  Undersigned counsel will, however, be happy to provide all such identifiers and/or unredacted versions of these exhibits to the Court or prosecutors upon request.

Since this case began, Ms. Eisenhart has received various expressions of support.  Ms. Eisenhart's aunt, Nancy Kirk, who is actually quite close in age to Lisa, notes how "[a]s kids we were more like siblings."  Ms. Kirk confirms how Ms. Eisenhart's "parents divorced when she was very young," and "[s]he and her brother spent a lot of time at my house."  Having known Ms. Eisenhart for decades, Ms. Kirk notes how "[l]ife has given her some challenges, and she always overcame any obstacles thrown her way.  She raised her two sons on her own, while putting herself through nursing school.  She is always the first one to pitch in when anyone needs help.  Her family means everything to her."  Ms. Kirk asks the Court to "[p]lease take into consideration the life Lisa has lived and her history when you decide her fate."  **Exhibit A.**

Ms. Eisenhart's other son Alex – who was not involved in any January 6 activities – notes how his mother mostly raised him as a single parent: "Not once did she ever let that stop her from working full time, supporting my brother and I in our education, being here for us at all of our Boy Scout camping trips and events."  He notes how "I took it for granted knowing my mother would be there, no questions asked to help fix and resolve any problem I encountered in life," and that he now sees how "she was shaping a life for me that would set me up to be a hardworking and dedicated American who never questioned the love of a parent."  **Exhibit B.**

Ms. Eisenhart's younger brother, Scott Gavelek, who has known her for 58 years, describes her as "one of he most honest, hardworking people I know":

> When Lisa was in her 20's she found herself a single mother in a homeless shelter with 2 children.  She did whatever it took to put herself through nursing school.  She succeeded and has always been able to support her family and help others as well.  In fact, when I was in a similar situation with my daughters years ago, Lisa stepped in in a big way to help us out.  She sacrificed a lot of time, money, and energy to support me and my daughters.  And she still does.

Mr. Gavelek calls his sister "one of the good people in the world.  She has been a nurse for over 30 years and she has a very giving, motherly heart."  He asks "that she be given the same compassion that she's given to so many over the years."  **Exhibit C.**

Brittany Webber, Ms. Eisenhart's niece, notes how "[m]y Aunt Lisa always played the rol[e] of a mother to me.  My entire 32 years of existing she has nurtured me and treated me as her own daughter…. [She] has always been there for me emotionally, physically and financially."  She notes how "her loving guidance … has shaped me into the person and mother I am today."  Ms. Webber concludes by noting that "[m]y Aunt Lisa is a passionate human being who is not perfect but is true to herself and others," and "I am so very blessed to have her in my life."  **Exhibit D.**

Co-workers also attest to Ms. Eisenhart's passionate work as a nurse.  Bernadette Pearson says she worked with Ms. Eisenhart for 9 years at Atlanta's Piedmont Hospital, and she describes Ms. Eisenhart as "an excellent coworker.  [S]he is caring, loving and respectful.  She is a wonderful nurse that has always shown compassion to her patients and to her coworkers."  Ms. Pearson recognizes that Ms. Eisenhart has made mistakes that will require punishment, but says, "I am asking that the courts be lenient towards Lisa."  **Exhibit E.**

Felicia Walker, who was also a co-worker with Ms. Eisenhart for the past 8 years, acknowledges she was "troubled and very surprised" to learn about Ms. Eisenhart's January 6 activities, since "she has always been a solid person and an outstanding citizen."  She says she "understand[s] the seriousness of this matter," but given what she knows of Ms. Eisenhart, she also "pray[s] that the court show some leniency toward Lisa Eisenhart."  She describes in particular a very personal interaction she had with Ms. Eisenhart after Ms. Walker's youngest son, a Marine, took his life while Ms. Walker was on the phone with him.  "I immediately called

Lisa and without hesitation she was there to support me[,] my grandchildren, and family through this horrible time.  I would not have made it without her support."  In this larger context, she says "Lisa Eisenhart is a great person inside and out.  She would feed, dress and nurture anyone that is in need.  Lisa Eisenhart has been truly a great mentor, [] friend, acting grandmother and auntie to my grandchildren and children."  **Exhibit F.**

Dejianna Brantley, Felicia Walker's daughter and the mother of three of Ms. Walker's aforementioned grandkids, says "Ms. Lisa is the most kind hearted, sweetest person that I have ever had the pleasure to meet.  She has been around me and my children for many years now and I have never seen her Not once loose her temper [sic].  My children love and adore her.  Since she has been in there lives she has treated them better than there own family" [sic].  Ms. Brantley asks "with everything that I have that you be lenient with her sentencing."  **Exhibit G.**

Zenobia Arnold, the other grandmother of three of Felicia Walker's grandkids, also describes Ms. Eisenhart as "my children's bonus grandmother."  "Since the day Ms Eisenhart entered our life[] she has been nothing but an amazing, caring and loving woman and grandmother to me and her grandchildren."  **Exhibit H.**[2]

Josh Johnson, Eric Munchel's best friend, says "Lisa is like a second mother to me.  For as long as I have known her she has always put others first."  He calls her "one of the strongest women I have ever known," and says "God bless America and thank God for Lisa Eisenhart."  **Exhibit I.**

Yvette Johnson, Josh's mother, has also sent a lengthy letter, imploring to your Honor to see Ms. Eisenhart as more than just another news story or court case:  "I love Lisa because Lisa loves my son.  When my son was at his worst, Lisa gave him her best.  Her relationship to him is

---

[2] By way of clarification, three of Ms. Walker's grandchildren are noted here, but after Ms. Walker's son committed suicide, Ms. Walker also helped raise his two kids (her two other grandchildren).  Ms. Eisenhart often helped.  This is why (in **Exhibit A**) Ms. Kirk says of Ms. Eisenhart, "I would never be able to handle 5 small children at a time!"

that of a second mom and for almost 8 years she has loved him as her own.  She has served him well and for that I am eternally grateful."  She also explains how "[m]y love for Lisa deepened when late last year my husband became deathly sick but refused to go to the hospital":

> When our family was at our wit's end, we reached out to Lisa.  We knew she was the only one he would listen to.  She came to our home between nursing appointments, examined him and firmly convinced him that he needed to go to the emergency room.  She volunteered to go with us to the hospital even though she already had a full day scheduled.  She insisted on staying with us until she was certain we were taken care of.  She was our medical advocate and personal support person in a very challenging time.  I am forever grateful to Lisa for her willingness to, without hesitation, make us a priority in our time of crisis.

After describing another incident after her husband passed away, when Ms. Eisenhart volunteered her truck and "rolled up her sleeves" to help remove household clutter, Ms. Johnson says these "are just two very personal examples from recent months that show the charitable spirit of a woman who despite deep troubles of her own, still chose to help along the way."  She says, "I don't dare presume to know what her future will look like," but notes Ms. Eisenhart "is looking forward to the birth of her first grandchild" and at this point, "desires nothing more than to work hard and live a decent life before God and man."  She expresses her "hope and genuine prayer that mercy and grace be extended," and "for the sake of all who love and need her I am humbly asking that Lisa be given the lowest sentence possible."  **Exhibit J.**

Ms. Eisenhart has zero history points, and she has already tasted the sting and humiliation of incarceration in this case.  Before her release on bond, she endured unusually strict conditions of pretrial confinement that essentially equated to many weeks spent in *solitary confinement*, as previous filings in this case revealed.  *See* ECF #40, 45, 47, 48 & 50.  Since then, she has also now completed more than 2½ years of pretrial supervision, under conditions that are also stricter

than what most defendants – including even January 6 defendants – have faced.[3]  In sum, during her more than 5 decades before January 6, 2021, and from the time she voluntarily contacted the FBI and turned herself in, just weeks after January 6, 2021, she has been law-abiding, respectful and compliant.  That is her larger character which deserves substantial consideration under the law, and which must now be weighed against her activities on this single day, when evaluating what additional amount of incarceration is actually "necessary" under 18 U.S.C. § 3553(a).

### B.  The Kinds of Sentences Available

Ms. Eisenhart's offense of conviction has no minimum sentence required.  Counts One and Two are Class C felonies (up to 20 years of incarceration), Counts Four and Six are Class A misdemeanors (up to one year) and Counts Eight-Ten are Class B misdemeanors (up to 6 months).  Probation is clearly an available statutory option, but on Counts 1, 2, 4 & 6 would not be available under the advisory Sentencing Guidelines absent a departure or variance.

### C.  The Sentencing Guidelines Range

According to the Final Presentence Report, Ms. Eisenhart's Sentencing Guideline range is 15-21 months on Counts 1 & 2, and 12 months on Counts 4 & 6, PSR ¶ 149, based on a calculated Total Offense Level of 14 and a Criminal History Category of I.  This Total Offense Level was derived in relevant part as follows:

---

[3] For example, the conditions imposed on Ms. Eisenhart basically barred any internet usage.  Few, if any, other January 6 defendants have faced such restrictions.  To be fair, Ms. Eisenhart did agree to those terms on March 29, 2021, after the Government presented them to her as a condition of withdrawal of its earlier motion for detention.  But she also never sought to modify them, even after a disparity developed between herself and other January 6 defendants – revealing years of willingness to fully comply and follow any and all specified conditions of her bond.

| | |
|---|---|
| **Base Offense Level under U.S.S.G. § 2J1.2(a):** | **14** |
| **+3 increase under U.S.S.G. § 2J1.2(b)(2)**<br>**(for "substantial interference with the administration of justice")** | **+3** |
| **Acceptance of Responsibility (combined)** | **-3** |
| | **14** |

Ms. Eisenhart objects to the +3 adjustment for reasons stated in *United States v. Seefried*, 2022 U.S. Dist. LEXIS 196980 (D.D.C. Oct. 29, 2022), *i.e.,* that obstruction of an "official proceeding" in Congress does not prove an interference of "justice."  But we also understand that *Seefried* is a minority view, with most judges in this District (including your Honor) rejecting it.

The Government, meanwhile, has asked for an eight-level Offense Level increase, pursuant to U.S.S.G. § 2J1.2(b)(1)(B)'s call for this very significant increase if "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."

As an initial matter, "the government bears the burden of proof in seeking sentencing enhancements under the Guidelines."  *United States v. Kaleta*, 552 F.3d 861, 866 (D.C. Cir. 2009).  And where the upward adjustment is as dramatic as the one at issue here (which would almost triple Ms. Eisenhart's sentencing range), we also submit (as some courts have held) a higher standard of proof than preponderance should properly be required.  *E.g., United Staes v. Hymas*, 780 F.3d 1285, 1289 (9th Cir. 2015) (while preponderance standard generally applies to the Sentencing Guidelines, "[t]he higher clear and convincing standard may apply … 'when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction.'") (clear-and-convincing standard applicable to +8 adjustment) (citations omitted).

In any event, under any applicable standard of proof, the Government has not satisfied its burden here.  As previously noted, U.S.S.G. § 2J1.2(b)(1)(B) applies **only** if:

> "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."

The Government's PSR Objections have identified "four grounds" that it claims justify the application of this sentencing enhancement.  None of those hold up to careful scrutiny, however, as the U.S. Probation Office's Final Presentence Report concluded.

Let us start with U.S.S.G. § 2J1.2(b)(1)(B) itself.  Looking at the language above, did these Defendants "cause" any "physical injury to a person, or property damage"?  The answer is plainly "no."  As PSR ¶ 65 makes clear, "While inside the US Capitol, neither Eric Munchel nor Lisa Eisenhart vandalized any property, aside from taking the zip ties, nor physically harmed another person."  Indeed, the Government did not even note any objection to PSR ¶ 65.

So the only question is whether Ms. Eisenhart "threaten[ed]" to "cause physical injury to a person or property damage."  And the Government fails to meet its burden of proof there.

The Government's "first" example claims Ms. Eisenhart "made statements and engaged in conduct that both explicitly and implicitly threatened <u>Members of Congress</u>."  But Ms. Eisenhart encountered no Members of Congress that day.  And nowhere does the Government prove that this Guideline includes so-called "implicit" threats (whatever those might be).  If "threats" are to be treated as harshly as actually "causing" physical injury, as this Guideline says, surely any such threat must properly be a very real one – not something merely "implicit."

Merely wearing tactical gear (which can be worn for defensive *or* offensive reasons) is not by itself "threatening … physical injury to a person."  Such attire is not illegal, and Ms.

Eisenhart in fact also wore this same "tactical gear" the night before, when she went out in a city where she harbored safety concerns.  Wearing such attire does not satisfy § 2J1.2(b)(1)(B).

The Government next claims Ms. Eisenhart "repeatedly expressed an eagerness for violence and a willingness to inflict it."  But even if assumed true, such general statements do not constitute "threats" to actually "cause physical injury to a person."  Mere "eagerness" and "willingness" are entirely anticipatory – not culpable actions.  The Government says Ms. Eisenhart "yelled encouragement to other rioters" and shouted "Treason!"  But in any riot, a person merely encouraging others or using even strong language (which may even include mere bystanders) would never fairly be charged with "threats" to "physically harm" another person.  Ms. Eisenhart was no bystander, but no "person" she allegedly threatened is *ever even identified*.

Next, the Government notes that Ms. Eisenhart picked up one zip tie.  The Government claims the "logical inference" is that Munchel and Eisenhart wanted to use the zip tie handcuffs to capture their enemies," described generally as "the members of Congress voting to certify the election."  But the Government's problem here is:  they *never threatened to do that.*  These Defendants never caused physical injury to anyone, and did not say anything they would do with the zip ties.  They did not encounter or speak to any "members of Congress."  The Government's entire argument here is built on inferences and assumptions, which is not enough to meet their burden, and insufficient to satisfy § 2J1.2(b)(1)(B)'s actual "injury" or "threat" parameters.

In a very similar January 6 case, which is highlighted in greater detail below, Larry Brock – the helmeted man on the Senate floor essentially directing various rioters there – was similarly found to have picked up zip ties inside the U.S. Capitol that he carried and displayed.  The Government similarly sought this same +8 enhancement in Brock's case, based in part on his

brandishing of zip ties, but Judge Bates *held it did not apply*. *See United States v. Larry Brock*, Case No. 1:21-cr-140 (D.D.C.).  This Court should reach the same conclusion in the instant case.

The Government's "second" claim here is that Munchel and Eisenhart threatened "another group of people: the police officers."  This claim is even thinner – all the Government can really claim here is that "Eisenhart – wearing a tactical vest – repeatedly yelled support to rioters battling police in hand-to-hand-combat," and that "[i]n doing so, Eisenhart threatened the police."  The same could be said in many riots about many mere bystanders.  Have all who express encouragement to rioters committed an offense of actually "threatening to cause physical injury to a person"?  Of course not.  Mere expressions of support fall far short of actually making "threats" oneself.  Moreover, this very claim also conflicts with the Government's concession of what Munchel expressly stated shortly after the events of January 6 – "The intentions of going in were not to fight the police."  PSR ¶ 66.  Indeed, even before leaving the U.S. Capitol building, Munchel had told the surrounding police officers, "Sorry, guys, still love you."  PSR ¶ 64.

Third, the Government claims Munchel and Eisenhart can be held liable under U.S.S.G. § 2J1.2(b)(1)(B) because of § 1B1.3(a)(1)(A)'s reference to "aiding, abetting, counseling, commanding and inducing other rioters."  The Government's only referenced suggestions of Ms. Eisenhart's conduct here, however, again involved generalized encouragements for others to resist advances by police – again, much like many mere riot bystanders might offer.  That falls short of the parameters of U.S.S.G. § 1B1.3(a)(1)(A), which basically refer more to control or active advancement of a principal's activities – not mere words of support in the midst of such activities.  Nor does the Government identify any act of actual physical violence against any particular person, or even the alleged principal here.  In short, the Government's claims here fall

short of what U.S.S.G. § 2J1.2(b)(1)(B) and § 1B1.3(a)(1)(A) require for this massive +8 sentencing enhancement to be applied.

Finally, the Government similarly claims U.S.S.G. § 2J1.2(b)(1)(B) can apply because of § 1B1.3(a)(1)(B)'s reference to jointly undertaken activities.  While it is true that Ms. Eisenhart was convicted of a conspiracy charge, her only named conspirator, Eric Munchel, has not been hit with this +8 enhancement under U.S.S.G. § 2J1.2(b)(1)(B) either.  And the charges on which each was convicted mention nothing at all about either "bodily injury" or "threats."

In sum, Ms. Eisenhart submits that the Final Presentence Report's calculation of a Total Offense Level of 14, a Criminal History of I, and a Guidelines Range of 15-21 months, represents the proper Sentencing Guidelines calculation unless this Court reconsiders *Seefried*.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

Under this factor, this Court must evaluate if the sentence imposed on Ms. Eisenhart would unduly diverge from sentences given to others similarly situated.  And in this setting, there is a similarly situated criminal defendant that already exists, and was already sentenced.  Indeed, it is difficult to fathom a more similarly situated January 6 defendant than Larry Brock.

The parallels between Brock and these Defendants are striking.  And where differences do exist, they plainly reveal that, if anything, Larry Brock's actions were considerably *more* aggravating, and that he was deserving of a *more serious sentence* than Ms. Eisenhart here:

| Lisa Eisenhart | Larry Brock |
|---|---|
| Served as registered nurse for about 30 years | Served in U.S. military for about 30 years |
| No previous allegations of violence or racism | Had received 6 months deferred prosecution for an admission of disorderly conduct (2015); also terminated from his employment (2018) after warnings about violent and racist rhetoric |
| Did not engage in any planning before Jan. 6 | Engaged in *substantial* planning before Jan. 6 |
| Wore tactical gear | Wore tactical gear *and a helmet*; purchased both *for express purpose of attending Jan. 6.* |
| Entered the U.S. Capitol only after many inside | *Among the first to enter* the U.S. Capitol (via |

|  | Senate Wing Doors 12 minutes after breach) |
|---|---|
| Did not cause physical injury/property damage | Did not cause physical injury/property damage |
| Picked up and carried one zip tie | Picked up and carried *multiple* zip ties |
| Entered the Senate Gallery | Entered the Senate Gallery *and Senate Floor*, rifled through paperwork on a Senator's desk |
| Shouted "TREASON!" when alone in hallways but did not purport to lead any other rioters | Shouted "THIS IS OUR HOUSE!" while on Senate Floor and had a "command presence" |
| Co-defendant Munchel warned others "don't vandalize anything" because "we ain't no GD Antifa," and "you break shit, I break you" | Warned other rioters against fighting police, apparently because "This is an IO [information operations] War" and "We can't lose" |
| Left on own voluntarily after confiding that the U.S. Capitol felt like "not a place for us" | Ignored MPD officer's initial attempts to direct him out of U.S. Capitol before later leaving |
| Said in later interview that if the right to speak freely is lost, "I would rather die and rather fight" than live under oppression | Said in later interview that he saw no violence at all on Jan. 6, and assumed he was welcome to go into the U.S. Capitol building on Jan. 6 |
| Charged with Obstruction and Misdemeanors | Charged with *Obstruction and Misdemeanors* |
| Agreed to a Joint Statement and Stipulated Trial; found guilty of Obstruction + misdems | Insisted on *a contested bench trial (lasted 3 days)*; found guilty of Obstruction + misdems |
| Government is recommending 41 months | Government recommended 60 months |
| Sentence will be ??? | Sentenced to 24 months of incarceration |

*See United States v. Brock*, Case No. 1:21-cr-140, ECF # 88 (Gov't Sentencing Memorandum).

As noted in the summary above, unlike Ms. Eisenhart, who made a last-minute decision to come to Washington, D.C. to participate in these events, Brock engaged in *substantial* pre-January 6 planning activities.  Among those the Government's Sentencing Memorandum cited:

- On November 7, 2020, when Biden's victory was called by mainstream media, Brock posted on Facebook: "A revolution every now and then is a good thing."

- On November 8, 2020, Brock posted on Facebook:  "If the President calls, I will answer.  #OathKeeper."

- On November 9, 2020, Brock posted on Facebook: "When we get to the bottom of this conspiracy we need to executed the traitors that are trying to steal the election."

- On December 5, 2020, Brock posted on Facebook: "If SCOTUS doesn't act we have two choices.  We can either live in a Communist Country or we can rebel"

- On December 6, 2020, Brock posted on Facebook: "Going to get a lot scarier if SCOTUS doesn't act.  No way in hell we should accept this rigged election. We need to restore the Constitution and the best and shortest way is to go offensive on the Communists that stole it, aka the Democratic party.

- On December 7, 2020, Brock messaged another Facebook user, stating "I think SCOTUS needs to see if they don't act that there will be blood."

- On December 11, 2020, Brock posted on Facebook: "It appears as if SCOTUS is going to duck.  If so then it will be game on soon.  We need ROE [rules of engagement], a clear chain of Command ending with President Trump and a master target list."

- On December 18, 2020, Brock engaged in an online conversation in which he said he was "ready to go at it," although he was confronted by another who warned of an "IO [information operations] loss if a cop got hurt."

- On December 24, 2020, Brock posted on Facebook that "I bought myself body armor and a helmet for the civil war that is coming."  He also sent, on this Christmas Eve, a memorandum with a "Plan of Action" for use if the "US Military isn't involved."  *See* Brock, ECF #88, at 7.  The listed "Main Tasks" included, among other particulars:

  1. "Seize all democratic politicians and Biden key staff and select Republicans (Thune and McConnell).  Begin interrogations using measures we used on Al Queda to gain evidence on the coup"….

  4. "Present slate for clean elections to existing congress and make sure they sign"

  5. "Let the Democratic cities burn.  Cut off power and food to all who oppose us."

  6. "Establish provisional government in rebellious states and representatives we can count on."….

8. "General pardon for all crimes up to and including murder of those restoring the Constitution and putting down the Democratic Insurrection."

The suggested ROE [rules of engagement] also included "Do not kill LEO [law enforcement officers] unless necessary.  Gas would assist in this if we can get it."  A message later that day also specifically predicted "occupation of the capital."

- On December 27, 2020, Brock messaged "I prefer outright insurrection at this point."

- On January 1, 2021, Brock wrote on Facebook:  "Help is on the way.  6 Jan 2021. #MAGA #StormtheCastle."

- On January 3, 2021, Brock wrote on Facebook: "Biden won't be inaugurated. We will ensure that on the 6th."

- And on January 5, 2021, Brock wrote on Facebook: "Our second American revolution begins in less than 2 days."

Moreover, as noted, on January 6, Brock not only picked up zip ties and went into the Senate upstairs gallery, but he also then went onto the Senate floor.  Photographs actually show him first in the same hall behind the Senate floor where Vice President Pence was evacuated just 21 minutes before.  *Brock,* ECF #88 at 18.  Brock then tried to unlock that back door with a set of keys, albeit unsuccessfully.  He then walked around to the front entry to the Senate floor, and after entering and rifling through Senator papers, he stood in full tactical gear and a helmet, and was said to exhibit a "commanding presence" other January 6 rioters deferred to.  *Id.* at 19.

With all due respect, there is simply no way in a rational world that Ms. Eisenhart can fairly be sentenced to more time in prison than Larry Brock.  Yes, Brock's sentencing referenced his 30-year record of military service, but Ms. Eisenhart also has a 30-year record of serving in the trenches, providing vital and needed medical services.  Yes, Brock complained his conviction would cause him to lose his pilot's license, but Ms. Eisenhart also now faces similar collateral

consequences with her nursing license.  At least for Brock, his military pension remains.  Ms.
Eisenhart has none of that.  Brock's upbringing and life does not appear more challenging than
hers, and she still struggles financially (and unlike Brock, required appointed counsel here).

Frankly, if anything, more should have been expected of a trained military officer like
Larry Brock – and he is *less* deserving of mercy after using that training for these purposes.  And
in any event, looking at all of these comparisons, *one cannot possibly say in fairness* that Brock
was not deserving of *more* incarceration than Ms. Eisenhart.  Even the Government's own
recommended sentence for Brock was basically about 50% higher (60 months) than its current
recommendation for Ms. Eisenhart (41 months).  Ms. Eisenhart also waived a contested trial, and
also submits a statement herewith, whereas at least as of the Government's filing in *Brock*, it
noted how he "has yet to express remorse for his actions," *Brock* ECF #88, at 27, after insisting
on a contested trial despite all the evidence above.  Larry Brock's 24-month sentence, which was
at the bottom of his final 24-30 month sentencing range that had given him no benefit for
acceptance of responsibility, reveals plainly that Ms. Eisenhart's 15-21 month sentencing range
here is wholly reasonable, and that a sentence within that range would be entirely proportionate.

Another comparable defendant of note is Connie Meggs, sentenced just this week.  Ms.
Meggs was accused of being a part of the conspiracy involving an organized group, the Oath
Keepers, that her husband helped lead.  Ms. Meggs was accused of driving firearms cases from
Florida to a hotel just outside of D.C. for the group.  On January 6, she donned both a tactical
vest and ballistic helmet, and she joined the key "stack" of Oath Keepers climbing the steps of
the Capitol, also going inside herself.  Ms. Meggs then insisted on a jury trial and testified,
giving numerous statements the Government characterized as false.  She nevertheless was given
a prison sentence of 15 months, despite Government suggestions that she might even be eligible

for the Sentencing Guidelines' terrorism enhancement. *United States v. Meggs,* No. 1:21-cr-28-9
(AJT). Again, giving Ms. Eisenhart a similar sentence would be reasonable and proportionate.

### E.  The Need for Restitution

The Probation Office and U.S. Attorney's Office have both recommended a restitution
payment of $2000. Although there is no plea agreement here, given that this amount has been
imposed in other comparable cases involving trials (including Larry Brock's), Ms. Eisenhart
does not contest that this $2000 amount is a reasonable restitution figure to impose.

### F.  Other Factors Listed

Finally, under 18 U.S.C. § 3553(a)(2), this Court must consider the need for the sentence
imposed to reflect the seriousness of the offense, to promote respect for the law and to provide
just punishment for the offense; to afford adequate deterrence; to protect the public from future
crimes; and to provide the defendant with needed educational or vocational training, medical
care, or other correctional treatment.

The Government's Sentencing Memorandum, as in most of these cases, will likely focus
almost exclusively on the need for deterrence – both general deterrence and specific deterrence.
But with respect to general deterrence, the type of sentence Ms. Eisenhart is suggesting here will
adequately provide that. No third party looking at this case would ever sanely want to similarly
endure months in solitary confinement at the D.C. Jail, or the loss of internet access for 2½ years.
Moreover, the reality of this case is that it has been conceded here that Ms. Eisenhart and Eric
Munchel were inside the U.S. Capitol on January 6 for a total of just 12 minutes. Sentencing
each of them to literally *a month of prison* for *every minute spent inside* seems ample to send
anyone else who might be looking at this case an adequate general message of deterrence.

With respect to specific deterrence, Ms. Eisenhart's own statement, submitted herewith, also explains why any need for specific deterrence is muted.  Ms. Eisenhart logically explains, in that statement, why this Court should not harbor concerns she is inherently violent, and why it also can rest assured that she will never, ever do anything like January 6 again.  **Exhibit K.**

Moreover, it is important to note that, in § 3553(a)(2) itself, these deterrent goals the Government emphasizes must also be balanced with considerations of "just punishment."  And the Government's views of "just punishment" in January 6 cases have often deviated frequently and even dramatically from the imposed sanctions imposed by judges of this District as "just."

The *Washington Post* published an article earlier this year, on the two-year anniversary of January 6, 2021, summarizing the 357 sentences imposed in related criminal cases thus far.  *See* Washington Post, January 6, 2023, https://www.washingtonpost.com/dc-md-va/2023/01/06/jan6-capitol-riot-sentencings/.  As the article notes, the various judges of this District "have gone below federal prosecutors' sentencing recommendations in more than three-quarters of the cases so far."  *Id.* p.2.

The Probation Office, just as often as the U.S. Attorney's Office, has been involved in all of these various January 6 cases, and it has dutifully considered and carefully calculated the applicable Sentencing Guidelines and other factors her in that context, taking into account what has been found in the hundreds of other January 6 cases it has similarly evaluated.  As noted, Probation suggests a 15-21 month range here, and it also further notes that, when actual sentences imposed for persons in this range are examined, the Judicial Sentencing Information database also shows that only 73% of the non-cooperating Obstruction (U.S.S.G. § 2J1.2) defendants with a Final Offense Level of 14 and Criminal History Category of I actually

received prison sentences, and that of those, the average and median length of those sentences were both below this 15-21 month guideline range – just 12 months.  PSR ¶ 186.

Ms. Eisenhart's actions on January 6, 2021 do not require a sentence longer than that, and neither does her personal background.  As noted, this case is somewhat unique in that setting. Ms. Eisenhart has already endured *far harsher conditions of confinement* (during her months of pretrial detention) plus *far stricter conditions of release* (for 2½ years) than almost any other January 6 defendant out there.  Accordingly, Ms. Eisenhart at most should be given a sentence at the low end of her 15-21 month Guideline range, if not the average/median 12 month sentence noted above.  Ms. Eisenhart has already tasted the depths of prison, and she has also incurred (and will continue to incur) significant financial penalties from this case, including collateral consequences that literally may end her 30-year nursing career, rendering longer incarceration unnecessary.  The defense thus recommends that this Court should impose a sentence of no more than 12-15 months of incarceration, $2000 in restitution, supervised release of 3 years (or less)[4] as this Court believes is necessary, and special assessments as required on each count.

This 31st day of August, 2023.　　　　Respectfully submitted,

　/s/  Gregory S. Smith_____
Gregory S. Smith
D.C. Bar No. 472802
913 East Capitol Street, S.E.
Washington, D.C. 20003
(202) 460-3381
*Counsel for Defendant Lisa Eisenhart*

---

[4] Given that Ms. Eisenhart has spent more than 2½ years under the supervision of U.S. Pretrial Services, with unusually strict conditions, and without incident, a shorter term of supervised release may well be warranted.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of August, 2023, a true and correct copy of the above

and foregoing is being forwarded to all counsel of record in this case automatically via PACER,

which is this Court's Electronic Case Filing (ECF) system.

 /s/  Gregory S. Smith_____
Gregory S. Smith
